1              IN THE UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF TEXAS

3                     HOUSTON DIVISION

4    UNITED STATES OF AMERICA        §    CASE NOS. 4:24-CR-0404-1
                                      §              4:24-CR-0404-2
5    VERSUS                           §              4:24-CR-0404-3
                                      §              4:24-CR-0404-10
6    ALFRED JACOBY GREEN (1)          §    HOUSTON, TEXAS
     KELVIN GEORADE JACKSON (2)       §    WEDNESDAY,
7    DEANDRE MARQUEL FIZER (3)        §    SEPTEMBER 11, 2024
     DENZEL CURTIS DWAYNE PINK (10)   §    9:02 A.M. TO 1:13 P.M.

8

9              **PRELIMINARY AND DETENTION HEARINGS**

10       BEFORE THE HONORABLE JUDGE RICHARD BENNETT
              UNITED STATES MAGISTRATE JUDGE

11

12           APPEARANCES:         SEE NEXT PAGE
             COURT RECORDER:      BRITTANY NICKLAUS
13           CASE MANAGER:        SHANNON JONES

14

15   **THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE**
     **UNDER THE CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS**
16   **AUTHORIZED BY COURT ORDER.  UNAUTHORIZED REPRODUCTION WILL**
     **RESULT IN AN ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN**
17   **ORIGINAL AND ONE COPY AT THE OFFICIAL RATE.  General Order**
     **94-15, United States Court, Southern District of Texas.**

18

19

20              TRANSCRIPTION SERVICE BY:

21         JUDICIAL TRANSCRIBERS OF TEXAS, LLC
              935 Eldridge Road, #144
22              Sugar Land, TX 77478
                  281-277-5325
23            www.judicialtranscribers.com

24

25     Proceedings recorded by electronic sound recording;
         transcript produced by transcription service.

1                           **APPEARANCES**:

2


3    FOR THE UNITED STATES OF AMERICA:
                              George Meggali
4                             DOJ-Tax
                              150 M Street NE
5                             Washington, DC 20002
                              202-598-5969
6


7                             Amy L. Schwartz
                              DOJ-Criminal
8                             Criminal Division/OCGS
                              1301 New York Ave. NW
9                             Suite 750
                              Washington, DC 20001
10                            202-616-1489

11   FOR THE DEFENDANT
     KELVIN GEORADE JACKSON:
12                            Andrew J. Williams
                              Attorney at Law
13                            1521 Green Oak Place
                              Suite 140
14                            Kingwood, TX 77339
                              281-358-9111
15


16   FOR THE DEFENDANT
     ALFRED JACOBY GREEN:
17                            J. A. (Joe) Salinas, III
                              Attorney At Law
18                            P. O. Box 941442
                              Houston, TX 77094
19                            713-227-7700


20
     FOR THE DEFENDANT
21   DEANDRE MARQUEL FIZER:
                              Trent Gaither
22                            Law Office of Trent Gaither
                              6602 Westview Dr.
23                            Houston, TX 77055
                              713-865-5600
24


25

1                        **APPEARANCES**:   (Continued)

2

3   FOR THE DEFENDANT
    DENZEL CURTIS DWAYNE PINK:
4                                       Brett Podolsky
                                        Attorney at Law
5                                       917 Franklin Street
                                        Suite 510
6                                       Houston, TX 77002
                                        713-227-0087
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

## **INDEX**

2

3

WITNESS:              Direct        Cross      Redirect      Recross

4   SHANE KRANTZ:
    By Mr. Meggali:    15            .          75            .
5   By Mr. Salinas:    .             25         .             .
    By Mr. Podolsky:   .             27         .             80
6
    RYAN WARE:
7   By Ms. Schwartz:   82            .          112,125       .
    By Mr. Salinas:    .             103        .             .
8   By Mr. Gaither:    .             113        .             .

9   JORDAN MEISTER-WILE:
    By Ms. Schwartz:   127           .          154           .
10  By Mr. Gaither:    .             141        .             .

11

12  EXHIBITS:                       Marked      Offered      Received

    GOVERNMENT'S:
13
    Exhibit Number 1:               89          89           89,132
14  Exhibit Number 2A, B, C:        97          98           98
    Exhibit Number F1:              133         133          133
15  Exhibit Number F2:              133         133          134
    Exhibit Number F3:              138         140          140
16

17

18                                   ***

19

20

21

22

23

24

25

1    **HOUSTON, TEXAS; WEDNESDAY, SEPTEMBER 11, 2024; 9:02 A.M.**

2         THE BAILIFF:  All rise.

3         THE CLERK:  United States District Court for the

4    Southern District of Texas is now in session.  The Honorable

5    Judge Richard Bennett presiding.

6         God bless these United States and this Honorable

7    Court.

8         THE COURT:  Thank you.  Be seated.

9       (Pause in the proceedings.)

10        THE COURT:  Good morning.  This is United States

11   Magistrate Judge Richard Bennett here for the 9:00 a.m.

12   docket this morning for several detention hearings.

13        The Court is first going to call the United States

14   versus Kelvin Jackson, Case Number 4:24-cr-0404, Defendant

15   Number 2.

16        Will the parties announce their appearances,

17   please?

18        MS. SCHWARTZ:  Amy Schwartz for the Government,

19   Your Honor, good morning.

20        THE COURT:  Good morning.

21        MR. WILLIAMS:  Andrew Williams for Kelvin Jackson.

22        THE COURT:  Good morning, Mr. Williams.

23        And, sir, would you please state your name?

24        DEFENDANT JACKSON:  Kelvin Jackson.

25        THE COURT:  All right.  Sir, we are here for a

1  detention hearing, but I have in my hand here a waiver of

2  that detention hearing.  Do you understand that you do have

3  a right to a detention hearing, correct?

4              DEFENDANT JACKSON:  Yes.

5              THE COURT:  And I'm holding this waiver here.  Do

6  you recognize this document?

7              DEFENDANT JACKSON:  Yes.

8              THE COURT:  Did you discuss it with your attorney?

9              DEFENDANT JACKSON:  Yes.

10             THE COURT:  And did you sign this document?

11             DEFENDANT JACKSON:  Yes.

12             THE COURT:  Did he answer all of your questions?

13             DEFENDANT JACKSON:  Yeah.

14             THE COURT:  All right.  By signing this document,

15 then you are waiving your right to a detention hearing and

16 based upon your answers and this document, then I find that

17 you will remain in custody pending trial in this case, and

18 order you are remanded to the custody of the Marshals until

19 your trial.

20             Do you want to go ahead and do Arraignment?

21             MR. WILLIAMS:  Yes, we can do that.

22             THE COURT:  Okay.  Mr. Jackson, have you received

23 a copy of the Indictment pending against you?

24             DEFENDANT JACKSON:  Yes.

25             THE COURT:  And have you had a chance to discuss

1   that Indictment, along with the charges, the elements, and

2   the penalties with your attorney?

3           DEFENDANT JACKSON:  Yes, sir.

4           THE COURT:  Are you ready to enter a plea to the

5   charges pending against you?

6           DEFENDANT JACKSON:  Yes, sir.

7           THE COURT:  And does Counsel waive formal reading

8   of the Indictment?

9           MR. WILLIAMS:  Yes, we do, Judge.

10          THE COURT:  How do you plead, sir?

11          DEFENDANT JACKSON:  Not guilty.

12          THE COURT:  A plea of not guilty will be entered

13  on the record in this case.

14          Ms. Jones, do you have dates?

15          MS. JONES:  To do arraignment?

16          MR. WILLIAMS:  We might have.  I don't remember.

17  There is a scheduling order already.

18          THE COURT:  Okay.  So, you have a copy of the

19  scheduling order?

20          MR. WILLIAMS:  Yes.

21          THE COURT:  Okay.  All right.  So, that has been

22  entered in the record.

23          Is there anything else we need to take care of at

24  this time, Mr. Williams?

25          MR. WILLIAMS:  No, Your Honor.

1          THE COURT:  Government?

2          MS. SCHWARTZ:  Nothing at this time, Your Honor --

3          THE COURT:  All right.  Thank you.

4          MS. SCHWARTZ:  -- as to this defendant.

5          THE COURT:  Thank you.  You're excused.

6          MR. WILLIAMS:  Judge, there is one thing he did

7  want me to bring to your attention.  He is not getting his

8  proper blood pressure medicine over at the FDC.  His blood

9  pressure is bouncing up to 180 or 200 over 100.  So, he

10 wanted me to bring that to the Court's attention.

11         THE COURT:  All right.  Will the Marshals look

12 into that, please?

13         THE MARSHAL:  Yes, Your Honor.

14         THE COURT:  Okay.  Thank you.

15         I understand that Mr. Fizer and Mr. Pink intend to

16 go forward with their hearings; is that correct?

17         MR. GAITHER:  Yes, Your Honor.

18         MR. PODOLSKY:  Yes, Your Honor.

19         THE COURT:  Okay.  And, Mr. Salinas, what do you

20 want to do?

21         MR. SALINAS:  Yes, we're going to go forward, Your

22 Honor.

23         MS. SCHWARTZ:  Your Honor?

24         THE COURT:  Yes.

25         MS. SCHWARTZ:  I have one brief matter with

1  respect to Mr. Green and Mr. Fizer, which is that I would

2  like to orally move the Court to unseal search warrants that

3  had been issued in the course of their apprehension and the

4  investigation of this case so that I may turn copies over to

5  Counsel now for them to read in preparation for this

6  hearing, and along those lines, potentially, if the other

7  hearing went first, that would give them time to read the --

8          THE COURT:  Well, you know, what I do is we're

9  going to do all -- I'm not going to do one by one by one.

10 We're going to -- you have one witness for all three or --

11         MS. SCHWARTZ:  No, we have three witnesses.

12         THE COURT:  You have -- are they for each person,

13 or are they for all of them?

14         MS. SCHWARTZ:  One witness for Defendant Pink, and

15 then a witness for Green and a witness for Fizer, but all of

16 the Fizer conduct is subsumed within Green as well.  So,

17 those two conceivably could go together.

18         THE COURT:  What I typically do is I'll have you

19 put all your witnesses on and then I'll allow each attorney

20 to cross-examine that witness with respect to their own

21 client.  That way, it's not -- it is not going to take

22 multiple hours, if we do one by one by one.

23         And then after they cross-examine, I'll allow you

24 to redirect as to that client.  And we're just here for

25 detention.  There's no probable cause.

1          MS. SCHWARTZ:  Certainly.

2          THE COURT:  So, I want all this to be limited to

3   detention.  I understand that weight of the evidence is part

4   of that consideration, so.

5          MS. SCHWARTZ:  But along those lines, I would like

6   to give Counsel the benefit of the warrants, and if the

7   Court will --

8          THE COURT:  Yes.  We'll give you a few minutes.

9          MS. SCHWARTZ:  -- orally give me permission to

10  give them the warrants that they do not at this point have.

11         THE COURT:  Right.  The Court will then grant your

12  oral motion to unseal those search warrants, and you can

13  turn them over to Counsel.

14         MS. SCHWARTZ:  Thank you so much.

15         THE COURT:  And are they long?

16         MS. SCHWARTZ:  Some of them are longer than

17  others.  The relevant part is not.  I mean, there's always

18  the extra pages and paperwork and presentations.

19         THE COURT:  Sure.

20         MS. SCHWARTZ:  I think if the witness for Pink is

21  called first, that should provide the time.  I mean, Counsel

22  can speak to their own ability to absorb the material, but I

23  think that should provide Counsel the time that they would

24  need.

25         THE COURT:  Go ahead and turn them over, and I'll

1  give you a few minutes to review those before we start.

2          MS. SCHWARTZ:  There is -- in addition to that,

3  Your Honor, there is a warrant that was prepared for

4  Defendant Green's telephone in connection with a Cincinnati

5  arrest.

6          The case in Cincinnati is going to be dismissed

7  because that is part of the current case, but the Cincinnati

8  Court did indicate that that was sealed.  I have nonetheless

9  received a copy through law enforcement.  I have made

10 efforts to get some kind of ruling from Cincinnati to permit

11 unsealing.

12          If the Court deems it appropriate, I can give that

13 to Counsel as well.  It's -- the relevant part is quite

14 short, but technically it is sealed in Hamilton County,

15 Cincinnati.

16          THE COURT:  And does it pertain to detention, or

17 does it have facts pertaining to detention?

18          MS. SCHWARTZ:  It is -- it relates to an incident

19 in which he was arrested in Cincinnati with 10 kilos, and

20 that goes to the strength of the case.

21          THE COURT:  Right.  Is that something you're going

22 to discuss here?

23          MS. SCHWARTZ:  Yes.

24          THE COURT:  Okay.  Well, then --

25          MS. SCHWARTZ:  I mean, if -- you know, if the

1   Constitution or federal law requires me to turn it over,

2   then I can turn it over without feeling --

3             THE COURT:  Just give them a copy to look at, not

4   to keep, and then, you know, after you looked at it, take

5   notes on it, or whatever, then return the copy.

6             MS. SCHWARTZ:  That would be fine.  Thank you,

7   Your Honor.

8             THE COURT:  Okay.  Thanks.

9             Mr. Salinas, take it -- take a look at that, and

10  then when you're done, just return it back to the

11  Government.

12            MR. SALINAS:  Yes, Your Honor.

13            MS. SCHWARTZ:  Thank you, Your Honor.

14        (Pause in the proceedings.)

15            THE COURT:  And for the record, the Court does

16  take judicial notice of all the Pretrial Services reports.

17            MR. PODOLSKY:  Your Honor, with regard to Pretrial

18  services, I have a Pretrial Services Report from our last

19  week's appearance, is that potentially the same as today?

20            THE COURT:  Which client is this?

21            MR. PODOLSKY:  Mr. Pink.  I'm so sorry.

22            THE COURT:  Okay.  Pretrials are the same?

23            MS. SCHWARTZ:  Your Honor, (indiscernible).

24            MR. PODOLSKY:  Okay.  Thank you.  I just want to

25  make sure I'm not missing --

1           THE COURT:  That's the one dated August 28.

2   That's what I have.

3       (Pause in the proceedings.)

4           MS. SCHWARTZ:  Your Honor, may I approach

5   Pretrial?

6           THE COURT:  I'm sorry?

7           MS. SCHWARTZ:  May I approach Pretrial?

8           THE COURT:  Yes, of course.

9       Have you-all had enough time to look at things, or

10  are you almost done?

11          Mr. Salinas, do you need additional time?

12          MR. SALINAS:  No, sir.

13          THE COURT:  I'm sorry?

14          MR. SALINAS:  I believe we're ready, Your Honor.

15          THE COURT:  Okay.  Mr. Podolsky?

16          MR. PODOLSKY:  Yeah, we got our search warrant --

17          THE COURT:  Okay.

18          MR. PODOLSKY:  -- Friday.  So, I assume that this

19  is the only search warrant.

20          MR. MEGGALI:  Yeah, that's the only search warrant

21  that our witness reviewed and relied on.

22          THE COURT:  Okay.

23          MR. PODOLSKY:  Not necessarily the question, but

24  my question was, is this the only search warrant that -- the

25  one that was turned over on Friday, is this the only search

1  warrant related to Mr. Pink?

2          MR. MEGGALI:  Yes, that's the only search warrant

3  that was --

4          MR. PODOLSKY:  Not just the only search warrant

5  that was given to us?

6          MR. MEGGALI:  Yes, that's the only one that was

7  (indiscernible).

8          MR. PODOLSKY:  Okay.

9          THE COURT:  All right.  And, Mr. Gaither?

10         MR. GAITHER:  We are ready, Your Honor.

11         THE COURT:  All right.  Government, are you ready

12 to proceed?

13         MS. SCHWARTZ:  Yes, Your Honor.

14         THE COURT:  And who -- what's the basis for the

15 request for detention?

16         MS. SCHWARTZ:  I believe we're going to deal with

17 Defendant Pink first.  Is that correct?

18         MR. MEGGALI:  Yeah, the Government is ready to

19 move forward with Defendant Pink.

20         THE COURT:  But what -- under what provision under

21 the Bail Reform Act are you moving -- requesting detention?

22         MR. MEGGALI:  I will get you the sections in a

23 moment.  My apologies, Your Honor.  3142(f)(1)(C), and we

24 assert that this is a presumption case under 18 U.S.C.

25 3142(e)(3).

1          THE COURT:  Okay.  You may proceed and call your

2   first witness.

3          MR. MEGGALI:  Government calls HPD Detective Shane

4   Krantz.

5          THE COURT:  Sorry.  What was the name?

6          MR. MEGGALI:  Shane Krantz.

7          THE COURT:  Krantz?

8          MR. MEGGALI:  Yes, Your Honor.

9          THE COURT:  Okay.  Thanks.

10          SHANE KRANTZ, GOVERNMENT'S WITNESS, SWORN

11      (Government's witness, Shane Krantz, takes the stand.)

12          THE WITNESS:  Yes, ma'am.  I do.

13          THE CLERK:  Okay.  You may proceed.

14          MR. MEGGALI:  May I proceed, Your Honor?

15          THE COURT:  Yes.

16              DIRECT EXAMINATION OF SHANE KRANTZ

17   BY MR. MEGGALI:

18   Q    Good morning.  Please state and spell your name.

19   A    Shane Krantz, S-H-A-N-E, K-R-A-N-T-Z.

20   Q    Where are you employed?

21   A    I'm a detective with the Houston Police Department.

22   Q    What is your position at the HPD?

23   A    I'm a detective with the major offenders division, and

24   I've been in the department approximately 12 years.

25   Q    Have you become familiar with a criminal matter

SHANE KRANTZ - DIRECT BY MR. MEGGALI                16

1    involving Denzel Pink?

2    A    Yes, sir, I have.

3    Q    Are you a case agent on his case?

4    A    No, sir, I'm not.

5    Q    And after speaking with case agents and reviewing

6    relevant documents, have you become familiar with the

7    Defendant, Denzel Pink?

8    A    Yes, I have.

9    Q    And do these documents include a search warrant, an HPD

10   report, and an interview report?

11   A    Yes, they do.

12   Q    And have you participated in any surveillance of Pink's

13   home?

14   A    Yes, sir, I did.  The night before the search warrant,

15   an arrest occurred.  I conducted surveillance overnight.

16   Q    Now, have you also become familiar with the Defendant's

17   appearance after reviewing DMV records?

18   A    Yes, sir, I have.

19   Q    Do you see the Defendant in the Courtroom here today?

20   A    Yes, sir, I do.

21   Q    Could you identify him by where he's sitting and what

22   he's wearing?

23   A    He's sitting just to my right of his attorney with a

24   green shirt and braids.

25            MR. MEGGALI:  Your Honor, may the record reflect

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

SHANE KRANTZ - DIRECT BY MR. MEGGALI                17

1  that the witness has identified the defendant?

2           THE COURT:  The record will so reflect.

3  BY MR. MEGGALI:

4  Q    Now, Detective Krantz, are you aware of a wiretapped

5  conversation between the Defendant and Alfred Jacoby Green

6  on March 11, 2024?

7  A    Yes, sir, I was.

8  Q    And who is Alfred Jacoby Green?

9  A    Alfred Jacoby Green is a suspected drug supplier.

10 Q    Did you review an excerpt of the line sheets between

11 them two that day?

12 A    Yes, sir, I did.

13 Q    And did the wiretap monitors determine that it was Pink

14 talking to Green based off of subscriber records?

15 A    Yes, sir, that's correct.

16 Q    And on that call, what if anything, did Pink ask of

17 Green?

18 A    Pink requested three to four, four ways, which I know

19 is kind of slang for cocaine, powder cocaine.  So, roughly

20 four ounces of cocaine.

21 Q    And would the total that he ordered equal four ounces,

22 or would one four way equal four ounces?

23 A    One four way equals four ounces.

24 Q    And how many four ways did you say he ordered?

25 A    He was trying to get four total.

SHANE KRANTZ - DIRECT BY MR. MEGGALI                      18

1   Q    And you know that based off of your training and

2   experience?

3   A    Yes, sir, I do.

4   Q    And right after that call, did law enforcement maintain

5   any surveillance on Green?

6   A    Yes, sir, they did.  There was a pole camera on the --

7   over Pink's house, and officers conducted physical

8   surveillance of the location that day.

9   Q    And where did law enforcement that surveilled Green

10  have gone?

11  A    So, Green traveled to 6103 Sonoma Way, which is Pink's

12  address, and they observed a couple transactions consistent

13  with dope transactions.  So, the first transaction where

14  Defendant Green pulled up to the house, Defendant Pink walks

15  out to his vehicle, gets inside his vehicle, a transaction

16  occurs inside, Pink exits the vehicle, and as he's wearing a

17  -- kind of a little satchel on his chest, and officers

18  observed him like moving around, putting kind of something

19  inside of it.

20       Defendant Green leaves and Pink goes back to his

21  vehicle, which is parked in front of the house and sits in

22  there for a few minutes before going inside.

23       There was another transaction that occurred after that,

24  where a white SUV pulls up, and another transaction

25  consistent with that occurs, where Pink goes inside the

SHANE KRANTZ - DIRECT BY MR. MEGGALI                    19

1   vehicle for a few minutes and then that vehicle leaves.

2       The third transaction occurred with a white Dodge

3   Charger that pulls in front of the house.  Defendant Pink

4   walks out to it to the passenger window.  The dome light

5   comes on --

6               MR. PODOLSKY:  Objection, narrative, Your Honor.

7               THE COURT:  Overruled but just ask questions as

8   well.

9   BY MR. MEGGALI:

10  Q    We could pause right there for now.

11  A    Okay.

12  Q    And by referring to Pink's home, is that 6103 Sonoma

13  that you mentioned before?

14  A    Yes, sir.

15  Q    And is that where you maintained surveillance before

16  his arrest on August 28?

17  A    Yes, sir, it was.

18  Q    Now, you mentioned the white Dodge.  Could you

19  elaborate on any surveillance that law enforcement might

20  have maintained on that Dodge?

21  A    Yes.  So, that white Dodge pulls up and a dome light

22  comes on inside because it was dark at the time.  Dome light

23  comes on, officers can see a transaction is made through the

24  window of that white Dodge, and Pink goes back to his

25  vehicle after this again, and then that Dodge leaves the

SHANE KRANTZ - DIRECT BY MR. MEGGALI                          20

1  location.

2  Q    Did law enforcement encounter the driver of that Dodge

3  at any point?

4  A    Yes, sir.  They conducted surveillance in unmarked

5  vehicles following that vehicle.  Officers from the South

6  Gessner Central Crime Suppression Team conducted a traffic

7  stop after observing -- the undercover officers observed a

8  failure to lane -- use a turn signal, and then the officers

9  in the marked patrol unit observed the vehicle failed the

10  turn in the first available lane of traffic while turning on

11  the Fuqua from Chimney Rock.

12  Q    And after making these observations, did law

13  enforcement make a traffic stop?

14  A    Yes, sir, they did.  They conducted a traffic stop in a

15  marked patrol vehicle.  They made contact with the driver,

16  whose name was Edward Turner, nickname was ET.

17       Upon making contact, they could smell a strong odor of

18  marijuana coming from inside the vehicle.  They asked

19  Mr. Turner about, you know, if he had smoked marijuana that

20  day.  He admitted that he had shortly there before as well

21  as the passenger.

22       At that time, both of them were detained, the driver

23  and the passenger.  A narcotics dog was brought to the

24  location and received a positive hit, indicating there was

25  narcotics inside the vehicle.

SHANE KRANTZ - DIRECT BY MR. MEGGALI                    21

1       Officers conducted a probable cause search of the

2   vehicle and found a small baggie of cocaine underneath the

3   seat that weighed approximately like 0.2 grams.

4       Defendant Turner was arrested and questioned after

5   that, where he admitted to buying narcotics from D-Boy,

6   which was referred to as Denzel Pink.

7   Q    And how do we know that that was cocaine recovered in

8   the baggie?  Was it tested by a lab?

9   A    Yes, sir.  It was tested by a lab.

10  Q    Now, was Turner shown any pictures of Pink when asked

11  who D-Boy was?

12  A    Yeah. I believe the officers that were interviewing

13  showed him a picture of a driver's license photo or a mug

14  shot of Defendant Pink, and he positively identified him as

15  the person known as D-Boy that he purchased the cocaine

16  from.

17  Q    Was he asked for any phone numbers?

18  A    Yes.  He did provide a phone number to officers, and

19  they informed me that was the same number that was on --

20  that they had for Defendant Pink on the wire.

21  Q    And did it match the number on the line sheet from

22  March 11?

23  A    Yes, sir, it did.

24  Q    Now, moving forward to August 28, 2024, can you walk us

25  through your surveillance efforts?

SHANE KRANTZ - DIRECT BY MR. MEGGALI                    22

1  A    We were -- my task was to conduct surveillance prior to

2  the arrest/search warrant of the property.  I had asked the

3  case agent, you know, a little bit about Defendant Pink, and

4  what kind of -- I might expect during my surveillance.  He

5  said that Defendant Pink is a drug dealer, and I'd likely

6  observe drug transactions that occurred during my

7  surveillance.

8       Our surveillance started approximately 10:00 p.m. the

9  night before August 28th.  At approximately 11:00 p.m., I

10 observed a van pull up to Defendant Pink's house.  Defendant

11 Pink walked out to that van, made some type of transaction

12 through the passenger or -- sorry, he climbed inside the van

13 for a short period of time where that's consistent in my

14 training and experience with a drug transaction.

15      Less than a minute or two later, he got out of his

16 vehicle, that van drove away, and then Defendant Pink went

17 to his blue sedan that was parked right in front of his

18 house, and sat there for a few minutes, and then went

19 inside.

20 Q    And just to clarify, unlike the observations that were

21 relayed to you by other law enforcement officers from March

22 11th, were these observations you personally made?

23 A    Yes, sir.  They were.

24 Q    And did you speak with any case agents or arresting

25 officers?

SHANE KRANTZ - DIRECT BY MR. MEGGALI                23

1  A    Yes, sir, I did.

2  Q    Did you learn whether the Defendant surrendered

3  immediately?

4  A    No, he did not.  It took some time for him to get in

5  custody.  They make -- were making contact with him, I

6  believe, through the door to the house, they could hear him,

7  but he took a long time to surrender to officers.

8  Q    And when agents finally arrested him, did they conduct

9  a protective sweep?

10  A    Yes, sir, they did.

11            THE COURT:  Let me back up.

12            What do you mean it took a long time?  Did he just

13  not answer the door?  What was that?

14            THE WITNESS:  No.  They were communicating with

15  him through the door, and I think his family members through

16  the door, and it was several minutes.

17            THE COURT:  Before anyone opened the door?

18            THE WITNESS:  Correct.  Before he appeared, yes.

19            THE COURT:  He opened the door and appeared?

20            THE WITNESS:  He did not open the door.

21            THE COURT:  Somebody opened the door and appeared?

22            THE WITNESS:  Yes.

23            THE COURT:  Okay.  You didn't have to break down

24  the door or anything, right?

25            THE WITNESS:  I don't believe the door -- that,

SHANE KRANTZ - DIRECT BY MR. MEGGALI

1   I'm not sure.

2          THE COURT:   Okay.   Thanks.

3      Go ahead.

4   BY MR. MEGGALI:

5   Q    And just to clarify, when he was finally arrested, your

6   shift of surveillance was already over by then.   Is that

7   right?

8   A    Correct.   It was.

9   Q    And so, this was just what was relayed to you by case

10  agents or arresting officers?

11  A    That's correct.

12  Q    And just to ask again, did they conduct a protective

13  sweep of his home when they arrested him?

14  A    Yes, sir, they did.

15  Q    What did they find, if anything, in plain view?

16  A    There was a pistol in the Defendant's bedroom that was

17  found in plain view, as well as some narcotics as well in

18  the Defendant's bedroom.

19  Q    Did law enforcement then execute a search warrant of

20  his home?

21  A    Yes, they did.   Shortly that same day, officers, I

22  think, held the scene to make sure nobody would come and go.

23  They executed a search warrant shortly thereafter.

24  Q    And what in total did they recover from his home that

25  day?

1  A     There were four firearms found in the home.  Two were

2  found in the Defendant's bedroom, which was a pistol, and

3  there was a shotgun in the closet.  And then there was two

4  pistols that were found in the kitchen on top of the

5  cabinets.  So, you'd have to climb on top of the

6  countertops, and above that space on the cabinets, there was

7  two found.  Those were both reported stolen.  As well as

8  approximately 220 grams of powder cocaine that were found

9  between the Defendant's vehicle and the Defendant's bedroom,

10 as well as 97 grams of crack cocaine that were found.

11 Q     But the -- is it the case that these drug amounts are

12 just suspected for now?

13 A     Correct.  Yes, it's suspected narcotics.  Yes.

14          MR. MEGGALI:  No further questions, Your Honor.

15          THE COURT:  All right.  Thank you.

16          I assume that this is -- since this is just

17 dealing with Mr. Pink that --

18          Mr. Salinas, do you have any questions of this

19 officer?

20          MR. SALINAS:  Just briefly, Your Honor.

21              CROSS-EXAMINATION OF SHANE KRANTZ

22 BY MR. SALINAS:

23 Q     My name is Joe Salinas, and I represent Alfred Green.

24 And, I guess, you had testified that there was a telephone

25 call between Mr. Green and Mr. Pink.  Is that correct?

SHANE KRANTZ - CROSS BY MR. SALINAS                    26

1   A    Yes, sir.

2   Q    Okay.  And you had surveillance where Mr. Green pulled

3   up to Pink's house, correct?

4   A    That's correct.

5   Q    Okay.  And tell me again what it is you saw when

6   Mr. Green pulled up to Pink's house?

7   A    I did not see anything personally.  This information

8   was relayed to me by the officers on scene or was from the

9   reports that I read.

10  Q    So, was it surveillance from the officer itself, or was

11  it the pole camera that --

12  A    Both.

13  Q    Both.  There was surveillance from --

14  A    There was physical surveillance according to the

15  report.  Yes, sir.

16  Q    And the pole camera?

17  A    Yes, sir.

18  Q    And what date was that?

19  A    That was on March 11th of 2024.

20           MR. SALINAS:  Nothing further, Your Honor.

21           THE COURT:  Thank you.

22           Mr. Gaither, do you have any questions?

23           MR. GAITHER:  I do not.

24           THE COURT:  All right.  Mr. Podolsky?

25           MR. PODOLSKY:  Yes, Your Honor.  Thank you.

                    CROSS-EXAMINATION OF SHANE KRANTZ

1

2   BY MR. PODOLSKY:

3   Q    Good morning.  My name is Brett Podolsky.  I'm

4   Mr. Pink's attorney.  I'm going to ask you some questions.

5   If you don't understand a question, please stop me and ask

6   me to rephrase or let me know that you're not sure what I'm

7   asking.  Okay?

8   A    Yes, sir.

9   Q    Okay.  So, it's Detective Krantz?

10  A    Yes, sir.

11  Q    Okay.  All right.  So, you were involved, it sounds

12  like somewhat briefly in this whole investigation, correct?

13  A    That's correct.

14  Q    Just one day, is that right?

15  A    That's correct.

16  Q    All right.  And you were -- you were doing surveillance

17  of my client's home, and you testified as Sonora Way?

18  A    6103, yes, sir.

19  Q    6103 Sonora Way?

20  A    Sonoma Way.  Yes, sir.

21  Q    Sonoma?

22  A    I believe it's Sonoma.  Yes, sir.

23  Q    Sonoma.  Okay.  All right.  And that was -- how long

24  were you conducting surveillance?

25  A    We got there approximately at 10:00 p.m. the night

1  before, and we conducted surveillance until 4:00 a.m. where

2  we were relieved by officers.  I think it was the Southwest

3  Crime Suppression Team that conducted surveillance from four

4  until the search warrant, and they were -- they helped out

5  with the outer perimeter, I think, for the SWAT officers

6  that conducted the arrest warrant.

7  Q    All right.  And where were you when you were conducting

8  the surveillance?

9  A    We were parked down the street, approximately five

10  houses down from the Defendant's house with binoculars.

11  Q    So, I mean, 250 feet, 350 feet?

12  A    Somewhere in there.  Yes, sir.

13  Q    Okay.  All right.  And in an unmarked vehicle?

14  A    Unmarked vehicle, and plain clothes.  Yes, sir.

15  Q    Plain clothes.  All right.

16       So, when you conduct surveillance, what tools are you

17  using?

18  A    Primarily for that, just my binoculars.  We had a

19  radio, and then for vehicles that came specifically that the

20  transaction that I observed, possible narcotics transaction,

21  we relayed the plate over to one of the case agents, and

22  they were also monitoring the location on the pole camera

23  for that transaction.

24  Q    Okay.  Did you have any recording equipment, cameras,

25  video cameras, still phone or photo cameras, dash cam, body

SHANE KRANTZ - CROSS BY MR. PODOLSKY

1  cam?

2  A    No, sir.

3  Q    Is that -- did you intentionally decide not to make any

4  recordings from your surveillance?

5  A    We weren't -- I'm not issued any, you know, technical

6  surveillance equipment.  You know, I use my binoculars, and

7  then, I believe the pole camera could be recorded, but I'm

8  not positive on that.

9  Q    So, you don't know if the pole camera was recording?

10  A    I believe it was, but, again, I'm not sure.  I'm not

11  the case agent over that case that has access to the pole

12  camera.  I was relaying this to one of the case agents who

13  monitors that.

14  Q    So, are you relying in real time is what you're --

15  you're standing there holding binoculars?

16  A    Correct.

17  Q    But, no -- but so which is pretty conspicuous, right?

18  A    During the time at 11 o'clock, not necessarily --

19  Q    It's a yes or no?

20  A    No, sir.  Not, in my opinion, no.

21  Q    So, it's sitting in a car, staring at home holding

22  binoculars to your eyeballs is not conspicuous?  Is it

23  because they can't see inside the car?

24  A    Partially, we did have tint on the windows, and we had

25  the seats pulled back, so it would have been somewhat

 1  difficult.  There was no traffic on the streets during that

 2  time, no people walking.

 3  Q    So, you weren't worried about getting seen, like

 4  monitoring or recording or anything like that?

 5  A    Of course, and that's why we were in plain clothes, but

 6  I believe that we were conspicuous enough to not be observed

 7  by anybody else.

 8  Q    Okay.  So, you could have certainly easily --

 9  binoculars, you could have easily taken a photograph with a

10  camera, and because you weren't worried about being observed

11  doing that either, right?

12  A    I could have, but I was on real time, on the phone with

13  one of the case agents that had access to the pole camera

14  who was also monitoring as well.

15  Q    Monitoring how?

16  A    With the pole camera.

17  Q    Okay.  So, this -- so there is recordings going on?

18  A    It should be, but again, I don't have access to that,

19  to provide that or know the details of how that works.

20  Q    Where was the pole camera?

21  A    I believe it was directly in front of the Defendant's

22  house.

23  Q    So, would it have recorded the area where these alleged

24  transactions were said to have occurred?

25  A    Yes.

1  Q    Okay.  And those -- that was recording -- that pole

2  camera was active during the time this was supposed to have

3  happened?

4  A    Yes, sir.

5  Q    Okay.

6  A    It was active.  Like I said, I can't confirm if it was

7  recording or not, but it was active.  I can tell you that.

8  Q    But the pole cam is recording, what, 24/7?

9  A    Like I said, this pole camera, I'm not -- I don't have

10  access to --

11         THE COURT:  All right.  Let's move along.  He has

12  already answered, he's not sure.  It was supposed to be

13  active.  He is not sure if it was recording or not.

14         THE WITNESS:  I know it was active and was visible

15  to the officer that I was talking to.  Whether it's

16  recording, I can't tell you that information.  You have to

17  ask that officer.

18  BY MR. PODOLSKY:

19  Q    With pole cameras, oftentimes, you will go back and

20  look at that footage.  I mean, you've done that before?

21  A    I have seen pole camera footage in the past, but, no, I

22  haven't installed the pole camera, or --

23  Q    That wasn't my question.

24       My question was, you have gone back and looked at

25  recordings from a pole camera that was installed to surveil

1   --

2   A    In other cases.  However, this is a federal pole

3   camera, I believe, so, I don't -- I don't know their process

4   and all that, but for HPD ones, yes.

5   Q    Now, in your -- you were relating a lot of information

6   based on what you've read and what other people have told

7   you today, right?

8   A    Correct.

9   Q    Now, did you not -- did you testify to what information

10  that was recovered from pole cam footage?  I heard you were

11  talking about the pole camera conducting surveillance,

12  right?

13  A    Correct.

14  Q    All right.  And that -- and officers will go back and

15  review that camera footage, right?  That's pretty standard.

16  A    In HPD, it is.  As far as the federal side, I'm not

17  sure.

18  Q    But they just --

19  A    But I'm sure -- I'm sure it is, but I'm -- I can't give

20  you a confirmation on that.

21  Q    Okay.  All right.  But you have no idea whether anybody

22  has reviewed any pole camera footage in this case?

23  A    I did not specifically ask the case agents about that,

24  no.

25  Q    Okay.  All right.  Now, and as I understand, you took

 1   no photographs, did no recordings of anything that you saw

 2   from, I believe, 10:00 p.m. to 4:00 a.m.?

 3   A    Correct.

 4   Q    And that was by choice?

 5   A    Correct.

 6   Q    All right.

 7   A    I didn't have any equipment to do that.  No, sir.

 8   Q    Okay.  The binoculars were issued by HPD or the feds?

 9   A    No, sir.  They're my personal binoculars.

10   Q    Do you own a camera that records?

11   A    Besides my cell phone, I don't have a -- like a

12   surveillance type camera.  No, sir.

13   Q    Does your cell phone record?

14   A    Yes, sir, it does.

15   Q    Does it take still photos?

16   A    Yes, sir, it does.

17   Q    Did you have it on you that day?

18   A    Yes, sir.

19   Q    Okay.  Now, there was a white Dodge that you said

20   pulled up.  Is that right?

21   A    Yes, sir.

22   Q    And is that the same white Dodge that HPD later

23   conducted a traffic stop?

24   A    Yes, sir.

25   Q    And you said that, and correct me if I'm wrong here,

1  that you saw what you thought was behavior consistent with a

2  drug transaction with regard to that white Dodge?

3  A    Sir, I didn't see it.  I read from -- based on the

4  interviews I had with case agents, and then referring to the

5  reports, they -- sorry, they saw --

6  Q    Okay.

7  A    -- what they believe.

8  Q    And this is, was this -- who did you talk to regarding

9  this traffic stop of this white Dodge?

10 A    I talked --

11 Q    And was it a -- was it a Dodge Charger?

12 A    Yes, sir, it was.

13 Q    All right.  Who did you speak with?

14 A    I spoke with Detective Anders (phonetic), who is one of

15 the case agents on this.  Or it's Officer Anders, sorry, not

16 Detective Anders.

17 Q    Okay.  And who else?  And specifically talking about

18 this Dodge Charger incident?

19 A    That is the only one I talked to.

20 Q    So, Officer Anders?

21 A    Yes, sir.

22 Q    Okay.  And did you review any reports?

23 A    Yes, sir, I did.

24 Q    Okay.  Which report was that?  Was it more than one or

25 just one?

1  A    There's multiple reports.  I think there's some on the

2  federal side, and then some on HPD side.

3  Q    And just -- I'm being specific to the incident, and

4  what date was this incident with the Dodge Charger?

5  A    I believe it was March 11, 2024.

6  Q    Okay.  So, what exactly did you review in preparation

7  for your testimony today related to the March 11th, 2024

8  interaction with this Dodge Charger?

9  A    An HPD report written by the South Gessner patrol

10  officers that stopped them.

11  Q    Okay.

12  A    As well as a narcotics report written by HPD narcotics.

13  And then I observed some federal reports regarding -- I'm

14  not sure exactly what those are called, but some federal

15  reports from the FBI.

16  Q    Like 302s?

17  A    I think so.  Yes, sir.

18  Q    Okay.  And that was regarding the Charger?

19  A    Yes, sir.

20  Q    Okay.  Some reports, or a report?

21  A    I believe that there was a few 302s that I reviewed.

22  I'm not sure how many.

23  Q    Okay.  Do you have those with you?

24        MR. MEGGALI:  Your Honor, the Government disclosed

25  every report that the witness has reviewed.

1              THE COURT:  Okay.

2              MR. PODOLSKY:  All right.  I have one 302, Your

3     Honor.  And that's why I asked if there was one or more than

4     one, and he said there was a few 302s.

5              MR. MEGGALI:  If defense Counsel wants to make

6     this a pop quiz as to, like, what pieces of discovery he

7     reviewed before this --

8              MR. PODOLSKY:  Objection, Your Honor.

9              THE COURT:  Okay.  No side bar, but here's the

10     deal, you participated yourself, one instance, correct, in

11     surveillance?

12              THE WITNESS:  Correct.

13              THE COURT:  And you've reviewed this -- you've

14     reviewed a report that was provided to Mr. Podolsky?

15              THE WITNESS:  Correct.

16              THE COURT:  And there's probably other reports

17     about this incident.  Is that correct?

18              THE WITNESS:  Correct.

19              THE COURT:  Now, you didn't participate yourself

20     in preparing those reports, right?

21              THE WITNESS:  No, sir.

22              THE COURT:  You weren't there physically and

23     participating in whatever the substance of those reports

24     are, correct?

25              THE WITNESS:  No, sir.

1          THE COURT:  So, your testimony is based on what

2   you've talked to other people about.  Is that right?

3          THE WITNESS:  And what I've read, yes, sir.

4          THE COURT:  All right.  So, those don't have to be

5   turned over at this time.

6          You-all move on.

7          MR. PODOLSKY:  And just for the record, we're

8   going to request every document, report that he reviewed in

9   preparation for his testimony today.

10          MR. MEGGALI:  Those have already been disclosed on

11  Saturday, Your Honor.

12          THE COURT:  All right.  Those are disclosed and

13  it's denied.

14          Please move along.

15          MR. PODOLSKY:  All right.

16  BY MR. PODOLSKY:

17  Q    Now, you said that you believe that -- or you don't

18  know, you didn't see anything, you have no personal

19  knowledge of this interaction with this white Dodge?

20  A    Correct.

21  Q    But you testify that it was consistent with a drug

22  transaction based on what someone else told you?

23  A    Yes, sir.

24  Q    Okay.  And what was consistent about it?

25  A    A short interaction like at the window or inside the

1  vehicle.

2  Q    Which was it??

3  A    It could be both because there was like -- there's one

4  that occurred through the window.  Oh, sorry, the white

5  Dodge.

6  Q    Yes, sir.

7  A    Okay.  The white Dodge occurred through the window.

8  Q    What occurred?

9  A    A transaction where Edward Turner turned on the dome

10 light of the vehicle.  There was some kind of transaction

11 made inside with the hands exchanging something and then

12 Defendant Pink put something into his little satchel across

13 his chest afterwards.

14 Q    Okay.  And that is based on what you read in a report

15 or what some officer told you?

16 A    It's both.  But based on my training and experience, I

17 would consider that consistent with a drug transaction.

18 Q    So, if someone walks up to a window, there's some sort

19 of interaction between the person and the other person --

20 A    Correct.

21 Q    -- that's drug -- that's a drug transaction.

22      Did you find any drugs on Mr. Pink that day, or did

23 anybody?

24 A    He wasn't stopped or detained that day.

25 Q    And so, which way was it going?  Was -- which way did

1   the transact- -- I mean, was there -- who got the money?

2   Who got the whatever?  Did you -- was there any money seen?

3   Were there any plastic baggies seen, or anything that was

4   consistent with contraband?

5   A    Not during the transaction.  There was a plastic baggie

6   of cocaine found in the vehicle that this transaction

7   occurred from after that.

8   Q    Okay.  Let's talk about that, because you're

9   representing to this Court that this interaction was a drug

10  transaction, right?

11  A    It's consistent based on my training and experience

12  with the drug --

13  Q    So, we would expect the -- Mr. Edward Turner?

14  A    Edward Turner.  Yes, sir.

15  Q    Mr. Turner to have either some quantity of drugs,

16  consistent with buying and selling of drugs, or some

17  quantity of money consistent with buying or selling of

18  drugs, right?

19  A    Correct.

20  Q    And you found 0.2 grams, which is pretty close to, you

21  know, getting close to residue amount?

22  A    I didn't find it, but the officers on scene did.  Yes,

23  sir.

24  Q    My apologies.  You're correct.  The royal you, you

25  being law enforcement.  Law enforcement found a sum total of

SHANE KRANTZ - CROSS BY MR. PODOLSKY                    40

1  0.2 grams?

2  A    Correct.

3  Q    Okay.  Not really amount that you're familiar with as

4  being part of a drug deal, is it?  I mean, we're getting

5  close to residue amounts, aren't we?

6  A    In my training and experience, there's multiple

7  transactions that have occurred with that amount.

8  Q    0.2?

9  A    Yes, sir.

10 Q    And, in fact, did Mr. Turner not say that it was

11 actually -- it was his girlfriend's?  Did he not?

12 A    I'm not sure on that.

13 Q    Well, it's in the report that you reviewed, is it not?

14 Did I read that correctly?

15 A    I remember it's in the report he admitted to officers

16 that he purchased that from Defendant Pink.

17 Q    Show me that.  I'm going to approach because maybe I

18 missed it, and I'll stand corrected.

19         MR. PODOLSKY:  May I approach, Your Honor?

20         THE COURT:  Yes.

21 BY MR. PODOLSKY:

22 Q    And I want to make sure that we're looking at the same

23 thing you're looking at and if there's something else that

24 you're relying on.  And so, is this -- you were referring to

25 HPD reports?

1  A    I think it was in interviews.

2  Q    And once again, I read it, and if I missed it, I'll

3  stand to be corrected.

4  A    It wasn't in this report.  It was in one, I believe the

5  interview, there was an interview one.

6  Q    Okay.  All right.  So, in that -- is that in the HPD

7  interview?

8  A    I can't remember off the top of my head.

9  Q    Okay.  And you read this?

10  A    Yes, sir.  I read --

11         MR. PODOLSKY:  May I approach, Your Honor?

12         THE COURT:  Yes.

13         MR. PODOLSKY:  Okay.

14  BY MR. PODOLSKY:

15  Q    Okay.  I'm looking at a FBI 302, which is their

16  designation for their report.

17  A    Correct.

18  Q    That's what they titled the document designation for

19  FBI report.  Can you see where --

20  A    They say he got it from D-Boy.

21  Q    It says he caught -- the narcotics that he was caught

22  with were in his car that the narcotic belonged to a female

23  he was with.  He did not want to tell on the girl.

24     Does it say that?

25  A    Yes, it says that.

1  Q    Right.

2  A    He said they got it from D-Boy.  Yes, that's what --

3  Q    Okay.  Well, hold on.  Then, let's unpack this.

4  A    Okay.

5  Q    So, is he saying that he -- that that drugs that they

6  found on the car, he got from D-Boy?

7  A    He said, they, so him being part of it.

8  Q    Well, was there someone else in the car that -- I never

9  heard about a second person in the car.

10  A    There was another person in the car.  Yes, sir.

11  Q    And who was that?

12          MR. MEGGALI:  Your Honor, just to clarify, on

13  direct examination, he did say there was a passenger.

14          THE COURT:  Proceed.

15          MR. MEGGALI:  Just to clarify the record.

16  BY MR. PODOLSKY:

17  Q    Who was the passenger?

18  A    I'm not sure if I remember her name correctly, but --

19  Q    So, he is saying that the girl -- well, he said it was

20  the -- that the girl got the drugs, right?  That's what it

21  says.

22  A    Correct.  It says the girl, and then he says they got

23  it from D-Boy.  So, I mean --

24  Q    The narcotics belonged to the female he was with, but

25  he didn't want to tell on her, right?

1  A    Correct.

2  Q    And so, did yours -- did the surveillance that you saw

3  that -- that you read about, that you were told about, talk

4  about any interaction with the female with Mr. Pink, or the

5  male and Mr. Pink?

6  A    I'm not sure if it was the male or the female.  It's

7  through the passenger window.  That's what I read in the

8  report.

9  Q    Okay.

10  A    I just know the narcotics were found underneath the

11  Defendant or Edward Turner's seat.

12  Q    Is there any bodycam or dashcam footage of that traffic

13  stop that you're aware of?

14  A    There should be.

15  Q    Because we know that HPD officers are issued what?

16  A    Body cameras.  Yes, sir.

17  Q    And often times their patrol cars have what?

18  A    Dashcams, in some cases, yes, but, yes, they should be

19  wearing a body camera.

20  Q    Okay.  All right.  So, we'll be able to figure all that

21  out from the bodycam footage, right?

22  A    It should be.  Yes, sir.

23  Q    All right.  So, we know that part.  Fair enough.

24       Now, moving on.  Edward Turner, as far as you know, did

25  he get charged that day?

1  A    He did.  Yes, sir.

2  Q    Okay.  And obviously he's cooperating with the feds.

3  Now, you are relying, or you're representing to --

4        THE COURT:  Mr. Podolsky, we don't need to say

5  something like that.  Obviously, he is cooperating with the

6  feds, unless there is a basis for it.

7        MR. PODOLSKY:  Well, I mean --

8        THE COURT:  Is there?  I mean, I don't know.

9        MR. PODOLSKY:  -- we have a report --

10        THE COURT:  Okay.

11        MR. PODOLSKY:  -- of talking to them.  I mean,

12  that's what I meant by cooperation.  That he sat for an

13  interview and answered questions.  I don't know, I'm not

14  suggesting, Your Honor --

15        THE COURT:  Right.

16        MR. PODOLSKY:  -- because I have no idea whether

17  he has a deal, or he's been -- there's any formal

18  cooperation agreement.  I'm saying on that day he was

19  cooperative.  He answered questions.

20        THE COURT:  He answered questions, correct?

21        MR. PODOLSKY:  Yes, Judge.

22        THE COURT:  Okay.  Move along.

23        MR. PODOLSKY:  Okay.

24  BY MR. PODOLSKY:

25  Q    So, you're representing to this court information that

1  was presented by Mr. Turner to law enforcement, right?

2  A    Yes, sir.

3  Q    All right.  So, obviously, Mr. Turner's credibility is

4  in question because you want the Judge to believe that the

5  information that Mr. Turner provided to law enforcement,

6  which you then provided to this court is truthful, right?

7          MR. MEGGALI:  Your Honor, if he could just reask

8  that question one more time.

9          THE COURT:  Yeah.  Rephrase, Mr. Podolsky.

10  BY MR. PODOLSKY:

11  Q    Well, you're presenting to the Judge information that

12  Mr. Turner told you or law enforcement?

13  A    Told law enforcement.  Yes, I did not talk to

14  Mr. Turner.

15  Q    Right.  That law -- that he relayed to law enforcement,

16  which then relayed to you, which then you relayed to the

17  Judge?

18  A    That's correct.

19  Q    All right.  So, and you want the Judge to believe that

20  that information that Mr. Turner provided is truthful,

21  right?

22  A    I don't know if I can -- I believe that the information

23  he gave was truthful, just based on the report that was

24  written, and I reviewed.

25  Q    You found 0.2 grams of cocaine, and he said he got it

1  from Mr. Pink, right?

2  A    That's correct.

3  Q    All right.  So, you have to believe that he is telling

4  the truth.  You certainly wouldn't get up here and relay

5  information to the Court that you thought was not truthful?

6  A    Correct.

7  Q    All right.

8         MR. MEGGALI:  Your Honor, if Counsel can only make

9  a distinction between what he asserts as truthful versus

10  what he's been conveyed and, therefore, portraying the

11  truthfulness of --

12         THE COURT:  I'm not going to get -- and we're not

13  going to get into the whether -- it can be determined later

14  whether this is truthful or not.  The detective is relaying

15  what was told to him.  That's what the Court is considering.

16  And let's move along.

17         If you have another question, Mr. Podolsky, about

18  that, please go ask it, but --

19         MR. PODOLSKY:  Yes, Your Honor.

20         THE COURT:  His credibility is not my -- what I'm

21  determining here right now.  I'm determining what he was

22  said to the Detective.

23         MR. PODOLSKY:  Right.

24  BY MR. PODOLSKY:

25  Q    And I'm saying that the credibility of Mr. Turner is

1  important because he relayed what you would say is

2  incriminating information regarding Mr. Pink, right?

3  A    Correct.

4  Q    All right.  Tell me about Mr. Turner then.  What about

5  his --

6            THE COURT:  How is this relevant to detention on

7  Mr. Pink?

8            MR. PODOLSKY:  Well, Judge, he is representing

9  that Mr. Turner told law enforcement that he bought drugs

10 from Mr. Pink.

11           THE COURT:  Correct.

12           MR. PODOLSKY:  All right.  That, I mean, is that

13 not his statement is then subject to a credibility analysis.

14 Is it not because the Court --

15           THE COURT:  It is, but I'm not here to make a

16 suppression - we're not here for suppression issues.

17           Do you have any information as to what Mr. Turner

18 told you was a lie at that time?

19           THE WITNESS:  No, sir.

20           THE COURT:  All right.  Do you have anything

21 further on that?

22           MR. PODOLSKY:  Yes, I do, Your Honor, if I may?

23           THE COURT:  All right.  Go ahead.

24 BY MR. PODOLSKY:

25 Q    So, as far as Mr. Turner's credibility is concerned,

1  what about his criminal history?

2  A     I did not review --

3          THE COURT:  That's not relevant.  Let's move

4  along.

5          THE WITNESS:  I did not review --

6          THE COURT:  I'm not going into any credibility

7  determinations or suppression issues at this detention

8  hearing.  I have -- I've heard what he said to him.

9          Let's move along, Mr. Podolsky.

10  BY MR. PODOLSKY:

11  Q     Now, you said that this -- you have mentioned in your

12  direct examination that this substance that was found, I

13  believe, under this passenger seat, this 0.2 grams of

14  suspected cocaine was then tested by a lab?

15  A     That's what I was told.  Yes, sir.

16  Q     Okay.  And who told you that?

17  A     Detective Anders.

18  Q     And is there some lab report?

19  A     I do not have that lab report.  I was just relayed what

20  was told.

21  Q     But you were told that that --

22  A     It was submitted to the Houston Forensic Science

23  Center, I believe.

24  Q     Okay.  And when were you told this information?

25  A     Yesterday.

SHANE KRANTZ - CROSS BY MR. PODOLSKY                    49

1  Q    Okay.  Now, let's move on to that which you actually

2  saw.

3  A    Okay.

4  Q    Which date -- was that the 27th of August?

5  A    Yes, sir.

6  Q    Of 2024?

7  A    Yes, sir.

8  Q    If my memory serves correctly.  You were on duty

9  conducting surveillance at 10:00 p.m. on the 27th to 4:00

10 a.m. on the 28th?

11 A    That's correct.

12 Q    All right.  Now, you said that according to your

13 testimony that -- and I think your quote was you witnessed

14 some type of transaction.  Is that your words?

15 A    Yes, sir.

16 Q    Okay.  All right.  And that was a -- was it a vehicle?

17 Was it a white -- another white vehicle?  Did I get that

18 correct?

19 A    No, it was a -- it was a van.  I think it was, like,

20 maybe a red or like a dark red color van.

21 Q    Okay.  So, it was --

22 A    It's not the white SUV that I just discussed --

23 Q    Was this a maroon?

24 A    Yeah, I mean, it's maroon, yes.

25 Q    Okay.  All right.  And that pulled up you said around

 1  11:00 p.m.?

 2  A     Yes, sir.

 3  Q     Now, excuse me, when you say van, these days it means a

 4  minivan.

 5  A     It was a minivan.

 6  Q     And there was some interaction between Mr. Pink and

 7  whoever was in that van?

 8  A     Yes.

 9  Q     Did you identify the person or persons inside that

10  maroon van?

11  A     No, sir.

12  Q     What about license plate?

13  A     I believe I relayed the license plate to the officer I

14  was on the phone with that had access to the pole camera.

15  Q     Did you -- were you making any notes or anything?

16  A     I didn't take any notes.  I gave it to him over the

17  phone so they could run it because I didn't have a computer

18  or anything to run the license plate.

19  Q     Was it run?

20  A     That, I'm not sure.

21  Q     Okay.  So, you have no idea if that was a friend or a

22  family member --

23  A     No.

24  Q     -- or, like, maybe a father-in-law that was coming to

25  the house?

1   A    I have no idea who it was.  No, sir.

2   Q    All right.  And this interaction, tell me about that.

3   A    I believe he went up to the passenger side window.  He

4   was talking to him.  His hands were kind of inside the

5   window and then he climbs in the vehicle.  Short period

6   later, the Defendant Pink goes back to his car that's parked

7   in front of his house, and that car leaves at that time --

8   Q    Okay.

9   A    -- or that van leaves at that time.

10  Q    So, what I heard from you relating to the Judge was

11  clearly an inference that this was some sort of criminal

12  activity?

13  A    Based on my training and experience, and the knowledge

14  I had beforehand of Mr. Pink, I would -- in my opinion, it's

15  consistent with a drug transaction.

16  Q    Okay.  And why again?

17  A    A short interaction where somebody just pulls up and,

18  you know, they talk for a second and leave.

19  Q    Okay.  And but who -- I mean, would it matter to you

20  who was driving that vehicle?

21  A    But --

22  Q    Or if that vehicle was registered to someone that you

23  known to be for a family member, or something like that?

24  A    It's possible at 11:00 o'clock, but given the time and

25  the interaction that occurred, it's my opinion it was a drug

1  transaction.

2  Q    Did you see anything exchanged between the individuals?

3  A    Just hand movement, and I couldn't see if anything was

4  actually exchanged, no.

5  Q    Okay.  But tell me about -- this is very similar to the

6  white Dodge Charger interaction, right?

7  A    Correct.  Except, I think he got -- he got inside the

8  vehicle with --

9  Q    In the maroon van.

10 A    -- in the maroon van.  Yes.

11 Q    Okay.  So, it's even -- there was even more contact

12 than you had with the Charger.

13 A    Yes.

14 Q    Okay.  All right.  So, as with the Charger, you called

15 in and they conducted a traffic stop, pretextual stop,

16 right?  Nothing necessarily wrong about that.  If you see a

17 traffic violation, pull them over, even though you really

18 have other investigative motives, right?

19 A    Correct.

20 Q    Perfectly fine.  Tell me about the late -- the traffic

21 stop of the maroon van.

22 A    There's no traffic stop of the marron van.  We -- I

23 believe the officers we were talking to on the phone were

24 going to try to find a marked patrol car if there's one in

25 the area, but I don't believe there was.  So, no traffic

1    stop was conducted.

2    Q    Okay.  So, there's no other evidence other than your

3    suspicion that there was any criminal activity going on?

4    A    No, sir.

5    Q    All right.  Now, let's talk -- you talk then about, I

6    guess, an arrest warrant -- well, hold on a second.  The

7    arrest warrant was executed on what day?

8    A    I believe it's the 28th, the day following.

9    Q    It was the 28th?  And were you a part of that?

10   A    No, sir, I was not.

11   Q    And what time was that arrest warrant, if you know?

12   A    I believe approximately 6:00 a.m.

13   Q    All right.  Okay.

14   A    Sorry.  The arrest warrant was conducted at 6:00 a.m.,

15   the search warrant was following that.

16   Q    Okay.

17            MR. PODOLSKY:  May I approach, Your Honor?

18            THE COURT:  Yes.

19            MR. PODOLSKY:  Would you -- I'm going to talk to

20   him about this.  I was produced a search warrant with a

21   return.  You want me to mark this or just --

22            THE COURT:  Just ask questions about it.

23            MR. PODOLSKY:  Okay.

24   BY MR. PODOLSKY:

25   Q    I'm going to show you what was provided by the

1  Government, the defense, what looks to be an affidavit and a

2  search warrant, and a return of an executed search warrant.

3  Is that --

4  A    Yes.

5  Q    I want you to just take a look at it, make sure that

6  I'm --

7  A    Yes, sir, that's the one I reviewed.

8  Q    Okay.  And just quickly flip through to make sure that

9  --

10  A    Yes, sir.

11  Q    -- that it is what I'm representing it to be.

12  A    Yes, sir, this is the search warrant I reviewed.

13  Q    Okay.  And what's the top page?

14  A    The top page is the return for the search warrant.

15  Q    And what is -- what is a return for the search warrant?

16  A    It's the items of contraband or evidence that are taken

17  from the property.

18  Q    And what is -- why does it -- why does that document

19  exist?

20  A    This document exists to give a record to the Defendant

21  or whoever's property it is, what was taken from a search

22  warrant and document what evidence was taken.

23  Q    And what day, what time, it's very important, right?

24  The date and time that a search warrant is executed is

25  extremely important, right?

1   A    Correct.

2   Q    All right.  Certainly, because it obviously it has to

3   happen after a search warrant is signed --

4   A    Correct.

5   Q    What's the date this search warrant is executed?

6   A    The warrant was executed on --

7   Q    That's not my question.  According to that document,

8   what date does it say that was executed?

9   A    The document says, May 28, 2024, however, the --

10  Q    Hold on.

11  A    Okay.

12  Q    Answer my question.

13  A    Okay.

14  Q    Thank you.

15  A    Yeah.

16  Q    So, according to this, and this is filed with the

17  Court, right?

18  A    I'm guessing so, yeah.

19  Q    What does it say?  What is this line where it says,

20  certification?  What does that say?

21  A    It says I declare under perjury -- or penalty of

22  perjury, that this inventory is correct and was returned

23  along with the original warrant to the designated Judge.

24  Q    Okay.  So, the information contained on this document,

25  this person, this is a -- is this Mr. Anders?

SHANE KRANTZ - CROSS BY MR. PODOLSKY                56

1    A    Yes, sir.

2    Q    Okay.  And Officer Anders, right?

3    A    Yes, sir.

4    Q    And you --

5    A    He's a TFO -- he's a TFO, but, yes.

6    Q    That means Task Force Officer?

7    A    Yes, sir.

8    Q    Okay.  So, he is filling out this extremely important

9    document, certifying that the information contained on this

10   document is true and correct under penalty of perjury.  Is

11   that accurate?

12   A    Yes, sir.

13   Q    Is that a true statement?

14   A    I think he made a mistake on the date, but --

15   Q    No, no, no.  Is it a true statement?  Is the

16   information on this document true and correct?

17   A    The date is incorrect.

18   Q    Okay.  And the date as you stated before is true and

19   important, correct?

20   A    It can be important, yes, sir.

21   Q    Right.  Because if this is executed before the signing

22   of a search warrant, what happens to the execution of that

23   warrant?

24   A    It's invalid.

25   Q    That's right.  So, it says, according to this document,

 1   you would agree that this was executed on May 28 of 2024.

 2   It pretty clearly says that, doesn't it?

 3   A    Yes, sir.

 4   Q    So, either this is not true and correct under penalty

 5   of perjury, or that search warrant was executed before the

 6   signing of the warrant, correct?

 7   A    I believe everything was accurate except for the date.

 8   Q    Sir, if that date is accurate, and it was certified

 9   under penalty of perjury, then this search warrant was

10   executed prior to the signing of the actual warrant,

11   correct?

12          MR. MEGGALI:  Your Honor, at this stage, we are

13   allowed to present admissible evidence.

14          THE COURT:  No.  Mr. Podolsky, you've made your

15   point, although this is not the forum to argue suppression

16   and the evidence.

17          MR. PODOLSKY:  I just did, Judge --

18          THE COURT:  I know.  I know what you're doing.

19          MR. PODOLSKY:  Okay.

20          THE COURT:  Your point has been made.

21          MR. PODOLSKY:  All right, Judge.  All right.

22   Moving on.

23   BY MR. PODOLSKY:

24   Q    And you mentioned also another white sedan.  Is that --

25   is that true?  I'm sorry.

1   A    I believe it's a white SUV.

2   Q    A white SUV?

3   A    The -- on the May 11 -- are you referring to the May

4   11th surveillance or interactions that were -- that I talked

5   about?

6   Q    Yes, sir.

7   A    Okay.  It was a white SUV that was documented in the

8   report.

9   Q    And tell me -- and that was another car that pulls up

10  to the home?

11  A    Correct.

12  Q    And did you describe that as another possible drug

13  transaction?

14  A    It's possible.

15  Q    Why is it possible?

16  A    Based on the short, like, the interaction that he

17  climbs -- I believe in that one, he also climbs inside the

18  vehicle, and then they part ways, and I believe he goes back

19  to the blue sedan.

20  Q    And whose car was that?

21  A    The blue sedan, or the white?

22  Q    The white?  I think we know the blue sedan.

23  A    Okay.  Yeah.  I don't know who the white SUV was.

24  Q    Okay.  And drive  -- license plate?

25  A    I'm not positive that was documented in the report or

 1  not.

 2  Q    Well, I mean, obviously you would want to document the

 3  license plate to determine the driver, especially if you

 4  thought it was a drug transaction, right?

 5  A    That is important.  Like I said, I don't know if that -

 6  - if the license plate is documented in there.

 7  Q    And where did you obtain -- and you were not part of

 8  observing any of that?

 9  A    Correct.

10  Q    So, you would have gotten that information from either

11  a person or a report?

12  A    That's correct.

13  Q    Which one, or was it both?  Person or report?

14  A    That one was from the report.

15  Q    Which report was that?

16  A    That one was from, I think it was a narcotics HPD

17  report by narcotics officers.

18  Q    Okay.  Was that the --

19            MR. PODOLSKY:  May I approach, again, Your Honor?

20            THE COURT:  Yes.

21            MR. PODOLSKY:  All right.

22  BY MR. PODOLSKY:

23  Q    Is that this one, that is -- looks like Report Number

24  361965-24 presenting to you?

25  A    Yes, sir.

1  Q    And this was, once again, for the record provided to

2  me by the Government prior to this hearing?

3  A    No, this is not the report.

4  Q    Is there another report?

5        MR. PODOLSKY:  I'm sorry.  I don't mean to talk

6  off the record, Judge, but I just want to confirm with the

7  Government I was provided this HPD draft report that looks

8  like Report Number 361965-24, and I don't believe I have

9  received a different -- another report, and maybe that could

10 be my mistake, but this is --

11       MR. MEGGALI:  So, the report that -- the HPD

12 report that the witness reviewed is a collection of reports

13 that make up 10 pages.  So, if that's a 10 page document

14 then that's everything.

15       THE WITNESS:  I believe it was narcotics officers

16 that wrote the report.  They were doing the surveillance.

17       MR. PODOLSKY:  Yes, this is 10 pages, nine, 10.

18 It's five pages front and back.  So, 10 total pages.

19 BY MR. PODOLSKY:

20 Q    But this is not what you were referring to?  And

21 what's --

22 A    It might be this -- the 302 then.  I'm not -

23 Q    Okay.  Hold on.

24       MR. MEGGALI:  Your Honor, if knowing -- if having

25 the witness pinpoint the exact source of each piece of

SHANE KRANTZ - CROSS BY MR. PODOLSKY                61

1   information that he reviewed and relayed is relevant to the

2   hearing determination of detention, we would have no

3   objection, but that's exactly what defense Counsel is doing.

4           MR. PODOLSKY:  I'm sorry, Judge.  My client was

5   talking to me.

6           THE COURT:  Mr. Podolsky, where are you going with

7   this questioning?

8           MR. PODOLSKY:  Well, I guess, my whole point here,

9   and I understand the limitations of the detention hearing.

10  I truly do.

11          THE COURT:  Right.

12          MR. PODOLSKY:  But what, you know, what the

13  officers role here is to obviously provide information about

14  the general details of this conspiracy as it's -- as it's

15  specific to Mr. Pink, and the reason why I was asking

16  questions about these interactions is because they want to

17  show the Court that this is a drug dealer, that he is --

18  that he is conducting these drug deal.

19          So, and it is my understanding that that certainly

20  the Court is going to weigh the credibility of this

21  testimony, as the Court would with any testimony, and the

22  Court's determination of, you know, the credibility of these

23  alleged -- the testimony regarding these alleged

24  transactions, I would imagine, it's going to weigh on the

25  course of determination of detention.

1            THE COURT:  And that is correct, but sitting there

2     and pinpointing everything out in a report is not really

3     conducive to the purpose of this hearing.  You can ask him

4     the question, is it in this report or is it?  Or maybe it's

5     in another report, you'll get somewhere down the line in

6     discovery.

7            MR. PODOLSKY:  And I guess, what I was getting to

8     is that if it's in some other report, if he's testified to

9     it, and it's in some other report that hasn't been provided

10    to us, we would ask for that.

11           THE COURT:  Well, again, the limited participation

12    doctrine under case law provides that if he participated

13    directly himself in the investigation, but did not write the

14    report then, yes, you can get that.  But if he is just

15    merely regurgitating from other reports that he read, then

16    this is -- you're not going to get that at this time.

17           MR. PODOLSKY:  Okay.  And that's -- and if that,

18    obviously, I respect the Court's ruling and I will move on.

19           But I guess my point is, is that if he's going to

20    represent to the Court that these are suspected drug

21    transactions, then I think I have a responsibility to

22    question that and to get --

23           THE COURT:  Sure.

24           MR. PODOLSKY:  -- why in fact, you know, if these,

25    in fact, are just interactions with other human beings, or

SHANE KRANTZ - CROSS BY MR. PODOLSKY

1  in fact, there's something specific to make this a drug

2  transaction.

3         THE COURT:  Right.  And you've done that.  I mean,

4  you've done that.  You've asked, you know, they -- you said

5  what he seen in surveillance, and they stopped the cars.

6  So, you made your points that what you -- what you just

7  said --

8         MR. PODOLSKY:  Understood, Your Honor.

9         THE COURT:  -- and the Court understands where

10 you're going with that.

11        MR. PODOLSKY:  Thank you.  I appreciate it.

12        MR. MEGGALI:  If I may, Your Honor?

13        THE COURT:  Yes.

14        MR. MEGGALI:  There are certain parts of the story

15 that he had omissions.  There were gaps that he could have

16 conveniently left, and he had not filled any of these gaps.

17 He educated himself based off of his limited participation

18 in surveillance and based off of his review --

19        THE COURT:  Right.  No.  The Court understands it.

20        MR. MEGGALI:  -- of reports, and he educated

21 himself as to the totality of the story.  Now, all I see

22 that defense Counsel is doing is trying to pinpoint him to

23 tell what's the source of each bit of information that he is

24 testifying about, and that's basically a discovery rabbit

25 hole and a pop quiz as to, like, what's the piece of --

1  what's the source of each piece of information he's --

2          THE COURT:  I know what Mr. Podolsky is asking,

3  and you brought it up, you got into the transaction, so he

4  is entitled to a limited extent to discuss those

5  transactions and what the officer knows and doesn't know.

6          So, you know, he has every right to go into that.

7  But, yes, I'm not going to -- we're not going to sit there

8  and pinpoint where is this -- you know, what report did this

9  come from, what report did that come from, who said this or

10 that.  You'll get that later on in discovery, but generally,

11 yes, you have the right to go into that, and he can testify

12 from what he knows.

13          MR. PODOLSKY:  Yes, sir.

14          THE COURT:  All right.  But let's keep moving.

15          MR. PODOLSKY:  May I approach the Government?

16          THE COURT:  Yes.

17          MR. PODOLSKY:  Thank you, Judge.

18 BY MR. PODOLSKY:

19 Q    And just quickly with regard to the white SUV that we

20 were just talking about, was there a traffic stop done down

21 the road?

22 A    No, sir.

23 Q    Was there identification of whoever was in that car?

24 A    Not that I'm aware of.

25 Q    So, whether or not that was friends or family or just

1    some --

2    A    It's unknown.

3    Q    Unknown.  Okay.  All right.  Now, let's circle back

4    quickly.  The arrest on August 28, 2024, the serving of the

5    arrest warrant, okay?  There was some discussion with the

6    Government of my client not being cooperative in

7    surrendering.  Is that a fair assessment of what you were

8    testifying --

9    A    Correct.

10   Q    Okay.  And the Court followed up with some questions on

11   that.  So, but I just want to be clear, because that is an

12   important issue.  When you say it was not being -- what were

13   your words about what my client's cooperation was when the

14   serving of the warrant?

15   A    From what I remember by speaking with the officer, he

16   was aware that officers were there.  They were expecting him

17   to come down, and it was a long time before he came down.

18   Q    What is a long time?

19   A    I mean, it was minutes.  I don't have the exact amount

20   of time, but more than like you hear the officers are there

21   and walking, walking down, you know, within a minute or two,

22   right?

23   Q    Okay.  So, five minutes, 10 minutes?

24   A    Again. I'm not sure on the exact amount of time, but it

25   was prolonged to where they were about, you know, saying,

1   hey, we made contact and then they're like, okay, we're

2   going to have to go in and get him at this point.

3   Q    Okay.  And we're not talking about some standoff,

4   right?  We're not talking about bull horns or anything like

5   that, correct?  Where there's -- you guys are surrounding

6   the house, and there's some prolonged, 30 minutes, an hour,

7   two hours of like standoff inside the house, right?

8   A    I don't believe it's that long.  I believe they do

9   during their warrant, they use a loud speaker too, you know,

10  and sirens to let them know that officers are there and to

11  specifically call him out by name.

12  Q    Okay.

13  A    It's usually a standard procedure.

14  Q    So, you have no idea whether we're talking about three

15  minutes, four minutes, five minutes, 10 minutes or longer,

16  correct?

17  A    I believe it is definitely over three to five minutes

18  for sure, yes.

19  Q    Okay.  And whoever answered the door was not my client?

20  A    I believe so, yes.

21  Q    Okay.  That's what you were told?

22  A    Yeah.

23  Q    Okay.

24  A    Yes.

25  Q    Was it just -- now, this part of what you're relaying

1  to the Court, was that based on just a conversation with

2  another officer or reading the report?

3  A   I believe that it was mostly off a conversation with

4  another officer.  I was actually listening part of this on

5  the radio because I was still around the -- still monitoring

6  the radio at this time, but I don't remember exactly about

7  how my -- how long.

8  Q   All right.  So, you were in the vicinity when all this

9  was going down?

10  A   No, I was at a totally different location.  I was at

11  the jail where everybody was going to get transported to --

12  Q   Okay.

13  A   -- because I had additional tasks to help out with.

14  Q   So, you were listening on a radio in real time?

15  A   Yes.

16  Q   Okay.  Well, how long was it?

17  A   Like I said, I don't remember because there's multiple

18  arrests going on at the same time.  There was about 18 or

19  so.

20  Q   Fair enough.  That's fair.

21  A   Yeah.

22  Q   They were hitting a bunch of different locations --

23  A   Correct.

24  Q   -- all at the same time?

25  A   Correct.

1  Q     That's fair.  All right.  So, as far as where my client

2  was when they were banging on the door, what he was doing,

3  whether he was in the shower, on the toilet or sleeping, or

4  whatever, you don't recall any of that?

5  A     I did not know where he was.  No, sir.

6  Q     All right.  So, really to attribute that somehow he was

7  stonewalling law enforcement is really you don't have any

8  information about that?  You just know that it took a few

9  minutes before somebody answered the door, correct?

10 A     And I believe they made contact with him, and they were

11 expecting him to come down, but he didn't, and there was

12 some delay after that.

13 Q     Okay.  So, they actually spoke with him?

14 A     I don't know if they spoke with him, but it may have

15 been through a family member.  I'm not sure, but --

16 Q     All right.  But you -- did he run out the back window?

17 Did he flee?

18 A     No, sir, not that I --

19 Q     Did he fight with officers?

20 A     No, sir.

21 Q     Okay.  All right.  So, he came out and surrendered

22 peacefully?

23 A     He eventually came out, yes, sir.

24 Q     Okay.  And whether it was three minutes, five minutes

25 or 10 minutes, you just don't remember, or you don't know?

1  A    I don't know.

2  Q    All right.  But as far as actively trying to elude or

3  evade law enforcement, you got --

4         THE COURT:  You made your point, Mr. Podolsky.  I

5  get that.  Move along.

6         MR. PODOLSKY:  Okay.

7  BY MR. PODOLSKY:

8  Q    Now, he comes out the front door?

9  A    That I'm not sure, but I believe so, but --

10 Q    Okay.  And then the officers enter the home?

11 A    I believe so, too.  Yes, sir.

12 Q    Okay.  And then they entered the home, and they sweep

13 the home?

14 A    Correct.

15 Q    Okay.  And is -- with this -- was the pole cam running

16 at this time?

17 A    That, I'm not sure of.

18 Q    Was there -- do you have a reason to think that it was

19 turned off at that point?

20 A    No.

21 Q    Okay.  All right.  So, he comes out the front door to

22 the best of your knowledge, he is taken into custody because

23 there's an arrest warrant, correct?

24 A    Correct.

25 Q    Then they entered the home and sweep the home?

1   A    Yes, sir.

2   Q    All right.  Now, you testified that there were at least

3   a gun in plain view, or multiple guns in plain view?

4   A    I believe it was just one.

5   Q    All right.  Where?

6   A    I believe it's in the Defendant's bedroom.

7   Q    Where?

8   A    Upstairs.

9   Q    No, no, no.  Okay.

10  A    Oh, it's like --

11  Q    No, fair enough.

12  A    -- it was tucked up -- I believe it was like between --

13  sticking out between a mattress, I believe.

14  Q    Sticking out --

15  A    Like, you could see the butt.  The picture that I was

16  provided, there was a gun between, like, the mattress and

17  the bed frame, and you could see the grip.

18  Q    Sticking out between, like, the box spring and the

19  mattress just like that?

20  A    Correct.  Yes.

21  Q    Okay.

22  A    That's how it appeared to me in the picture, yes.

23  Q    All right.  So, you saw a photo?

24  A    Yes, sir.

25  Q    All right.  And were the officers that were executing

1   this warrant, were they in uniform?

2   A    Like I said, they should have been.  Yeah, that's

3   protocol, but I wasn't there.

4   Q    Was this federal agents, HPD agents or a combination of

5   both?

6   A    I believe this was HPD Swat that conducted the search.

7   Q    Did they have body cam?

8   A    I believe they do, yes.

9   Q    Okay.  So, we should be able to see all this?

10  A    Yes, sir.

11  Q    All right.  And as far as whether -- now, were there

12  drugs in plain view?  Did I -- am I remembering that

13  correctly?

14  A    I believe next to the gun, it also appeared to be a

15  baggie with what I was told was, appeared to be cocaine.

16  Q    It's also sticking out between the mattress?

17  A    It was laying next to the gun, I believe.

18  Q    Well, the gun was under the mattress with the -- you

19  can see the butt sticking out.

20  A    It was -- the picture that's provided, there was a

21  baggie right next to it, and there's also baggie in the car,

22  I believe.  A picture of a baggie on the car seat.

23  Q    Yeah, I'm just talking about the home right now.

24  A    Right.

25  Q    We'll get to the car.

SHANE KRANTZ - CROSS BY MR. PODOLSKY

1        So, you saw a photo of a baggie that appeared to be

2   some sort of contraband, cocaine or whatever, sticking out

3   of the mattress next to where -- you could see that --

4   A    There was a gap between, I think, the mattress and the

5   box springs.  Like there was -- it was -- the picture I saw

6   of the mattress was slightly to the left of the box spring,

7   so there was kind of a ledge, and that's where the pistol

8   and the baggie was.

9   Q    But those are photographs, we'll be able to see all

10  that at some later date?

11  A    Correct.

12  Q    All right.  And then there was -- other than the

13  baggie, and going back to this warrant return, the one that

14  I showed you -- Can you see this one here?

15  A    Yes, sir.

16  Q    This is what I'm looking at.

17  A    Yes, sir.

18  Q    And this is the warrant return that was signed by

19  Jonathan Anders.

20       Which amount are we saying was found in plain view kind

21  of sticking out from the mattress, between the mattress and

22  the box spring?

23  A    That I can't answer.  I'm not sure.

24  Q    All right.  Because there's listed on here, there are

25  three different amounts which I think that you --

SHANE KRANTZ - CROSS BY MR. PODOLSKY                    73

1  A    Correct.  Yeah, I'm not sure which one that is.

2  Q    Okay.  All right.  And then a subsequent search warrant

3  based on -- included in this document that you reviewed is a

4  probable cause affidavit, right?

5  A    Correct.

6  Q    Which includes a lot of what you were relaying to the

7  Court today as basis for the probable cause for signing the

8  warrant, right?

9  A    Correct.

10  Q    All right.  Is this the -- just quickly, Judge, and I -

11  - the inventory of property that's on this return, is that

12  the complete inventory of all items that were taken from the

13  home that day?

14  A    To my knowledge, yes.

15  Q    Okay.  And you said you saw some photographs, at least

16  of the mattress and box spring, correct?

17  A    Correct.

18  Q    Were your other photographs of the -- of where any of

19  this other contraband was found?

20  A    There was a photograph of the front seat of the

21  Defendant's blue sedan, and there was a baggie, it would

22  appear to be contraband in there.

23  Q    Okay.  All right.

24  A    But, no, I did not observe any pictures of the other

25  firearms that were listed in there or the ammunition.

1   Q    Now, oftentimes, as I know that you think -- if my

2   memory is serving, you've been a HPD officer for 12 years?

3   A    Correct.

4   Q    Okay.  Working for the last -- I don't think he says –

5   at major offenders, for how many years?

6   A    It's a little over a year and a half at major offenders

7   division.

8   Q    Okay.  As far as items or documents or personal

9   belongings that are specific to Mr. Pink, you're not aware

10  of any of those being found in that room, correct?

11  A    On the items listed on the inventory is what you're

12  asking?

13  Q    Or just -- or -- yeah.  Clearly there's no items listed

14  like I found a letter or a bill or a cell phone bill with

15  Mr. Pink's name on it in that room, or driver's license, or

16  anything like that?

17  A    That, I don't know.

18  Q    You're not aware of that --

19  A    Not aware of that.

20  Q    -- discussions?

21  A    Correct.

22  Q    And I apologize to the Court Reporter who is taking

23  this on.  I don't want to speak over you.

24  A    Sure.

25  Q    But you're not aware of any documents or other personal

1   belongings that are specific to Mr. Pink that were found in

2   that room?

3   A    Not that I'm aware of.

4            MR. PODOLSKY:  Nothing further, Your Honor.

5            THE COURT:  Any redirect?

6            MR. MEGGALI:  Yes, Your Honor.  I do have

7   redirect.

8            THE COURT:  All right.  Keep it brief.

9              REDIRECT EXAMINATION OF SHANE KRANTZ

10  BY MR. MEGGALI:

11  Q    You were asked some questions about other vehicles that

12  Pink encountered during your surveillance beginning

13  August 27th that you didn't end up further investigating,

14  right?

15  A    That's correct.

16  Q    And is it because Pink was just about to get arrested

17  that morning?

18  A    That's part of the reason, yes, where resources are

19  very limited, and we had 18 simultaneous search warrants or

20  arrest warrants planned that morning.

21  Q    Okay.  And you're asked a bunch of questions about

22  binoculars and recordings from your surveillance beginning

23  August 27?

24  A    Correct.

25  Q    Did you have a clear view of Pink when he exited his

1  home?

2  A    Yes, I did.  Well, when -- so, when I first -- we drove

3  by the house, so I can get familiar with the house and the

4  layout on our first pass, and Pink was actually sitting in

5  the driver's seat of that blue sedan, which we were told

6  before was his vehicle.

7       So, I got a view of him when we passed by, and then we

8  made a loop around neighborhood to set up just past his

9  house, so if he left, he would not pass us, and we had a

10 clear view right down the road to kind of the front of his

11 house/where his vehicle was located.

12 Q    Defense Counsel during your cross examinations

13 suggested that some of the documents, Turner suggested that

14 the cocaine found belonged to the passenger.  Is that right?

15 A    Correct.

16 Q    As part of your training and experience as a law

17 enforcement officers, do targets sometimes change their

18 stories?

19 A    Yes, they do.

20 Q    Now, if we could just backtrack to March 11.  Could you

21 remind the Court how much was ordered during the call

22 between Pink and Green?

23 A    Up to four four ways of powder cocaine.

24 Q    And what's a four way again?  How much is that worth?

25 A    Roughly -- how much is it worth?

1   Q    Like, in terms of size.  What's the size of a four way?

2   A    Roughly around four ounces.

3   Q    Four ounces?

4   A    Of cocaine, yes.

5   Q    And so, he ordered about 12 to 16 ounces?

6   A    Correct.

7   Q    And that would account amount to several 100 grams,

8   right?

9   A    Correct.

10  Q    And based off your training and experience as a law

11  enforcement officer, is that a consumer amount or is that a

12  distribution amount?

13  A    Distribution amount.

14  Q    And is that your testimony that right after they

15  encountered the same day as that phone call, right after

16  Green and Pink encounter, the same day as that phone call,

17  the encounter between Turner and Pink took place?

18  A    Correct.

19  Q    And is that the encounter that law enforcement believes

20  resulted in the residue amount that Defense Counsel brought

21  up?

22  A    Yes.

23  Q    Okay.  And would that residue amount be consistent with

24  a consumer amount of cocaine?

25  A    Correct.

1  Q    Now, as far as the interview between law enforcement

2  and Turner, did Turner offer a phone number for Denzel, or

3  was he given a phone number and asked to confirm that that

4  was his?

5       And I could show you the 302, if you would like me to

6  refresh your recollection.

7  A    Yes, sure.  Yeah.

8            MR. MEGGALI:  Your Honor, may I approach?

9            THE COURT:  Yes.  Does he have a copy of this?

10           MR. MEGGALI:  He should have it --

11           THE COURT:  Okay.

12           MR. MEGGALI:  -- but I could show him to make

13 sure.

14           THE COURT:  Okay.

15           MR. MEGGALI:  We have a redacted copy, but I kind

16 of read between the lines.

17 BY MR. MEGGALI:

18 Q    If you could review the last paragraph (indiscernible)

19 go to the second page.

20      And just for the record, is that the 302 you reviewed

21 prior to your testimony?

22 A    Yes, sir, it was.

23 Q    Or one of them.

24      Let me know whenever you're ready.

25 A    Okay.

1  Q    Do you see where the 832-570-2812 number is listed?

2  A    Yes.

3  Q    Was that a number that was offered by law enforcement

4  for Turner to confirm, or was that a number offered by

5  Turner himself?

6  A    Turner provided that number.

7  Q    Now, you reviewed line sheets for the March 11th call

8  before this, right?

9  A    Correct.

10 Q    And I could refresh your recollection, if you'd like me

11 to, but is that the number that you saw in the line sheets?

12 A    Yes, sir, it was.

13 Q    Okay.  And you were shown search warrant returns dated

14 May 28, 2024 during cross examination?

15 A    That's correct.

16        MR. MEGGALI:  Your Honor, may I approach?

17        THE COURT:  Yes.

18 BY MR. MEGGALI:

19 Q    Can you tell us is that the same warrant returns that

20 you were shown on cross?

21 A    Yes, it was.

22 Q    And what's the date of the signature at the bottom?

23 A    It was August 30th, 2024.

24 Q    Now, besides the pictures you just mentioned in the

25 search warrant returns, is there anything else that you

1  reviewed prior to your testimony that told you a firearm was

2  found in his home?

3  A    I believe that one of the reports mentioned that.  No,

4  I'm not sure actually.

5  Q    Okay.  So --

6  A    Yeah.

7  Q    -- it was just that search warrant returns and the

8  picture that you saw?

9  A    Yeah, I believe it's just a search warrant.  Yes.

10  Q    Okay.  And just because I'm not sure if I got it out in

11  direct, were any ammunition found?

12  A    Yes, there was ammunition.

13  Q    And when officers reported on August 28 to arrest the

14  defendant, who was there?

15  A    The defendant was there, and I believe his family

16  members were there.

17  Q    Do you know how many?

18  A    I do not.

19  Q    Okay.

20         MR. MEGGALI:  No further questions, Your Honor.

21         THE COURT:  Any recross?

22         MR. PODOLSKY:  Briefly.

23         THE COURT:  Yes.

24              RECROSS-EXAMINATION OF SHANE KRANTZ

25  BY MR. PODOLSKY:

1  Q     The Government said, I think it was based on your

2  training and experience do suspects often change their

3  story.  Is that -- did I paraphrase that correctly?

4  A     Yes, sir.

5  Q     Okay.  Let's just speak plainly.  What he meant was, do

6  suspects often lie to your face and then tell a different

7  story later, right?

8  A     Yes, they can.  Yes.

9  Q     Thank you.

10          MR. PODOLSKY:  Nothing further, Your Honor.

11          THE COURT:  Are we -- anything further from this

12  witness?

13          MR. MEGGALI:  Nothing further from this witness,

14  Your Honor.

15          MR. PODOLSKY:  Nothing further, Your Honor.

16          THE COURT:  May he be excused?

17          MR. MEGGALI:  Yes, Your Honor.

18          MR. PODOLSKY:  Yes, Your Honor.

19          THE COURT:  All right.  Thank you, sir.  You may

20  step down.

21      (Witness steps down.)

22          THE COURT:  All right.  Call your next witness.

23          MS. SCHWARTZ:  The Government calls Officer Ryan

24  Ware, and as he is taking the stand let me also note that in

25  the course of Mr. Podolsky's cross-examination, I realized

1    that I had neglected to provide Mr. Salinas with six pages

2    of discovery with respect to statements made by this actual

3    witness, notes he took as reviewed materials and the report

4    he wrote.

5            So, I had those printed, and I gave them to

6    Mr. Salinas a few moments ago, and six pages total, and I

7    apologize for the dilatory discovery.

8            THE COURT:  All right.  Well, let's -- we can't

9    let that happen.  It delays things.

10           Mr. Salinas, have you had a chance to look at

11   that?

12           MR. SALINAS:  Yes, Your Honor.  I've reviewed it.

13           THE COURT:  Are you ready to proceed?

14           MR. SALINAS:  Yes, Your Honor.

15           THE COURT:  All right.  Please proceed.

16            RYAN WARE, GOVERNMENT'S WITNESS, SWORN

17      (Government's witness, RYAN WARE, takes the stand.)

18                 DIRECT EXAMINATION OF RYAN WARE

19   BY MS. SCHWARTZ:

20   Q    Please tell the Court your name and employer.

21   A    Yes, ma'am.  My name is Ryan Ware.  I'm a police

22   officer for the Houston Police Department.

23   Q    And about how long have you worked for the Houston

24   Police Department?

25   A    Approximately, 11 years.

1   Q    What is your current position with the Houston Police

2   Department?

3   A    I'm currently assigned to the narcotics division as a

4   K-9 handler.

5   Q    And how long have you been a K-9 handler?

6   A    Over two years.

7   Q    Are you trained and certified in that role?

8   A    Yes, ma'am, I am.

9   Q    And do you have a particular K-9 that's assigned to

10  you?

11  A    Yes, ma'am.  My partner's name is Krokusz.  She is a

12  female German Shepherd Belgium Malinois mix.

13  Q    Could you spell Krokusz for the Court Reporter's

14  benefit, please?

15  A    K-R-O-K-U-S-Z.

16  Q    And is Krokusz also certified with you in that

17  training?

18  A    Yes, ma'am.

19  Q    What is Krokusz trained to detect?

20  A    She is detect -- she is trained to detect narcotics.

21  Five narcotic odors, marijuana, cocaine, heroin,

22  methamphetamine, and MDMA.

23  Q    Now, did you have a role in this case with respect to

24  the investigation of a Defendant Alfred Jacoby Green?

25  A    Yes, ma'am, I did.

RYAN WARE - DIRECT BY MS. SCHWARTZ                84

1   Q    Starting on what date?

2   A    Starting on August 28.

3   Q    Of this year?

4   A    Of 2024.

5   Q    And was it -- so, that was the first date that you came

6   in contact with this investigation to your knowledge?

7   A    Yes, ma'am, it is.

8   Q    Have you, in addition to that, reviewed materials about

9   the investigation and about the Defendant and events leading

10  up to August 28, 2024?

11  A    Yes, ma'am, I have.

12  Q    Had there been an FBI investigation of the Defendant?

13  A    Yes, there has been.

14  Q    Approximately, or at least how long had it gone on?

15  A    It has been going on -- it went on for approximately a

16  year and a half.

17  Q    And was that based on surveillance of various kinds?

18  A    Yes, ma'am.

19  Q    What were some of those kinds of surveillance?

20  A    Physical surveillance, telephone taps, vehicle trackers

21  and pole cameras.

22  Q    Now, let me direct your attention to August 28, 2024,

23  the date of your involvement.  Did something happen with

24  respect to Defendant Green on that date?

25  A    Yes, ma'am.

1   Q     What was that?

2   A     I was requested to assist with an operation at the

3   Comfort Suites located in Stafford, Texas, off of 59.  I was

4   informed that there would be an arrest warrant executed at

5   the location.

6   Q     And is that -- that location is in the Southern

7   District of Texas, is it not?

8   A     Yes, ma'am, it is.

9   Q     Briefly just -- and the arrest warrant was for who?

10  A     Well, it was for Alfred Green.

11  Q     Okay.  Briefly describe what happened when you got

12  there?

13  A     Yes, ma'am.

14        So, I was in an unmarked vehicle.  I was in plain

15  clothes.  I was parked in the parking lot of the Comfort

16  Suites before the arrest team made entry.  Marked Houston

17  Police Department narcotics tactical team entered the

18  parking lot. They positioned personnel on an exterior window

19  for containment.  Another element of the arrest team went

20  inside the hotel and up to the third floor, and got

21  containment on the door, and then they turned on their

22  lights and sirens and began announcements over the public

23  address system that an arrest warrant was being executed and

24  for Alfred Green to exit the hotel room.

25  Q     And how loud were those announcements?

1    A    Extremely loud.  The sirens were loud.  Other patrons

2    or customers of the hotel were being awoken and exiting to

3    see what was going on.

4    Q    And about how long did those announcements and lights

5    and sirens continue before you heard something - heard or

6    saw something else?

7    A    So, after about approximately five minutes, I was

8    listening to the police radio, and I heard that the scene

9    was secure and that the suspect was taken into custody.

10   Q    And what happened at that point, briefly?

11   A    At that time, I deployed my K-9 in the parking lot,

12   conducted an open-air sniff, and my K-9 gave me indicators

13   that she smelled the odor of narcotics.  She pulled to a

14   black truck that I knew to be Alfred Green's and she came to

15   an alert on the passenger door seam to alert me that she was

16   in the presence of the odor of narcotics.

17   Q    And at that point, what was your understanding of what

18   other officers were doing after Green had been secured?

19   A    So, at that time, I had learned that during the

20   execution of the arrest warrant that they saw narcotics in

21   plain view of the hotel room, and that there would be an

22   affidavit drafted, and they were going to attempt to get a

23   search warrant for the hotel room.

24        I notified them of my alert on the truck, and they said

25   that they would include the vehicle in their affidavit for a

1    search warrant.

2    Q    And was a search warrant ultimately obtained for the

3    room and the truck?

4    A    Yes, ma'am, it was.

5    Q    And did you participate in the actual search of the

6    vehicle?

7    A    Yes.

8    Q    Please describe what happened.

9    A    Upon getting or upon running that the search warrant

10   for the vehicle was obtained, the vehicle was unlocked.  I

11   deployed -- as soon as I opened up the door myself could

12   detect a strong odor of marijuana coming from the vehicle.

13   I deployed my K-9 into the vehicle where she alerted to the

14   center console and to the two front cup holders.

15   Q    And were any narcotics actually recovered from the

16   vehicle?

17   A    No, ma'am, there wasn't.

18   Q    Was anything -- was any other contraband recovered from

19   the vehicle?

20   A    A loaded pistol.

21   Q    Now, did you and Krokusz assist in the search of the

22   hotel room?

23   A    Yes, ma'am, we did.

24   Q    Briefly just tell the Court about that search.

25        Oh, and let me just back up.  That was the same hotel

1  room where law enforcement had found contraband?

2  A    Yes, ma'am, it was.

3  Q    Briefly describe that search.

4  A    We started in the hallway the third floor.  My K-9 was

5  pulling me down the hallway.  Pulled me into the room.  We

6  had to be careful, the door to the room was breached, and so

7  we had to be careful that, you know, safety of me and my dog

8  stepping on wood particles and debris from the door having

9  to be breached.  She pulled me immediately into the bathroom

10 and came to an alert on the bathtub.

11 Q    And what did you observe about the bathtub?

12 A    In the bathtub, I saw the bathtub to be wet.  I saw a

13 zip lock baggie and white powder that looks like it was

14 being discarded in the bathtub.

15         MS. SCHWARTZ:  May I approach, Your Honor --

16         THE COURT:  Yes.

17         MS. SCHWARTZ:  -- to show the witness an exhibit?

18         THE COURT:  Yes.

19         MS. SCHWARTZ:  I have one for Counsel and the

20 Court as well.  Actually, I only have one for Mr. Green's

21 Counsel.

22         THE WITNESS:  Thank you, ma'am.

23 BY MS. SCHWARTZ:

24 Q    Is Government Exhibit 1 a fair and accurate

25 representation of what the bathtub looked like when you

RYAN WARE - DIRECT BY MS. SCHWARTZ                    89

1    looked at it?

2    A    Yes, ma'am, it is.

3         MS. SCHWARTZ:  I'll move Government 1 in evidence

4    at this time, Your Honor, for purpose of this hearing.

5         THE COURT:  Any objections?

6         MR. SALINAS:  No objection, Your Honor.

7         THE COURT:  Admitted.

8       (Government's Exhibit No. 1 received in evidence.)

9    BY MS. SCHWARTZ:

10   Q    And did you observe something in particular about any

11   of the areas depicted in the photo?

12   A    The drain.

13   Q    What did you observe?

14   A    White powder substance and floor to be wet.

15   Q    Okay.  What did you conclude having seen that based on

16   your training and experience?

17   A    With my training and experience, I concluded that the

18   Defendant, Alfred Green, attempted to destroy evidence down

19   the drain of the bathtub.

20   Q    Now, beyond the search in the bath -- in the bathroom,

21   did you -- with Krokusz's help, did you search other aspects

22   of the hotel room?

23   A    Correct.  We continued our search of the hotel room.

24   She also alerted on the bed.  On the bed was a large

25   assortment of U.S. currency.  She alerted onto a nightstand,

 1  a desk and a trash can inside of the room.

 2  Q    And what items were recovered by law enforcement from

 3  the room, among other things?

 4  A    On the nightstand, there was an additional bag

 5  containing U.S. currency, and a black baggie also believed

 6  to contain narcotics, and the trash can was recovered rubber

 7  gloves and other chemical agents, cutting agents that, from

 8  my training and experience, I know is used in the packaging

 9  and distribution of cocaine.

10  Q    About how much U.S. currency was in the totality of

11  those two containers, if you -- the two locations in the

12  room, if you recall?

13  A    Over $10,000.

14  Q    And so, now, let's talk about some of the things that

15  led up to the arrest and the search warrant on that day.  I

16  want to direct your attention to March 7, 2024 and ask

17  whether you listen to any recordings of any calls relating

18  to activity on that day.

19  A    Yes, ma'am, I did.

20  Q    Briefly describe what happened on that date as

21  described in those calls.

22  A    Yes, ma'am.  I read a report that indicated that Alfred

23  Green, on a wiretap, was purchasing several kilograms of --

24  was attempting to purchase kilograms of cocaine.

25  Q    And who was he purchasing from, if you recall?

 1   A      Another male by the last name of Lopez.

 2             THE COURT:  Last name of what?

 3             THE WITNESS:  Lopez.

 4             THE COURT:  Thank you.

 5   BY MS. SCHWARTZ:

 6   Q      And are you aware of whether that individual Lopez is a

 7   separately indicted defendant in this -- connected to this

 8   investigation?

 9   A      Yes, ma'am, I am.

10   Q      And do you recall what quantity Green had requested

11   from Lopez?

12   A      I believe it started out at five kilos and then went to

13   six kilos.

14   Q      When you say, "went to six kilos", meaning what?

15   A      Green requested additional.

16   Q      Based on the context of the investigation and agents

17   experience with this, what substance did you understand

18   Green to be trying to buy from Lopez?

19   A      Cocaine.

20   Q      And are you yourself familiar with the voices of Lopez

21   and Green?

22   A      No, ma'am, I'm not.

23   Q      Were agents familiar with the voices of Lopez and

24   Green?

25   A      Yes, ma'am, they were.

RYAN WARE - DIRECT BY MS. SCHWARTZ

1  Q    And was this pursuant to a wiretap on Green's phone?

2  A    Correct.

3  Q    Was there an issue between Green and Lopez as to the

4  cost of this transaction?

5  A    Yes, ma'am.  The cost of the transaction was supposed

6  to be 73,500 and the wire taps indicated that Defendant

7  Green shorted Lopez an amount of money.

8  Q    And did they go back and forth about the amount that

9  had been paid versus the amount that that should have been

10 paid?

11 A    Correct.  They went back -- the wiretaps indicate they

12 went back and forth on how the money was packaged and

13 stacked, and the denominations were not the same throughout

14 the stacks, and that was how the total count of 73,500 was

15 shorted.

16 Q    And did you yourself actually listen to these calls?

17 A    Yes, ma'am, I did.

18 Q    Now, I'm going to turn your attention to later that

19 month.  Now, to March 29th, 2024 and ask you whether there

20 was some kind of seizure of contraband at George Bush

21 International Airport on that date.

22 A    Yes, ma'am.

23 Q    Briefly describe what led up to that.

24 A    There was evidence from a wiretap that indicated that

25 Alfred Green was going to have an amount of narcotics sent

1    to Ohio through the airport and with the utilization of a

2    police K-9 at the airport who alerted to checked baggage,

3    and a search warrant was obtained, and kilogram amounts of

4    cocaine were recovered from those suitcases.

5    Q    Now, prior to the sniff and the warrant at the airport,

6    had law enforcement done any surveillance?

7    A    Yes, ma'am.  From the reports I read, the surveillance

8    initiated at the individual's house, they maintain

9    surveillance to the airport, where they watched them checked

10   the baggage, and then at that point, a K-9 sniff was

11   conducted.

12          THE COURT:  Who's "him"?  You said, watched him

13   checked the baggage.

14          THE WITNESS:  It was -- it's not Alfred Green.

15          THE COURT:  Okay.

16          THE WITNESS:  It's a courier.  And I'm not 100

17   percent positive without refreshing off of the material, the

18   name of the individual.

19          MS. SCHWARTZ:  Your Honor, the next witness is

20   going to testify about this specific incident as to

21   Defendant Fizer, with exhibits.

22          THE COURT:  Okay.

23          MS. SCHWARTZ:  I'm going to go through it quickly

24   because I wasn't sure whether we were doing separate

25   hearings or individual, but you'll see more evidence

RYAN WARE - DIRECT BY MS. SCHWARTZ                    94

1   specifically from the next witness.

2            THE COURT:  Okay.

3   BY MS. SCHWARTZ:

4   Q    How many -- so, how many people checked baggage at the

5   airport in connection with this, if you recall.

6   A    Two individuals did.

7   Q    And were there two suitcases?

8   A    Yes, ma'am, there was.

9   Q    How many kilos were recovered collectively from the two

10  suitcases?

11  A    I believe eight in total.  Four in each suitcase.

12  Q    And did each of those kilos test positive for cocaine?

13  A    Yes, ma'am, I reviewed lab results that indicated it

14  tested positive for cocaine.

15  Q    Okay.  Now, I'm going to skip you ahead to April 10th,

16  2024, and ask whether agents observed a meet between Green

17  and Lopez?

18  A    Yes, ma'am, they did.

19  Q    Briefly describe what you recall about that date.

20  A    On that day, I reviewed still photos that showed two

21  vehicles meet up, and there was an exchange of a brown box

22  and a bag, which we believe the box contained kilogram

23  quantities of narcotics, and the bag to contain money.

24  Q    And did you also read agents accounts of that

25  transaction and warrant affirmations and so forth?

RYAN WARE - DIRECT BY MS. SCHWARTZ                    95

1  A    Yes, ma'am, I did.

2  Q    And prior to arriving at the scene where Green met

3  Lopez, where had Lopez been?

4  A    Went to a house and --

5  Q    Do you remember the name of the person whose home it

6  was?

7  A    I do not recall the name off the top, but I could

8  refresh my memory off of the material that I reviewed.

9  Q    Okay.  One moment and I will refresh the witness's

10 recollection.  I'm going to ask you to look at paragraph 36

11 of this item, which Counsel has.  It's a search warrant for

12 a property located at 5635 Heather Run Drive.

13      Actually, it's paragraph 35.

14 A    Yes, ma'am.

15 Q    And Counsel does have this document.

16      THE COURT:  Thank you, ma'am.

17      MS. SCHWARTZ:

18 Q    Actually, Counsel for Mr. Green has this document.  I'm

19 not sure if Counsel for Mr. Fizer does, but I do have an

20 extra copy.

21      MR. GAITHER:  Heather Green?

22      MS. SCHWARTZ:  Pardon me?

23      MR. GAITHER:  Are you talking about Heather Green?

24      MS. SCHWARTZ:  Heather Run.

25      MR. GAITHER:  Heather Run.  I'm sorry.

1          MS. SCHWARTZ:  Did I send you that?

2          MR. GAITHER:  No, you did not.

3          MS. SCHWARTZ:  Okay.

4          MR. GAITHER:  That's first I've heard of it.

5          MS. SCHWARTZ:  The witness is refreshing his

6   recollection by reference to paragraph 35.

7   BY MS. SCHWARTZ:

8   Q    Does that refresh your recollection --

9   A    Yes, ma'am, it does.

10  Q    -- Officer Ware?  What was the name of the -- of the

11  person whose home Lopez went to prior to the meeting with

12  Green?

13  A    Last name with Tingle.

14  Q    And he obtained what at Tingle's home?

15  A    A box or a parcel, brown cardboard box.

16  Q    Skipping ahead slightly.  Was a box somehow connected

17  to Tingle ever recovered in this case?

18  A    Yes, ma'am.  At an execution of a search warrant at

19  Defendant Alfred Green's house, there was a box that had the

20  postage stamp or that had Tingle's name on it, which was

21  consistent in appearance with the box that was observed in

22  the transaction on that day.

23  Q    So, when you say posted, are you talking about some

24  kind of mailing label?

25  A    A mailing label.  Yes, ma'am, I believe it was a UPS

 1  that has the address and the name of where the box was being

 2  shipped to.

 3  Q    Now, you mentioned photographs of the meet between

 4  Green and Lopez.

 5          MS. SCHWARTZ:  May I approach, Your Honor?

 6          THE COURT:  Yes.

 7          MS. SCHWARTZ:  Okay.  Let me give one to Counsel

 8  for Mr. Fizer.

 9          MR. FIZER:  Thank you, ma'am.

10  BY MS. SCHWARTZ:

11  Q    Are these the photograph -- are these the photographs

12  that you saw that you understand from the materials you

13  reviewed to represent a transaction between Green and

14  and Lopez on April 10th --

15  A    Yes, it is.

16  Q    -- 2024?

17  A    Yes, ma'am, it is.

18  Q    And in that bottom picture marked C, is that a box

19  being given from one to the other?

20  A    Yes, ma'am, it is.

21          MS. SCHWARTZ:  Your Honor, at this time, I'll move

22  Exhibit 2 in evidence, 2A, B and C.

23          MR. SALINAS:  No objection, Your Honor.

24          THE COURT:  Mr. Gaither, since you have a copy, do

25  you have any objection for this?

1          MR. GAITHER:  For?  Do you mean Exhibit 2?

2          THE COURT:  Yes.

3          MR. GAITHER:  No, Your Honor.

4          THE COURT:  All right.  It's submitted for

5    purposes of this hearing.

6          MS. SCHWARTZ:  Thank you, Your Honor.

7      (Government's Exhibit 2A, B, and C received in

8    evidence.)

9    BY MS. SCHWARTZ:

10   Q    So, now, Officer Ware, let me direct your attention to

11   April 17, 2024, and ask whether Alfred Green, the Defendant

12   in this case, was arrested in Cincinnati on that date?

13   A    Yes, ma'am, I reviewed documents indicating that he

14   was.

15   Q    And based on the items you've reviewed, briefly

16   describe what happened leading up to the arrest of Alfred

17   Green in Cincinnati?

18   A    Yes, ma'am.  Alfred Green and another individual flew

19   from Houston into Cincinnati.  Another female drove a

20   vehicle from Houston to Cincinnati.  Off of the wiretap on

21   Defendant Green, they believe there to be a large shipment

22   of narcotics going from Houston to Cincinnati.

23        Law enforcement officials in Houston notified officials

24   in Cincinnati of this event.  They conducted and implemented

25   surveillance at the airport, and they observed a female

RYAN WARE - DIRECT BY MS. SCHWARTZ                              99

1   pickup Alfred Green and another individual, and that

2   probable cause was developed for a traffic stop, and they

3   were found to be in possession of kilo quantities of

4   cocaine.

5   Q    Now, in between the airport and the traffic stop, had

6   there been a -- had the vehicle stopped at any location?

7   A    Yes, ma'am.  The vehicle did stop at a hotel.  Law

8   enforcement officials reviewed video footage inside the

9   hotel.

10       The two males entered the hotel, each carrying a

11  backpack.  They went to the front desk.  They booked a room.

12  They immediately left the front desk, went back out into the

13  vehicle, the vehicle left, and that was whenever probable

14  cause was initiated for a traffic stop and a K-9 was

15  utilized for a probable cause for search of the vehicle, and

16  two backpacks, each containing five kilograms for a total of

17  10 were recovered at that time.

18  Q    So, the kilos were in the backpacks at the time that

19  the -- that law enforcement recovered them.

20  A    Yes, ma'am, they were.

21           THE COURT:  Let me ask you a question

22  (indiscernible).  Back up.  When you said the Defendant went

23  from Houston to Cincinnati, was he in the car?

24           THE WITNESS:  No, sir.  The Defendant and another

25  male individual, both flew to Cincinnati, and a --

RYAN WARE - DIRECT BY MS. SCHWARTZ

1          THE COURT:  Okay.

2          THE WITNESS:  -- off of the wiretap they knew a

3    car was driving to Cincinnati.

4          THE COURT:  And this was the car that you saw stop

5    at a hotel with --

6          THE WITNESS:  I didn't see.  No, sir, but that law

7    enforcement officials saw, pick him up at the airport and go

8    to the hotel.

9          THE COURT:  Okay.

10          THE WITNESS:  It had Texas registration on them.

11          THE COURT:  Okay.  Pick the Defendant at the

12    airport, then went to the hotel?

13          THE WITNESS:  Correct.

14          THE COURT:  Okay.  And that's where the two -- the

15    bags were recovered with the cocaine?

16          THE WITNESS:  In the vehicle immediately upon

17    leaving that hotel --

18          THE COURT:  After the stop, yeah.

19          THE WITNESS:  -- and there was -- the law

20    enforcement went in and reviewed footage.  They were -- they

21    went to the hotel, they checked in, immediately left.  They

22    maintained the backpacks the entire time.

23          THE COURT:  Okay.

24    BY MS. SCHWARTZ:

25    Q    And were those drugs tested at the lab?

RYAN WARE - DIRECT BY MS. SCHWARTZ                    101

1   A    Yes, ma'am, I reviewed a lab report that indicated

2   positive results for cocaine.

3   Q    And what was the approximate total weight of the lab

4   verified cocaine?

5   A    10 kilograms.

6   Q    Now, on that same date, April 17th, 2024, was a search

7   warrant executed at the Defendant's home in Houston, Texas?

8   A    Yes, ma'am, it was.

9   Q    And were there items in the home connected to the

10  Defendant?

11  A    Yes, ma'am.

12  Q    Such as what?

13  A    Mail was recovered that had Defendant Alfred Green's

14  name on it.

15  Q    Addressed to him at that location?

16  A    Yes.

17  Q    Okay.  And did law enforcement find any firearms during

18  that search?

19  A    Yes, ma'am, they found approximately 11 firearms.

20  Q    And was there also ammunition for the firearm?

21  A    Yes, ma'am, there was.

22  Q    Okay.  And did law enforcement find any narcotics

23  during that search?

24  A    Yes, ma'am, they found a large amount of cocaine as

25  well.

1  Q     Do you remember approximately how much cocaine that

2  was?

3  A     It was approximately -- it was over 500 -- it was in

4  the 500 range, grams of cocaine.

5  Q     So, more or less half a kilo?

6  A     More or less half a kilo, correct.

7  Q     And was that also tested to verify that it was cocaine?

8  A     Yes, ma'am, I reviewed lab results indicating that that

9  is what.

10 Q     Now, were the transactions about the only transactions

11 involving cocaine sales by Defendant Green that you came

12 across in reading the background on this case?

13 A     No, ma'am.

14 Q     Did agents tabulate a total amount of cocaine bought by

15 Defendant Green from Jose Lopez in the months only of March

16 and April 2024?

17 A     Yes, ma'am, and I read that it was approximately 22

18 kilograms.

19 Q     And that was based on the totality of -- for that

20 period of time of the investigative means that they had,

21 including the wiretaps and everything else?

22 A     Yes, ma'am, that is what the paperwork indicated.

23 Q     Okay.  And has Alfred Green been convicted on two

24 separate occasions of manufacture -- of possession of a

25 controlled substance with intent to manufacture or deliver

```
 1  it in Texas?

 2  A    Yes, ma'am, he has.

 3  Q    And was he sentenced to six years concurrent on each of

 4  those occasions?

 5  A    Yes.

 6  Q    And does he have -- and were those both in 2020, 2015?

 7  A    Yes, ma'am, that is correct.

 8  Q    And did he also have an earlier conviction for

 9  possession within -- for the purpose of manufacture or

10  delivery of a controlled substance in 2007?

11  A    Yes, ma'am.

12          MS. SCHWARTZ:  I have no further questions for the

13  witness.  I pass the witness.

14          THE COURT:  All right.  Thank you.  Cross,

15  Mr. Salinas?

16          MR. SALINAS:  Yes, Your Honor, if I may.

17          THE COURT:  Yes.  Proceed.

18              CROSS-EXAMINATION OF RYAN WARE

19  BY MR. SALINAS:

20  Q    Officer Ware, my name is Joe Salinas, and I represent

21  Alfred Green.

22  A    Good morning.

23  Q    Just a couple of quick questions.  So, you were

24  involved in the search at the hotel, correct?

25  A    Yes, sir, that is correct.
```

1  Q    So, in the first -- the first thing that happened there

2  was the dog, your dog alerted on the black truck, correct?

3  A    So, that was not the first thing that occurred.  But,

4  yes, during the course of that morning, my dog did alert on

5  the black Dodge truck.

6  Q    Okay.  You hadn't done anything in the hotel room yet,

7  right?

8  A    No, sir.  I had not -- the first thing that occurred at

9  the hotel that morning was the execution of an arrest

10  warrant.

11  Q    Execution of the arrest warrant?

12  A    Yes, and I was in the parking lot during that time.

13  Q    You were in the parking lot when that happened?

14  A    Yes, sir.

15  Q    Okay.  And so, after they executed the arrest warrant,

16  the first thing you did was the dog went through the vehicle

17  first, or did you go through the hotel room first?

18  A    No, sir.  So, they executed an arrest warrant at the

19  hotel, and they indicated that the Defendant was in custody

20  and that the scene was safe and secure.

21      At that point, I deployed my dog in the parking lot and

22  conducted an open-air sniff, and my dog alerted onto the

23  Defendant's truck.

24  Q    Okay.  And when the dog went through the truck, he

25  didn't find any drugs, but he alerted to marijuana.  Is that

1  correct?

2  A    So, upon the search warrant being obtained for the

3  truck, that is, whenever I introduced my K-9 into the

4  interior of the vehicle, where she alerted to the presence

5  of one of the five odors that she is trained to detect, I

6  can't determine which odor it is, but one of the five odors

7  that she's trained to detect on the center console and on

8  the cup holders, but you are correct.  No narcotics were

9  recovered from the truck at that time.

10 Q    Okay.  And you had said that there was a loaded pistol

11 that was founded in the truck at that time, correct?

12 A    Correct.

13 Q    And are you aware of any -- did they run the pistol to

14 see if it was stolen or who purchased the pistol?

15 A    I'm unaware of.

16 Q    Okay.  And then, after the hotel room was secure, the

17 dog -- you took the dog up to the room and went through the

18 room, correct?

19 A    The timeline is not exactly correct, but the hotel room

20 was secured, and then several hours passed in the

21 (indiscernible) of the submittal of an affidavit for a

22 search warrant of the hotel.  I did not introduce my dog

23 into the hotel until the search warrant was obtained.

24 Q    Okay.  As far as you -- are you aware of whether or not

25 they ever checked to see who the hotel room was rented to?

1   A    I'm unaware of that.

2   Q    Okay.  Once they obtained a warrant and you took the

3   dog into the hotel room -- can we go across -- let's see you

4   indicated that there was some white substance in the tub and

5   it was wet, correct?

6   A    Correct.

7   Q    Okay.  Then there was some money found on the bed, some

8   money found on a nightstand, and what else was found on a

9   nightstand?

10  A    A black baggie containing narcotics.

11  Q    Okay.  What was found on the desk?

12  A    I believe there was -- I would -- I reviewed -- I was

13  there and I reviewed photos that were taken.  I believe -- I

14  would like -- I cannot recall exactly what was recovered off

15  of the desk.

16  Q    Okay.

17  A    It's in the paperwork.

18  Q    Right.  In the trash can?

19  A    In the trash can was rubber gloves and other chemicals

20  that I know to be used as cutting agents in the packaging of

21  cocaine.

22  Q    Okay.  And then basically testified on the wiretap, and

23  the wiretap was a phone call between Mr. Green and

24  Mr. Lopez, correct?

25  A    That is correct.

RYAN WARE - CROSS BY MR. SALINAS

1  Q    Okay.  And that phone call basically was a discussion

2  with the purchase of kilos, and then there was an issue

3  about money, correct?

4  A    Correct.  Yes, sir.

5  Q    And then the next thing you testified to was there was

6  a wiretap on March 29 and that involved the George Bush

7  Airport, correct?

8  A    Yes, sir.

9  Q    And can you please tell me again what the discussion

10  was on the wiretap to the airport?

11  A    After reviewing the material, it was -- the agents

12  believed that there was going to be a large amount of

13  narcotics being traffic through George Bush International

14  Airport to Ohio.

15  Q    Okay.  And you know who that wiretap -- who the wiretap

16  concerned?  Was it Green and somebody else?

17  A    It was -- I know it to concern Defendant Green and

18  somebody else.

19  Q    But you don't know who the other person is?

20  A    No, sir.  I do not recall.

21  Q    Okay.  And there was surveillance at somebody's home,

22  and those individuals were going to the airport.  Do you

23  know whose home that was?

24  A    The surveillance initiated on Mr. Fizer's house.

25  Q    Okay.  And then I -- did Mr. Fizer and Mr. Green

RYAN WARE - CROSS BY MR. SALINAS                    108

1  checked bags at the airport?

2  A    No, sir.

3  Q    Did they not have any luggage that was checked?

4  A    Mr. Green did not have any luggage at George Bush

5  International Airport that I'm aware of on that date.

6  Q    Okay.  But you testified that both -- is it Mr. Fizer

7  and Mr. Green that flew to Ohio?

8        THE COURT:  Your Honor, I think we're confusing

9  dates.  It might -- if Counsel wants to proceed, that's

10 fine, but if I can detangle it for him, I'm happy to do

11 that.

12        MR. SALINAS:  That's fine, Your Honor.

13        THE COURT:  Sure, that's fine.

14        MS. SCHWARTZ:  The incident on March 29th involved

15 Defendant Fizer and a woman who is not subject to this

16 detention hearing, Alexis Hatchet.  The information -- the

17 trip to Ohio involving Defendant Green and another person

18 happened on April 17th.

19        So, there were two different ventures to Ohio with

20 different characters.

21        THE COURT:  Okay.

22        MR. SALINAS:  Okay.

23 BY MR. SALINAS:

24 Q    Okay.  And you had testified that on April the 10th,

25 there was a meeting between Green and Lopez, and it was

1   something with a brown box, and a bag containing money.  Do

2   you remember that?

3   A    Yes, there was a transaction brown bag in a bag that --

4   in a bag that they believed to contain money.  Yes, sir.

5   Q    Okay.  When you say they believe, are we talking about

6   agents that were surveilling, or are they just speculating?

7   A    The agents through that conclusion off of their

8   investigative means to include a wiretap that discussed the

9   transaction.

10  Q    So, was there surveillance in relationship to that

11  wiretap?

12  A    Correct.  These pictures are from the surveillance of

13  that.

14  Q    Okay.  And is that the pictures where the two trucks

15  are side by side?  I guess, there's a GMC pickup and a Dodge

16  pickup, correct?

17  A    Yes, sir, it is.

18  Q    Okay.  And that's a meeting between Mr. Green and

19  Mr. Lopez, correct?

20  A    To my knowledge, yes, sir.

21          MR. SALINAS:  Give me a second, Your Honor,

22  please.

23          THE COURT:  Sure.

24  BY MR. SALINAS:

25  Q    Okay.  On the April 17th Ohio arrest, a search warrant

RYAN WARE - CROSS BY MR. SALINAS

1   was also executed at a home at 2130 Abiding Grace, Missouri

2   City?

3   A    Yes, sir.

4   Q    Okay.  And do you know whose home that is?

5   A    That was -- I do -- if the -- who owns the home, or who

6   -- I do not know.  I know that Alfred Green was believed to

7   live there, and there was evidence indicating that.

8   Q    Okay.  So, on that particular home, there were guns,

9   drugs in an envelope with Mr. Green's name on it.  Do you

10  know what address the envelope had for Mr. Green?

11  A    That address, sir.

12  Q    It have the address of the 2130 Abiding Grace?

13  A    Yes, sir.

14  Q    Okay.  But you don't know whose home that is, correct?

15  A    I do not know who owns the home.  No, sir.  If that is

16  your question.

17  Q    Yes.  Do you -- where did the amount of kilos that

18  Mr. Green purchased from Mr. Lopez come from?  Where was

19  that amount calculated?

20  A    Are you referring to the total amount over a time

21  period?

22  Q    Yes, the 22 kilos.  Where did that come from?

23  A    That was a -- that was listed in a -- one of the

24  paperwork that I reviewed that the agents were -- that the

25  gents tabulated, through their investigative means of the

1  surveillance techniques that they had implemented to include

2  pole cameras, wiretaps, physical surveillance, etcetera.

3  Q    Okay.  So, basically, that is their best guess as to

4  what was actually purchased based off of pole cameras and

5  Title III wiretap?

6  A    Yes, sir.

7  Q    Now, back on the search warrant for the Comfort Inn,

8  Room 316.  There were drugs that were found in the room,

9  correct?

10 A    Correct.

11 Q    Okay.  Do you know if those drugs were ever tested?  Is

12 there a lab report that will reflect --

13 A    I am not positive.  I cannot recall if there's a lab

14 report that has been completed at this time.  There may be

15 or they may -- I do not recall at this time.

16 Q    Normally, anytime you find drugs, you would have a lab

17 report to substantiate that in fact they are drugs, correct?

18 A    Absolutely.  I just do not recall if I have -- if I

19 have reviewed that lab report or not.  I have reviewed

20 several.

21 Q    And was Mr. Lopez arrested in another case?

22 A    I am -- I'm unsure of the status of him being in

23 custody or not.  I know that he is a target of the

24 investigator -- or that he was involved in the

25 investigation.

1  Q    Okay.  But he is not -- he is not charged in this -- in

2  this case, correct?

3  A    I do not know.

4         MR. SALINAS:  Pass the witness, Your Honor.

5         THE COURT:  Any redirect?

6         MS. SCHWARTZ:  Very briefly.

7              REDIRECT EXAMINATION OF RYAN WARE

8  BY MS. SCHWARTZ:

9  Q    Based on your training and experience, Officer, can the

10 odor of narcotics linger in a place after the narcotics have

11 been removed from that place?

12 A    Yes, ma'am, it can.

13 Q    And the telephone calls you listened to on March -- for

14 March 7, 2024, was that one call or multiple calls?

15 A    Multiple calls.

16 Q    And were some -- did some of them appear to be -- well,

17 with respect to the timing of any transaction, were they

18 before or after, or some of each?

19 A    Some of each.  There was a call to arrange the

20 transaction, and then there was additional calls, as I

21 indicated, with the purchase amount and the currency being

22 shorted to Suspect Lopez.

23        MS. SCHWARTZ:  I have nothing further for the

24 witness.

25             THE COURT:  Any recross based on that,

RYAN WARE - REDIRECT BY MS. SCHWARTZ                    113

1   Mr. Salinas?

2           MR. SALINAS:  Excuse me, Your Honor.

3           THE COURT:  Any recross based on her questions?

4           MR. SALINAS:  No, Your Honor.

5           THE COURT:  All right.  Mr. Podolsky, Mr. Gaither,

6   do you have any need to ask questions of this witness?

7           MR. PODOLSKY:  No, Your Honor.

8           MR. GAITHER:  Yes, Your Honor.

9           THE COURT:  Okay.  Mr. Gaither, you may proceed.

10          MR. GAITHER:  I believe so.

11                  CROSS-EXAMINATION OF RYAN WARE

    BY MR. GAITHER:

12

    Q   Officer Ware, I take it you are not asked as part of

13

    your preparation for testimony today to focus on Mr. Deandre

14

    Fizer.  Am I correct about that?

15

    A   The documents that I reviewed do not focus on your

16

    client, sir.

17

    Q   But they do mention his name, or his name comes up from

18

    time to time?

19

    A   Correct.

20

    Q   So, let me just -- let's get through this and --

21

            THE COURT:  Give him one of the microphones or

22

    speak in the microphone.  Thank you.

23

            MR. GAITHER:  Is that alright?  Is that better?

24

            THE COURT:  Yeah.

25

    BY MR. GAITHER:

1  Q    Can you hear me better, Officer Ware?

2  A    Yes, sir.  Thank you.

3  Q    All right.  First of all, I was handed a search warrant

4  for a property located at 5635 Heather Run.  It's pretty

5  lengthy document, and I flipped through it, I did not see my

6  client's name.  You had used it to refresh your recollection

7  about something.

8       Based on the documents -- let me back up a second and

9  say, your testimony is based in part on your personal

10 experience involvement in certain aspects of this case,

11 correct?

12 A    That is correct.

13 Q    And some of it is based on reviewing documents and

14 interviews and reports and things of that done by other

15 police officers, correct?

16 A    Yes, sir, that is correct.

17 Q    As in relation to this warrant, this search warrant, it

18 appears to me to relate mostly to the Mr. Lopez that you

19 have mentioned.  Is that generally correct?

20 A    Yes, sir.

21 Q    My question is, are you aware and all the documents

22 that you reviewed and all the material that you've looked

23 through, all the conversations that you had with anybody,

24 has there ever been any reference or communication that

25 Mr. Fizer has any relation to this Mr. Lopez whatsoever?

1   A     Not that I can recall.

2   Q     And what is marked as Government Exhibit Number 2, and,

3   I guess, it is now admitted for purposes of this hearing.

4   The picture of -- I guess, there's actually three pictures

5   of two trucks side by side, which my understanding is -- am

6   I correct in my understanding that one of those drivers is

7   Lopez and the other one is Green?  Did I understand that

8   testimony correctly?

9   A     That is my -- yes, sir.  That is what I believe after

10  reviewing the documents.

11  Q     Okay.  Do you know just by looking at the photograph or

12  and based on the other information that you've compiled,

13  which truck is Mr. Green's?

14  A     I would have to go back and look and review the

15  paperwork.  I don't want to -- I don't want to guess in my

16  testimony.  I would like to review the paperwork.

17  Q     Would this be the same truck that you search later on

18  at the -- at some hotel?

19  A     That's what I would want to go back and review, and the

20  license plate is visible.  So, I would like to confirm that

21  before giving it as testimony.

22  Q     Do you know whether or not -- and you can't see really

23  in these photographs about inside the trucks very easily.

24  Do you know based on your personal knowledge or knowledge

25  compiled, whether or not there was anybody else present

1  during the time that these photographs were taken in the --

2  in the vehicles?

3  A    From the information that I have reviewed in

4  preparation, I do not know of any if there were or if there

5  were not any other occupants in the vehicles.

6  Q    Okay.  But you have no information to suggest Mr. Fizer

7  was involved in this -- whatever it was, this encounter?

8  A    Not in the paperwork that I reviewed.

9  Q    All right.  Now, specific reference related to your

10 personal involvement in the case.  Did you have any personal

11 involvement in what has -- I will characterize as the George

12 Bush Airport incident?

13 A    No, I did not.

14 Q    Do you have any -- did you -- have you had, or did you

15 have any personal involvement in the arrest of Mr. Fizer?

16 A    No, sir, I did not.

17 Q    Have you had any involvement surveillance or personal

18 involvement with Mr. Fizer during the extent of this

19 investigation?

20 A    No, sir.  I have not.

21 Q    All right.  Going specifically in relating to that

22 George Bush incident.  You have an understanding of

23 generally of how that went down, right?

24 A    That's correct.

25 Q    And initially, I believe you testified that it started

1   with an information received via a wiretap on Mr. Green,

2   correct?

3   A    To my knowledge, yes, sir.

4   Q    And have you, in preparation for your testimony or in

5   the course of the investigation, listen to those

6   conversation -- that conversation, or those conversations

7   that were the sort of the predicate of that incident?

8   A    No, I have not.

9   Q    Okay.  Do you have any understanding of what that

10  conversation was other than there's something he wants to

11  take -- he wants somebody to take a bunch of stuff to Ohio?

12  A    That's the extent.

13  Q    Okay.  Now, you said that there was surveillance --

14  after the phone call, there was surveillance established on

15  individual or individuals, correct?

16  A    Correct.

17  Q    Who was the surveillance established on if you -- if

18  you know?

19  A    Surveillance was established and your client,

20  Mr. Fizer, and another individual at a residence in Houston,

21  and it maintained to George Bush International Airport where

22  your client was arrested.

23  Q    Okay.  So, the telephone conversation, this happened on

24  March 29th, correct?

25  A    Yes, sir.  That is correct.

1  Q    Okay.  Now, the telephone conversations -- the

2  telephone conversation, do you know if there was one

3  conversation or more than one conversation?

4  A    I do not know.

5  Q    Okay.  But they were presumably, were they that day or

6  before that day, or do you know?

7  A    I do not know.

8  Q    So, you don't know -- or was the -- was the

9  surveillance -- to your knowledge, was the surveillance on

10 Mr. Fizer established after the phone calls were made?

11 A    I do not know when it was established.

12 Q    All right.  You testified about Mr. Green making a trip

13 to Cincinnati on or about April 10.  Am I -- have I got that

14 right?

15 A    Yes, sir.

16 Q    Do you have any information, or do you have any kind of

17 understanding that Mr. Fizer was involved with that, or

18 related to that in any matter?

19 A    Not that I know of.

20 Q    Do you -- are you familiar with Officer Snell

21 (phonetic)?

22 A    Yes, sir.

23 Q    Is he in the same unit as you are?

24 A    Yes, sir.  He's a K-9 handler assigned to the Houston

25 Police Department's Narcotics Division, and his assignment

RYAN WARE - CROSS BY MR. GAITHER

119

1   is at George Bush International Airport.

2   Q    Okay.  And he handles Ricky Bobby?

3   A    That is correct.

4   Q    That's his K-9?

5   A    Correct.

6   Q    Okay.  Is there any -- how long have you known him, or

7   how long have you worked together?

8   A    Over five years.

9   Q    Have you ever had occasion to work with Ricky Bobby?

10  A    We train together.  So, I have seen him and his dog

11  working on numerous occasions.

12  Q    All right.  He receives pretty much the same training

13  that you do?

14  A    Correct.

15  Q    And that training is through HPD?

16  A    Yes, sir, and we're certified through a third party.

17  Q    Through, I'm sorry, what?

18  A    A third party.

19  Q    What third party?

20  A    The National Narcotics Detection Dog Association.

21  Q    And does that certification require a certain regiment

22  that you have to go through, a test that has to be passed

23  and things of that nature?

24  A    Correct.

25  Q    Now, in terms of -- you mentioned that Krokusz is

1  trained to alert on certain narcotics.

2  A    That is correct.

3  Q    But the alert is such that it does not distinguish

4  between each narcotic, right?

5  A    That is correct.

6  Q    And that would presumably be -- or would I be

7  reasonable to assume that that's typically the -- or that's

8  the same training that Ricky Bobby receives?

9  A    Correct.

10 Q    And that would be true with him as well?

11 A    Correct.

12 Q    Okay.  What is -- I see -- it looked to be a term of

13 art, but I can't find the word right now.  Open sniff, open-

14 air sniff, something like that.  Am I getting close?

15 A    Yes, sir.

16 Q    Okay.  What technically is it called?

17 A    It's technically calling an open-air sniff.

18 Q    Okay.  It was pretty close.  Okay.  Now, what is that?

19 A    It is a -- it is a deployment of your K-9 in an open

20 environment that people are free.  It's not a secluded area.

21 It is a place that you and the K-9, and any other member

22 would have the right to be at.

23 Q    When you say an open area, I mean, are you -- is there

24 any kind of dimension that is part of the criteria for

25 determining what -- where that should be utilized?

1  A     No, sir.

2  Q     And do you have any kind of understanding based on the

3  information you received how the search of the suitcases at

4  George Bush on that occasion was conducted?

5  A     No, sir.  All that I reviewed was that an alert was

6  obtained.

7  Q     Okay.  But have you yourself been involved in airport

8  searches?

9  A     Yes, sir, I have.

10 Q     Okay.  And based on the understanding, based on your

11 testimony earlier, there was surveillance of Mr. Fizer going

12 to the airport, checking in baggage, and then at that point

13 -- at some point in time the bags were seized, or the dog

14 was alerted, things of that nature.

15       Okay.  Now, my question is that, obviously, those bags

16 had already been checked based on your understanding,

17 correct?

18 A     I am not 100% certain at what point the K-9 alerted to

19 the bags.

20            THE COURT:  Let me just interrupt you,

21 Mr. Gaither.

22            MR. GAITHER:  Sure.

23            THE COURT:  Is your next witness going to cover a

24 lot of this?

25            MS. SCHWARTZ:  My next witness is going to cover a

 1  lot of this, and there was also a factual error that this

 2  witness made, which I can bring out on --

 3          THE COURT:  You can bring it out on redirect.

 4          MS. SCHWARTZ:  Okay.

 5          THE COURT:  I just want to make sure that you're

 6  understanding, Mr. Gaither, that a lot of these questions

 7  can be addressed by the next witness, I believe.

 8          MR. GAITHER:  Thank you, Judge.

 9          MS. SCHWARTZ:  Not in great detail, but --

10          THE COURT:  Sure.

11          MS. SCHWARTZ:  -- to more so than this witness.

12          MR. GAITHER:  Might I just ask who the next

13  witness is?

14          THE COURT:  Right.

15          MS. SCHWARTZ:  The next witness is not someone who

16  was there, but someone who has reviewed paperwork, Officer

17  Meister.

18          MR. GAITHER:  It's not Snell, right?

19          MS. SCHWARTZ:  It is not Snell.

20          MR. GAITHER:  Okay.  This might be my only shot at

21  some of this, Judge.

22          THE COURT:  Go ahead, proceed.

23          MR. GAITHER:  I appreciate it.

24  BY MR. GAITHER:

25  Q    So, that kind of situation, let's assume that the bag -

1  - that the bags have been checked.  They go to some location

2  there in the airport, right, in preparation of getting them

3  on the plane to take them wherever their destination is,

4  correct?

5  A    Yes, sir, but I'm not -- I am not familiar with the

6  exact process of once that -- what happens to luggage after

7  it gets checked at the airport.

8  Q    Okay.  So, you don't know how big -- if it was done

9  that way, you don't know how big the area was, you don't

10 know how secluded it was, what kind of dimensions we're

11 talking about --

12 A    I have no clue.

13 Q    -- in terms of where that is?

14 A    Correct.  I have no clue.

15 Q    That would matter in terms of how the dog handles his

16 business, would it not?

17 A    It --

18 Q    I guess, my question is, don't the dogs have a range?

19 A    There's a lot of variables in working your dog that

20 includes airflow, dimensions and everything else, but I have

21 -- I have no idea what the specifics of this alert

22 contained.

23 Q    I understand.  I'm just talking generally here in terms

24 of what you would expect, in terms of just natural

25 protocols.  The smaller the room, you know, the less -- the

RYAN WARE - CROSS BY MR. GAITHER                     124

1  less air there is to deal with, right?

2       And, of course, you that -- I mean, the air

3  conditioning may be going and things like that.  You talk

4  about air flow, but it matters -- the amount of room the dog

5  has to work does make a difference in whether or not they

6  are more apt to alert or focus on certain things, correct?

7  A    Our training -- our training includes small -- small

8  areas to open fields.  So, our dogs are trained to search

9  and search for the five odors in a wide variety of

10  environments.

11  Q    And that includes -- does that include currency?

12            THE COURT:  All right.  Mr. Gaither, I'm going to

13  interrupt you here.  I don't see how this is going to be

14  relevant to detention.  We're not here on the expert of

15  Daubert hearing on their training of the K-9s.

16            MR. GAITHER:  I understand, Judge.

17  BY MR. GAITHER:

18  Q    All right.  Then, if I may have just a moment.  Do you

19  have -- dating back to the -- or going back to the -- for

20  the George Bush Airport while Mr. Fizer was under

21  surveillance.  Do you have any kind of understanding as to

22  where or to whether he met with Mr. Green?

23  A    Not that I can recall.

24  Q    Do you have any kind of understanding as to where the

25  packages that were in the suitcases were packed?

1    A     Not that I know of.

2    Q     During the time that he was under surveillance, did

3    Mr. Fizer go anywhere or meet anyone after that initial

4    phone call or phone calls?

5    A     I am not entirely briefed on when the surveillance was

6    implemented after the completion of the phone call.

7    Q     All right.  And just to make clear, I believe I ask you

8    this, and if I am redundant, I apologize, but you were not

9    present at the time of Mr. Fizer's arrest, and don't know

10   anything about his arrest, correct?

11   A     I was not present.  That is correct.

12   Q     And haven't heard anything of there being any kind of

13   disturbance or problems with -- with that -- with them

14   taking him in custody?

15   A     Not that I'm -- not that I'm aware of.

16   Q     I'm sorry?

17   A     Not that I'm aware of.

18   Q     Thank you, sir.

19          MR. GAITHER:  I believe that's all I have, Judge.

20          THE COURT:  Any redirect?

21          MS. SCHWARTZ:  Yes, just briefly.

22                REDIRECT EXAMINATION OF RYAN WARE

23   BY MS. SCHWARTZ:

24   Q     I believe you testified on cross that Fizer was

25   arrested at George Bush International Airport on March 29th.

1  Are you sure of that?

2  A    No, ma'am.  I misspoke and recalled incorrectly to that

3  matter.

4           MS. SCHWARTZ:  I have nothing further.

5           THE COURT:  Any recross based on that?

6           MR. GAITHER:  No, Your Honor.  Thank you.

7           THE COURT:  All right.  May this witness be

8  excused?

9           MS. SCHWARTZ:  Yes, for the Government.

10          MR. PODOLSKY:  Yes, Your Honor.

11          THE COURT:  And you, Mr. Gaither, may this witness

12  be excused?

13          MR. GAITHER:  Yes, Your Honor.

14          THE COURT:  Mr. Salinas?

15          MR. SALINAS:  Yes, Your Honor.

16          THE COURT:  Thank you, sir.  You may step down.

17          THE WITNESS:  Thank you.  I appreciate it.

18      (Witness steps down.)

19          THE COURT:  All right.  Call your next witness.

20          MS. SCHWARTZ:  The Government calls Detective

21  Meister.

22          MR. PODOLSKY:  Your Honor, can I step around the

23  corner for just a minute?

24          THE COURT:  All right.  You need a break?

25          MR. PODOLSKY:  Yes.

1          THE COURT:  We'll take a five-minute break.

2          MR. PODOLSKY:  Thank you, Judge.

3          THE BAILIFF:  All rise.

4      (Brief break taken.)

5          THE COURT:  All right.  Is everyone here?  Are we

6  ready?

7          MS. SCHWARTZ:  Yes, Your Honor.

8          THE COURT:  Okay.  Call your next witness.

9          MS. SCHWARTZ:  The government calls Detective

10  Jordan Meister-Wile.

11          MR. SALINAS:  I'm sorry.  What's that name?

12          THE COURT:  He'll say his name on here.

13          MR. SALINAS:  Okay.

14          MS. SCHWARTZ:  He'll say it better than I did.

15       JORDAN MEISTER-WILE, GOVERNMENT'S WITNESS, SWORN

16      (Government's witness, JORDAN MEISTER-WILE, takes the

17  stand.)

18          THE WITNESS:  Yes, ma'am.

19          THE CLERK:  You may be seated.

20          MS. SCHWARTZ:  May I proceed, Your Honor?

21          THE COURT:  Yes.

22          DIRECT EXAMINATION OF JORDAN MEISTER-WILE

23  BY MS. SCHWARTZ:

24  Q    Please tell the Court your name.

25  A    Yes, ma'am.  So, my first name is Jordan, J-O-R-D-A-N,

1    last name Meister-Wile, so it's M-E-I-S-T-E-R hyphen

2    W-I-L-E.

3    Q    And by whom are you employed?

4    A    The Houston Police Department,

5    Q    And what is your position there?

6    A    I'm a homicide detective.

7    Q    And about how long have you worked for the Houston

8    Police Department?

9    A    Little over five years.

10   Q    And how long have you been a homicide detective?

11   A    Going on about four months.

12   Q    And what are your general duties in that position?

13   A    I intake the homicide cases and investigate them and go

14   through the whole course of the investigation.

15   Q    Now, were you involved with the FBI investigation into

16   Alfred Jacoby Green, Deandre Fizer and others, or not?

17   A    No, ma'am.

18   Q    Have you reviewed materials about that investigation in

19   preparation for your testimony today?

20   A    Yes, ma'am

21   Q    So, let me direct your attention to events of March

22   29th, 2024.  Were agents surveilling Deandre Fizer on that

23   date?

24   A    Yes, ma'am, they were.

25   Q    And you've reviewed -- and this is based on your review

1  of materials about events of that date.  Is that correct?

2  A    Yes, ma'am.

3  Q    Based on the material you have reviewed, did two sets

4  of things happen on that day with respect to Deandre Fizer?

5  A    Yes, ma'am.

6  Q    What was one of those things?

7  A    So, Mr. Fizer was surveilled from his apartment.

8  Mr. Fizer and another female had two green suitcases, which

9  they loaded into a white Honda Accord, believed to be an

10 Uber.  The two of them went to Bush Airport.  Once they

11 arrived there, they self-checked their bags, and at that

12 point in time, their bags were removed from the check

13 section.

14 Q    And did some kind of -- did something happen to their

15 bags at that point?

16 A    Yes, ma'am.  An open-air sniff was conducted and the

17 dog --

18         THE COURT:  I'm sorry.  What did you say?

19         THE WITNESS:  An open-air sniff was conducted by a

20 K-9 --

21         THE COURT:  Okay.

22         THE WITNESS:  -- and it received a positive hit.

23 At that time, the luggage was removed from that area, and a

24 search warrant was obtained.

25 BY MS. SCHWARTZ:

1  Q    And stopping there for a second.  What led up to the

2  surveillance on Deandre Fizer's clothing and luggage?

3  A    So, the day prior on March 28 through a phone tap, a

4  call was intercepted from Mr. Green to Mr. Fizer, in which

5  Mr. Green advised that he will be picking up approximately

6  eight to nine unidentified items and wanted Mr. Fizer to

7  deliver them to Ohio.

8  Q    Are you confident that Mr. Fizer was a party to that

9  call as opposed to Mr. Green and someone else?

10 A    I would have to review the documents.

11        MS. SCHWARTZ:  Your Honor, as an officer of the

12 Court, I just feel compelled to make the record clear that

13 Mr. Fizer was not, to my knowledge, a party to that call,

14 and --

15        THE COURT:  The call he just talked about

16 between --

17        MS. SCHWARTZ:  The call he just talked about.  It

18 was between Mr. Green and someone, but I do not believe that

19 Mr. Fizer was the other party.

20        THE COURT:  This is the call the day before the

21 incident?

22        MS. SCHWARTZ:  Yes.  And I do not want to create a

23 misimpression in the Government's favor.

24        THE COURT:  Right.

25        MS. SCHWARTZ:  So- --

1          THE COURT:  Okay.

2          MS. SCHWARTZ:  -- I'm just -- I'm just going to

3    leave it -- leave the record that way.

4          THE COURT:  All right.

5    BY MS. SCHWARTZ:

6    Q     But based on the intercepted call, the Government set

7    up interception and the totality of the investigation, the

8    Government set up interceptions out by Mr. Fizer's building?

9    A     Yes, ma'am, correct.

10   Q     Okay.  And I'm going to show you Government Exhibit 1

11   for identification.  I don't believe you have a copy of

12   this.

13   A     Thank you.

14   Q     And you recognize what's depicted in Government's

15   Exhibit 1?

16   A     Yes, ma'am, I do.

17   Q     And what is that?

18   A     It is a luggage tag belonging to a Deandre Fizer.

19   Q     And was that -- is that a tag on one of the two --

20   well, I'm not sure whether you said this already, but when

21   Mr. Fizer and the female went to the airport, were there two

22   suitcases?

23   A     Yes, ma'am, there were two.

24   Q     And was this the tag on one of those two suitcases?

25   A     Yes, ma'am, it was.

1  Q    Is there a name on that tag?

2  A    Yes, ma'am, there is.

3  Q    And what is that name?

4  A    The name is Deandre Fizer.

5  Q    And does that match the Defendant's name, but for a

6  missing letter?

7  A    Yes, ma'am, it does.

8  Q    The letter being the last letter of his first name?

9  A    Yes, ma'am.

10  Q   All right.

11       THE COURT:  Hold on.  Just -- where's the -- I

12  don't see that.  Where's the name?

13       MR. GAITHER:  It's at the very bottom, Judge.

14       THE COURT:  Oh, I see.  Okay.  Thank you.

15       MS. SCHWARTZ:  And I'll move Exhibit 1 in evidence

16  for this hearing.

17       THE COURT:  Any objection?

18       MR. GAITHER:  No objection.

19       THE COURT:  All right.  Admitted for purpose of

20  this hearing.

21     (Government's Exhibit 1 received in evidence.)

22  BY MS. SCHWARTZ:

23  Q    After the search warrant was obtained, were the two

24  suitcases opened?

25  A    Yes, ma'am, they were.

1   Q    And what was found inside the two suitcases?

2   A    There were four objects located in each suitcase

3   believed to be narcotics.

4   Q    And were those objects tested and determined to be

5   narcotics?

6   A    Yes, ma'am, they were.

7   Q    And what narcotic substance were they?

8   A    Cocaine.

9   Q    And approximately what was the weight collectively of

10  the eight objects in the two suitcases?

11  A    Approximately eight kilos.

12          MS. SCHWARTZ:  Okay.  I'm going to -- I'd like to

13  approach and show the witness, Government Exhibit 2, if I

14  might?

15          THE COURT:  Yes.

16          MR. GAITHER:  We already have a Government's

17  Exhibit 2.

18          MS. SCHWARTZ:  Well, that was -- oh, I had

19  marked --

20          THE COURT:  Well, just put it -- just write on

21  there, 2A and --

22          MS. SCHWARTZ:  Let's call this F2.

23          THE COURT:  Okay.

24          MS. SCHWARTZ:  And the first one will be F1.

25          THE COURT:  F1 and F2.

1          MS. SCHWARTZ:  Because I had to mark them

2    separately for each witness anticipating separate hearings.

3          THE COURT:  Sure.

4       (Government's Exhibit 1 previously marked was remarked

5    as Government's Exhibit F1.)

6       (Government's Exhibit F2 was marked for

7    identification.)

8          MS. SCHWARTZ:  So, if I may, Your Honor?

9          THE COURT:  Yes.

10   BY MS. SCHWARTZ:

11   Q    Okay.  Handing F2 to the Court and to the witness.  Can

12   you tell us, Detective, what is shown in F2?

13   A    There appears to be eight package item consistent with

14   narcotics.

15   Q    So, is each of those a photograph of one of the two --

16   contents of one of the two suitcases?

17   A    Correct.

18   Q    Yes, ma'am.

19          MS. SCHWARTZ:  I'd like to move F2 in evidence at

20   this time.

21          THE COURT:  Any objection?

22          MR. GAITHER:  No objection.

23          THE COURT:  Admitted for purposes of this hearing.

24       (Government's Exhibit F2 received in evidence.)

25   BY MS. SCHWARTZ:

JORDAN MEISTER-WILE - DIRECT BY MS. SCHWARTZ                135

1  Q    Now, was there also a search that day of Apartment 501

2  at 3131 West Loop in Texas -- in Houston, Texas?

3  A    Yes, ma'am, there was.

4  Q    And was that building the same building where officers

5  had begun their surveillance on the defense -- on Defendant

6  Fizer?

7  A    Yes, ma'am.

8  Q    Was a search warrant conducted on that apartment on

9  that day?

10  A    Yes, ma'am, it was.

11  Q    And was the search warrant a probable cause based on

12  the rental of an apartment there using the stolen identity

13  of a Kentucky woman?

14  A    Yes, ma'am.

15  Q    What were some of the things found in the apartment?

16  A    Located inside of the apartment, in plain view, was a

17  loaded pistol.  There are also documents belonging to

18  Mr. Fizer such as a Texas ID, a Social Security Card, and

19  what appear to be court return documents.  There was also

20  different items associated with sealing and manufacturing

21  narcotics.

22  Q    And when you talk about sealing narcotics, can you be a

23  little more descriptive?

24  A    Packaging narcotics in order to have them transported.

25  Q    Was there some kind of sealing equipment?

JORDAN MEISTER-WILE - DIRECT BY MS. SCHWARTZ                136

1    A    Yes, there was.

2    Q    And do you recall where that was in the apartment?

3    A    I do not without looking, no, ma'am.

4    Q    Okay.  Were Fizer -- were Defendant Fizer and the

5    female arrested on that day at George Bush International

6    Airport or not?

7    A    No, ma'am, they were not.

8    Q    What were they led to believe with respect to the

9    luggage?

10   A    I believe they were led -- that it was -- the luggage

11   was lost at that point in time.

12   Q    Now, let me skip ahead to July 16, 2024.  Was there

13   another incident involving Defendant Fizer at the same

14   airport?

15   A    Yes, ma'am, there was.

16   Q    Describe briefly what happened in the later incident at

17   the airport?

18   A    In that scenario, I believe agents had learned that

19   Mr. Fizer was traveling from Ohio back to Houston.  Once he

20   had arrived to Houston, they had removed his backpack and

21   conducted an open-air sniff, which tested positive, or which

22   hit positive.  A search warrant was conducted, and there was

23   U.S. currency located inside of the backpack.

24   Q    About how much U.S. currency was recovered?

25   A    Roughly $31,000.

JORDAN MEISTER-WILE - DIRECT BY MS. SCHWARTZ        137

1  Q    Now, I'm going to direct your attention to Wednesday,

2  August 28, 2024.  Just a couple weeks ago, did something

3  happen with respect to Deandre Fizer, Defendant Deandre

4  Fizer, on that date?

5  A    Yes, ma'am.  A arrest warrant was conducted on

6  Mr. Fizer.

7  Q    And did agent -- where did -- where did that -- where

8  was that arrest warrant executed?

9  A    I believe it was 3100 Post Oak.

10 Q    And did agents see anything when they went into that

11 location to arrest him?

12 A    Yes, they did.  They saw a pistol in plain view.

13 Q    After seeing the pistol in plain view, did agents

14 obtain a search warrant for that apartment where they had

15 found him?

16 A    Yes, ma'am, they did.

17 Q    And was in -- what, if anything, were among the things

18 recovered in the search of that apartment at that time?

19 A    In that instance, another pistol was located, so two in

20 total, as well as a green leafy substance believed to be

21 marijuana.

22 Q    And were those guns loaded --

23 A    Yes, they were.

24 Q    -- or accompanied by ammunition?

25 A    Yes, they were loaded.

JORDAN MEISTER-WILE - DIRECT BY MS. SCHWARTZ          138

1  Q    Does Defendant Fizer have any prior felony convictions?

2  A    Yes, he does.

3  Q    Does he have a felony conviction in federal court for

4  being a felon-in-possession of a firearm in 2015?

5  A    Yes, ma'am, he does.

6  Q    And was he sentenced to 75 months in the Southern

7  District of Texas for that crime at that time?

8  A    Yes, ma'am.

9  Q    And is that in addition to other felony convictions as

10  well?

11  A    Yes, ma'am.

12  Q    Now, does he also have -- well, actually, let me go

13  back and say one -- ask one question further on the 29th.

14      Do you recall what state, if any, or what location, if

15  any, Defendant Fizer and the female were flying to on March

16  29th?

17  A    Yes.  They were flying to Ohio, I believe, Cincinnati.

18  Q    So, returning to where I was.

19      Setting aside any Cincinnati case relating to the

20  events of April 17th, does Defendant Fizer have an open

21  Cincinnati case?

22  A    Yes, ma'am, he does.

23  Q    And I'm going to show you what is marked for

24  identification as Government Exhibit F3.

25      (Government's Exhibit F3 was marked for

1   identification.)

2          MS. SCHWARTZ:  If I may approach, Your Honor?

3          THE COURT:  Yes.

4          MS. SCHWARTZ:  And I have a copy as well for

5   Pretrial because I'm not sure this is in their report.

6          THE COURT:  Okay.  Thank you.  You can hand it to

7   Ms. Jones here.

8   BY MS. SCHWARTZ:

9   Q    Is this a court record or a computer record of a court

10  proceeding that you've seen before as to Defendant Fizer?

11  A    Yes, ma'am.  It is.

12  Q    And does it -- what does it indicate about whether he

13  has an open case in Cincinnati, and what the status of it is

14  there?

15  A    It appears he has an open case as well as four warrants

16  issued for his arrest.

17  Q    And what are -- and what was the arrest date in the or

18  the occurrence date in the  -- in the Cincinnati case?

19  A    It looks like it was filed on December 12th of 2023.

20  Q    And the charges?

21  A    One, it reads as alcohol and/or abuse of drugs.  The

22  second, driving without a license.  The third, stopping

23  after an accident on public roads or highways, and the

24  fourth, a traffic light violation.

25  Q    And when was a warrant issued with respect to these

JORDAN MEISTER-WILE - DIRECT BY MS. SCHWARTZ                    140

1    charges?

2    A    On May 3rd, 2024.

3    Q    And as far as you know, is this a current record of the

4    status of this case?

5    A    Yes, ma'am.

6              MS. SCHWARTZ:  I have nothing further for the

7    witness.

8              THE COURT:  All right.  Let's start with

9    Mr. Gaither.  Cross?

10             MS. SCHWARTZ:  Let me just move that in evidence.

11             MR. GAITHER:  Yes, Your Honor, as to -- in

12   relation to Government's Exhibit F3, for a limited purpose,

13   but for relevance, for our purposes here today, it is not

14   relevant or immaterial because they have not -- there's no

15   indication that Mr. Fizer was aware of this, or that he was

16   aware that a warrant had been issued, why a warrant had been

17   issued.  It doesn't say why it is.  So, for our purposes

18   here today, I would say that it's irrelevant.

19             THE COURT:  Well, the rule of evidence don't apply

20   to these hearings.  This will be admitted, and you can

21   obviously proffer what you just said, and the Court takes

22   note of that as well.

23             MR. GAITHER:  Okay.

24        (Government's Exhibit F3 received in evidence.)

25             THE COURT:  You may proceed.

1          MR. GAITHER:  May I proceed?

2          THE COURT:  Yes, sir.

3          CROSS-EXAMINATION OF JORDAN MEISTER-WILE

4   BY MR. GAITHER:

5   Q    All right.  Getting back to your testimony about

6   Mr. Fizer's being injected or becoming involved in this

7   investigation from what you have seen and read and whatnot.

8        First of all, in terms of your personal involvement,

9   personal observations, did you have any kind of personal

10  involvement in the airport incident?

11  A    No, sir.

12  Q    I mean, the first one on March 29?

13  A    No, sir.

14  Q    The second one in July?

15  A    No, sir.

16  Q    Do you have any personal involvement, any personal

17  observations at the time that Mr. Fizer was arrested on

18  August 28?

19  A    No, sir.

20  Q    The phone call that was discussed, have you -- what

21  information -- where did you get your information in

22  relation to that phone call about the Ohio -- stuff going to

23  be shipped to Ohio?

24  A    It was through a report that I was given.

25  Q    Okay.  You've not had any discussions with anybody

JORDAN MEISTER-WILE - CROSS BY MR. GAITHER                    142

1    about that phone call?

2    A    No, sir.

3    Q    You have not listened to the -- or you have not

4    listened to those intercepted messages that was based on  --

5    that that report was based on?

6    A    No, sir, I have not.

7    Q    I believe Mr. Schwartz said that Mr. Fizer was not a

8    party to that call.  So, as you sit here today, do you have

9    any understanding as to how Mr. Fizer became involved in

10   that transaction?

11   A    No, sir.  I do not specifically.

12   Q    But is your understanding that he was under

13   surveillance at some point, at least on March 29, correct?

14   A    Correct.  Yes, sir.

15   Q    As you sit here today, you have no information as to

16   where the drugs in the suitcases came from?

17   A    No, sir.  Other than from the apartment, but prior to

18   that, no, sir.

19   Q    Because the suitcases were under constant surveillance

20   from the time that they left the apartment?

21   A    That is correct.  Yes, sir.

22   Q    But you don't know how long -- when they were at the

23   apartment, how long they were at the apartment, correct?

24   A    Correct.  Yes, sir.

25   Q    You don't know whether or not the packages were in the

1  suitcases at the time that Mr. Fizer may have picked up the

2  packages that were overheard on the wire intercepts?

3  A    Correct, sir.

4  Q    And you said that there was a warrant executed that

5  same day on 3100 Post Oak Boulevard, Number 501 -- Unit 501;

6  is that correct?

7  A    Yes, correct.

8  Q    And do you know who is -- who lives in that unit?

9  A    Mr. Fizer, to my knowledge.

10 Q    I understand that there were some, or at least your

11 testimony was that there were some documents and things that

12 were associated with Mr. Fizer located as a result of that

13 search, but he actually lives in Unit 201, doesn't he, or do

14 you know?

15 A    No, sir, I do not know.

16        MR. GAITHER:  May I approach the witness?

17        THE COURT:  Yes.

18 BY MR. GAITHER:

19 Q    You testified, did you not, that at the time of the

20 arrest that there was another search conducted, and there

21 were certain things found in Mr. Fizer's apartment at that

22 time?

23 A    Yes, on that date.  Yes, sir.

24        THE COURT:  I can't hear you.  What are you --

25 what are you saying?

1         THE WITNESS:  I think it's possible that the two

2    searches are being confused with each other.

3    BY MR. GAITHER:

4    Q    Okay.  The West Loop is what?

5    A    The West Loop South was the warrant that was executed

6    on May 20, I'm sorry, March 29th.

7    Q    I see.  Okay.  And this one is -- so, his unit, where

8    he lives, is 3100 Post Oak, 201?

9    A    That was where he was arrested, correct.

10   Q    Okay.  All right.  So, we're talking about two

11   completely different places?

12   A    Yes, sir, that's correct.

13   Q    All right.  Now, at the time that that warrant was done

14   in March -- okay.  On the March incident, Mr. Fizer is

15   allowed to proceed after his bags are confiscated, correct?

16   A    Yes, sir.

17   Q    Do you know, or do you have any understanding as to

18   whether or not after that date, Mr. Fizer was continued to

19   be under surveillance?

20   A    I cannot speak to that part of the investigation.

21   Q    To your knowledge, after that date, there was no

22   regular video surveillance or physical surveillance of any

23   kind, correct?

24         MS. SCHWARTZ:  Asked and answered, Your Honor.

25         THE COURT:  Go ahead and answer it, if you know.

1          THE WITNESS:  Correct.  To my knowledge, no.

2    BY MR. GAITHER:

3    Q    Okay.  And the July incident, that's where the --

4    Mr. Fizer was coming back -- oh, by the way, did I

5    understand you correctly, in the March occasion, did I

6    understand you correctly to say that your understanding was

7    that Mr. Fizer was traveling to Cincinnati?

8    A    Yes, to my belief, yes.

9    Q    Are you certain of that?

10   A    I believe on the luggage tag it says Cincinnati.

11   Q    Well, actually on the luggage tag, does it say

12   Columbus?

13   A    It may.  I may have misspoken.

14   Q    Is it possible that in some of the information that you

15   have gone through, you had a chance to review that there are

16   errors in those reports that gave -- that led you to believe

17   that he was going to Cincinnati as opposed to Columbus?

18   A    I cannot speak to as far as what they wrote is true or

19   not.  I can only speak to what I've read.

20   Q    But you read that he was going to Cincinnati?

21   A    I would have to review it one more time to make sure.

22   Q    Okay.  So, as you sit here, you just don't know?

23   A    Correct.  At this time, no.

24   Q    All right.  Now, moving to July.  At that point in

25   time, you have no understanding as to whether or not he was

1   under surveillance prior to going to Ohio?

2   A    My part of the investigation, no, sir, I do not know.

3   Q    Well, I mean, you were asked to come in and testify as

4   to Mr. Fizer's case, correct?

5   A    Yes, sir.

6   Q    And I would imagine that they gave you everything that

7   was significant for purposes of allowing you to do so.

8         MS. SCHWARTZ:  Objection, Your Honor.  He would

9   have no way of knowing.

10        THE COURT:  Sustained.

11  BY MR. GAITHER:

12  Q    Well, wouldn't you have asked to be given all the vital

13  information about Mr. Fizer so that you could testify fully

14  and completely in front of the Judge?

15  A    Yes, sir.

16  Q    All right.  And at least at the time that you were

17  reviewing this, and the time that you were getting prepared

18  for your testimony, you were satisfied that you were given

19  all the information that you needed to testify, correct?

20  A    From my knowledge, yes, sir.

21  Q    All right.  Well, if they're holding out on you, you

22  know, I'm not going to hold that against you, but I don't --

23  I don't think that happened.  But anyway --

24        THE COURT:  Mr. Gaither, I don't want these

25  sidebar comments, please.  Please proceed.

1          MR. GAITHER:  Yes, Your Honor.

2    BY MR. GAITHER:

3    Q    Okay.  In the July incident, you have no understanding

4    that he was under surveillance leading up to that trip,

5    correct?

6    A    There was some sort of surveillance because they were

7    aware that he was coming from Ohio to Houston.  So, there

8    was some sort of surveillance, but as far as to what extent,

9    I cannot speak on that.

10   Q    Okay.  So, you don't know what it was that alerted them

11   whether he was just on some watchlist, and he was picked up

12   at the airport, or if he had been under surveillance, or for

13   how long any of that?

14   A    Correct.  I'm unsure.  Yes, sir.

15   Q    All right.  Is it quite possible that he was tagged at

16   the airport itself, or at one of the airports because he is

17   on some watchlist?

18   A    I cannot speak to that.

19   Q    All right.  But what you can speak to is that he was

20   coming in from some place to Houston at the time that he was

21   stopped and detained on that occasion, correct?

22   A    Yes, sir.

23   Q    And do you have an understanding as to where it was he

24   was coming from?

25   A    From Ohio.

1  Q    Do you know whereabouts in Ohio?

2  A    No, sir, not without looking.

3  Q    All right.  If I were to suggest to you that it was

4  from Cincinnati on that occasion, would that refresh your

5  recollection, or would you have your reason to disagree with

6  that?

7  A    I would not have any reason to disagree.  No, sir.

8  Q    And possibly that is the basis of the confusion about

9  the Columbus on the other occasion, right?

10 A    Yes, sir.

11 Q    All right.  Now, have you -- you've been in HPD for

12 five years.  Is that correct?

13 A    Yes, sir.

14 Q    Where were you prior to that?

15 A    I've been at three different patrol stations.

16 Q    Three different patrol stations?

17 A    Yes, sir.

18 Q    Well, I mean, before you -- the patrol station within

19 HPD?

20 A    Yes, sir.

21 Q    Well, I'm talking about -- how long have you been with

22 HPD?

23 A    For five years.

24 Q    Okay.  And before that you were with who?

25 A    I worked for various places.  The last one was a

1  aviation company.

2  Q    Okay.  The sort of roundabout way of going to ask you,

3  on that July 16th occasion, Mr. Fizer was not found with any

4  drugs to your understanding, correct?

5  A    That is correct to my understanding, yes.

6  Q    There are no drugs in his baggage.  There were no drugs

7  in his vehicle, not on his person, etcetera, etcetera,

8  correct?

9  A    Correct.

10 Q    Are you familiar at all, or how familiar are you with

11 Cincinnati?

12 A    None at all.

13 Q    None at all?

14     So, you are not aware that they're within driving

15 distance, I'd say 50, 75 miles of the CBD of Cincinnati,

16 there are like 10 casinos?

17 A    No, sir.  I'm not aware of that.

18 Q    As conceivable that the currency that was located on

19 Mr. Fizer, on that occasion, had nothing to do with

20 narcotics.  Is that true?

21         MS. SCHWARTZ:  Objection, Your Honor.  Calls for

22 speculation.

23         THE COURT:  Answer if you know.

24         THE WITNESS:  I do not know, sir.

25 BY MR. GAITHER:

1  Q    Okay.  You don't have any -- based on your

2  understanding of what you have seen, what you have read, you

3  have no reason to say there's no evidence that says that

4  that is definitively narcotics money or money derived from

5  the sale of narcotics, correct?

6  A    Correct.

7  Q    You had no personal involvement at the time of

8  Mr. Fizer's arrest, correct?

9  A    Correct.

10 Q    Have you read anything about that occasion?

11 A    Yes, I have.

12 Q    Okay.  And am I correct in saying that at the time of

13 Mr. Fizer's arrest, he was arrested without incident,

14 correct?

15 A    Yes, sir.

16 Q    Okay.  Which means that he didn't put any kind of

17 struggle or anything like that, or you have no reports that

18 there was any kind of resistance or any kind of standoff,

19 or, for that matter, any kind of delay in securing

20 Mr. Fizer's custody, correct?

21 A    That's correct.

22 Q    Do you know -- have you seen anything that indicates

23 that mister -- excuse me, that Mr. Fizer was interviewed at

24 the time of his arrest?

25 A    I have not seen anything.  No, sir.

1   Q    All right.  Do you have any reason to believe that

2   there were attempts to interview him that he was not

3   cooperative with?

4   A    I cannot speak to that.

5   Q    As far as you know, based on your understanding and

6   things that you've read and material and get prepared for

7   testimony today, at the time of his arrest, he was

8   professional and cooperative -- and by cooperative, I mean

9   that he did what he was supposed to do, or what he was asked

10  to do within a reasonable amount of time to satisfy the

11  arresting officers, correct?

12  A    Yes, sir.

13  Q    All right.  Now, have you seen anything or read

14  anything, or have any knowledge at the time that he was

15  detained in March of 2024 as to whether or not he was

16  interviewed at that time?

17  A    I have not seen anything to that.  No, sir.

18  Q    You have not seen any statements that Mr. Fizer

19  allegedly made during that incident or after that incident?

20  A    No, sir.

21  Q    Same question as to the July 16th incident.  Have you

22  seen any -- have any knowledge -- have you seen anything

23  that indicates that Mr. Fizer made any statements in

24  relation to that incident?

25  A    No, sir, I'm not.

1  Q    And, of course, you have no way of knowing this warrant

2  or this information on the warrant that's marked as

3  Government Exhibit 3.  Do you know what I'm talking about?

4  A    Yes, sir.

5  Q    The Ohio thing?

6  A    Yes, sir.

7  Q    You have no way of knowing whether or not there have

8  been any efforts to execute that warrant?

9  A    I do not know, sir.

10 Q    A warrant was issued in May of 2024, and is it fair to

11 say that in July of 2024, that nobody at HPD, or nobody

12 involved in this investigation was aware of this?

13 A    I cannot speak to what they knew or did not.

14 Q    Well, based on your understanding.

15 A    To my understanding, no, but I can't speak to what they

16 did know or did not know.

17 Q    Well, sir, the -- but that's one of the things that one

18 would expect to be in a report that you had reviewed for

19 purposes of preparing to testify.  But you said you haven't

20 seen anything that references this, that there's a warrant

21 out of Cincinnati or out of Ohio?

22 A    Other than seeing this exhibit, no, sir.

23 Q    Right.  And same in there -- at the time of his arrest

24 on August the 28th, any of the information that you have,

25 any of the material that you have reviewed, does any of that

1  say that there is an arrest warrant out of Ohio as perhaps

2  part of the basis for the arrest?

3  A    No, sir.

4  Q    Okay.  So, there is no indication that you know of that

5  anybody at HPD was aware that there was an open warrant out

6  on Mr. Fizer, correct?

7  A    As far as documentation, no, sir.

8  Q    Okay.  Do you have there a copy of the return --

9  A    No, sir, I do not.

10  Q    -- for -- let me finish it.

11  A    Sorry.

12  Q    Return for the items that were recovered at the time

13  Mr. Fizer's -- or I guess, to be technically correct, at the

14  time of the execution of the search warrant following

15  Mr. Fizer's arrest on August 28th?

16  A    I do not have that return.  No, sir.

17  Q    All right.  Do you recall what it was that you

18  testified to that was recovered, or at least was listed on

19  the return of that  warrant?

20  A    Yes, there was two pistols.

21  Q    All right.  Anything else?

22  A    Believed to be marijuana.

23  Q    That was the only substance, or narcotic substance that

24  was found?

25  A    Yes, sir.

1   Q    Okay.  Anything else of significance to the

2   investigation in your opinion?

3   A    From what I can observe, no, sir.

4   Q    Okay.  On August 28, for example, the return from the

5   August 28 warrant, there was no bagging equipment, there was

6   no sealing equipment, there was no vacuum type equipment

7   that is associated from time to time with narcotics

8   activity, correct?

9   A    In that instance, no, sir.

10  Q    All right.  That stuff had been there previously as a

11  result of the warrant that was issued -- that was executed

12  back in March?

13  A    Correct.  Yes, sir.

14  Q    All right.  So, there's at least some indication that

15  Mr. Fizer was not -- did not have that kind of trafficking

16  equipment or paraphernalia four months after the initial

17  March incident, correct?

18  A    Correct.  It was not listed on the return, yes, sir.

19          MR. GAITHER:  All right.  I believe that's all I

20  have.  Thank you.

21          THE COURT:  Any redirect?

22          MS. SCHWARTZ:  Just briefly.

23          REDIRECT EXAMINATION OF JORDAN MEISTER-WILE

24  BY MS. SCHWARTZ:

25  Q    The March warrant and the August warrant were for

1    different apartments and different buildings, correct?

2    A    Correct.  Yes, ma'am.

3    Q    And you mentioned in the July incident at the airport,

4    I believe you mentioned a search warrant.  Did you ever see

5    a search warrant in connection with that, or did you just

6    surmise that there was a search warrant?

7    A    I read in the report that there was a search warrant,

8    but I did not see the physical search warrant.

9    Q    Okay.  And finally, do you know when the wiretap on

10   Defendant Green ended with respect to -- as a source of

11   information on the conduct of Green and his associates?

12   A    No, ma'am, I do not.

13            MS. SCHWARTZ:  Nothing further.

14            THE COURT:  Any recross based on that,

15   Mr. Gaither?

16            MR. GAITHER:  No, Your Honor.

17            THE COURT:  All right.  Any further questions for

18   this witness from the Government?

19            MS. SCHWARTZ:  None for the Government.

20            THE COURT:  Mr. Podolsky?

21            MR. PODOLSKY:  No, Your Honor.

22            THE COURT:  Mr. Salinas?

23            MR. SALINAS:  No, Your Honor.

24            THE COURT:  And, Mr. Gaither, anything further

25   with this witness?

1          MR. GAITHER:  No, Judge.

2          THE COURT:  All right.  Thank you, sir.  You're

3     excused.

4     (Witness steps down.)

5          THE COURT:  Any further witnesses from the

6     Government?

7          MS. SCHWARTZ:  No further witnesses.  Two small

8     matters.

9          THE COURT:  Yes.

10         MS. SCHWARTZ:  In the course of the hearing, I

11    received an email from Cincinnati that the warrant that I

12    turned over provisionally has now been unsealed.  So,

13    Mr. Salinas may keep that.

14         THE COURT:  Okay.

15         MS. SCHWARTZ:  And second, the witness maybe

16    accurately remembering a warrant for July 16th, or he may be

17    wrong, but as I stand here now, I cannot tell you one way or

18    the other.  I had not thought that there was one.

19         THE COURT:  Something to be fogged out at a later

20    time.

21         All right.  So- --

22         MR. GAITHER:  I just have a clarification.

23    Warrant on July 16th for what?

24         MS. SCHWARTZ:  For the bag at the airport with the

25    money.

1          MR. GAITHER:  Okay.

2          MS. SCHWARTZ:  I just -- I had not thought there

3    was one, but I can't really say that I'm sure that there

4    wasn't.

5          MR. GAITHER:  I've not seen one.  There is a

6    reference that there was one.

7          MS. SCHWARTZ:  Okay.

8          MR. GAITHER:  But --

9          MS. SCHWARTZ:  Then in that case, my memory is

10   faulty.

11         MR. GAITHER:  You would tax my memory to pinpoint

12   it at this time.

13         I do have one sort of question.  I do not have a

14   copy of the search warrant information for the 5/29 search.

15         MS. SCHWARTZ:  3/29.

16         MR. GAITHER:  I'm sorry.  3/29.

17         MS. SCHWARTZ:  I have -- because I only very

18   recently obtained a copy of the warrant for the March 29,

19   the witness did not review it, and, therefore, I did not

20   consider it required disclosure for this hearing.

21         It was a state warrant rather than a federal

22   warrant, and I was planning to turn it over as in the course

23   of general discovery once it was unsealed.

24         THE COURT:  Okay.

25         MR. GAITHER:  That's fine.  I have no problem with

1    that if I -- if you can just get it to me, I'd appreciate

2    it.

3           THE COURT:  Sure.

4           MS. SCHWARTZ:  I certainly will.  There was --

5    there was a fairly detailed report about the basis for that

6    warrant.

7           THE COURT:  Okay.  All right.  So, to defense

8    Counsels, anyone planning to call witnesses?

9           MR. PODOLSKY:  Your Honor, I would just prefer to

10   proffer the Court.

11          THE COURT:  And that's what I'm going to ask

12   first.  If you-all are proffering, that's great.  We'll go

13   one by one, but I just want to see if anyone's going to

14   bring a witness first.

15          MR. GAITHER:  No, Your Honor, we do not intend to,

16   but we do intend to proffer.

17          THE COURT:  Okay.  Mr. Salinas?

18          MR. SALINAS:  No, Your Honor.

19          THE COURT:  All right.  So, then, let's start with

20   Mr. Salinas.  You may proffer on Mr. Green.

21          MR. SALINAS:  Your Honor, there was just one

22   correction on the Pretrial  Services Report as far as

23   page 4, felony possession of a firearm where he received the

24   tenure deferred that was successfully or early terminated.

25   So, he is no longer on deferred probation.

1          THE COURT:  Right.  That says that on the next

2    page, terminated early.

3          MR. SALINAS:   And, basically, Your Honor, by way

4    of proffer, he is a 35-year-old high school student,

5    graduate in 2007.  He has got -- he is single, and he does

6    have two minor children, a two-year-old and a one-year-old.

7          Employment with Remus Barber Lounge, and he does

8    the Spivey Uptown Promoter (phonetic) afterhours on the

9    weekends.  He resides at 9402 Silver Borough Lane in

10   Rosharon.  In that home is his mother, his stepfather, the

11   two-year-old, the one-year-old and the defendant.  The

12   mother is here today, and the stepfather is here, Rosetta

13   Douglas and Rodney Douglas, and I believe his grandfather is

14   here also.

15         Rosetta Douglas has been employed for 30 years as

16   caregiver, and Rodney Douglas has been employed 19 years at

17   the Port of Houston.  He is a longshoreman.  They own a

18   home, which is appraised at $379,460.  They're willing to

19   post the bond should the Court grant the bond for him.

20         He also has three sisters that are all employed.

21   A 36-year-old, a 32-year-old and a 30-year-old that are

22   lifelong residents of Harris County, and they'd be willing

23   to assist in the bond as well.

24         So, I would suggest that there is a condition for

25   bond that the Court could fashion, possibly with a GPS

 1    monitor and hours that he would have to be at home.

 2             That's all, Your Honor.

 3             THE COURT:  All right.  Thank you.

 4             All right.  Mr. -- Defendant Number 3,

 5    Mr. Gaither.

 6             MR. GAITHER:  Yes, Your Honor.

 7             THE COURT:  Just going in order of the defendant

 8    numbers.

 9             MR. GAITHER:  Yes, Your Honor.  I'm going to focus

10    on those that we're going to proffer to the Court as

11    potential custodians or guarantors.  Lonnie Fizer is here.

12    She is Mr. Fizer's mother.  She is employed by Net Force

13    Security, and has been for several years, currently

14    stationed at 1010 Lamar, which is my understanding is a

15    building that was recently purchased by Harris County and is

16    in the middle of being transformed into some sort of annex.

17             She is a security -- she is on the security force

18    there.  She is licensed by the -- by the Tops Agency, which

19    is the licensing agency for those kinds of folks.  And, she,

20    of course, would be in a position to verify about her

21    background information that appears in Pretrial report, in

22    terms of Deandre having been born here in Houston, having

23    lived in Houston his entire life.  That she believes that

24    her son would abide by the conditions that would be placed

25    upon him as a result of a bond, and would confirm that, to

1    her knowledge, he has never traveled outside the United

2    States and does not nor has never had a passport to do so.

3    And so, she doesn't believe he's a risk of flight.

4            When I confronted her with the numerous instance

5    showing in the Pretrial report of bond revocations and bond

6    forfeitures, and things of that nature, which I may get back

7    to later, but essentially she under -- I mean, she is aware

8    that he has had various problems, and in fact, she has been

9    on some of those bonds herself through the years.  But, the

10   bottom line is the -- she at no point in time, was he ever

11   intending or attempting to run, hide or abscond or not

12   ultimately face and as you can see, for the most part,

13   whatever difficulties, ultimately, he was there to face the

14   music.

15           She has offered to accept the responsibility of

16   the custodian or guarantor.  As I mentioned before, she does

17   live in an apartment with another child, and so there is

18   another person that I will get to in a moment that we would

19   kind of proffer as a better situation overall.  But she is

20   also aware of, obviously, his grandmother, that Deandre's

21   two children -- he does have two children, one daughter,

22   Ziara and a son, Terrion, who he does not have primary

23   custody over, but he sees on a regular basis, provides

24   financial support for and she has had an opportunity to see

25   him interact with those -- with his kids, and believes him

1  to be a very good parent, and knows that they are

2  financially reliant on him to some degree.

3          Secondly, Tracy Davis, who is Mr. Fizer's cousin,

4  but in talking with her, it kind of comes off as more of a

5  brother sister type relationship, but she has a successful

6  business -- or she runs a business and is successful in that

7  business.  Owns a trucking company called, All You Needed

8  Transportation and a tire shop at Colin Reed called Road

9  Runner Services, and she works and conducts those companies

10 while also being the mother to three daughters.

11         She owns her home, and where she lives with the

12 three daughters.  The house has five bedrooms, and she would

13 -- and we would proffer that she would accept the

14 responsibility and welcome Mr. Fizer into her home because

15 there -- because there's adequate room, and it would not be

16 any kind of inconvenience in terms of that nature.

17         But I discussed with her at length the obligations

18 of a custodian or a guarantor, and she confided that she is

19 willing to entertain those roles and has confidence -- has

20 every confidence in the world that Mr. Fizer will show up

21 and do what he's supposed to do.  And understands that part

22 of that obligation would be that if he doesn't, then, part

23 of that obligation is to notify the Court accordingly and

24 let them handle it, and she is willing to do that.

25         And we are kind of looking at her, we believe this

1  to be a better fit because, number one, it is a -- it is a

2  -- it is more accommodating, and because she is, or at least

3  comes off to me, to be a very structured person, very

4  disciplined person, and I think that that under the

5  circumstances here would be a very healthy environment.

6          The second part of it is kind of a, you know,

7  possibility, I suppose, and that is that through her

8  businesses, it would also offer an opportunity for him --

9  the kind of businesses that she's in, she can always use

10 more help, and he would be a perfect candidate to do some of

11 the stuff that doesn't require any kind of special expertise

12 around the various shops.  And that would keep them busy and

13 also basically allow her to be in some sort of monitoring or

14 supervisory capacity virtually 24 hours a day.

15         And in relation to -- or speaking of employment,

16 as the Pretrial report notes that Mr. Fizer is self-employed

17 as a barber, and I have contacted -- I've talked to probably

18 half a dozen of his customers to confirm that, number one,

19 and to find out how that exactly works.  And as a general

20 rule, he could be what you -- what you call a mobile barber.

21 He doesn't work out of his own shop.  He goes to where the

22 business is.  And most of the folks are -- yeah, most of the

23 folks that I've talked to have been customers of his in one

24 way or another for at least -- well, somewhere between one

25 and three years.

1          And of the half dozen or so that I've spoken to,

2    they all speak very highly of his skill and his ability and

3    him as a person, but one struck me in particular, and that

4    was talking to a Ms. Camery Powell (phonetic), and that's

5    because she herself is not a customer, but she takes her

6    kids to Mr. Fizer, and like all of them, they were referred

7    to him by mutual acquaintances, friends, whatever.

8          But Ms. Powell told me that in the course of that

9    relationship, they have actually become friends.  She has

10   kids that are about the same age as Mr. Fizer's kids, and so

11   they -- actually their families have socialized on various

12   occasions.  And so, she too has had an opportunity to

13   observe Mr. Fizer with his children, and she characterizes

14   him as a wonderful father, very attentive, very loving, very

15   caring to their needs in the times that they were together,

16   and that's on a fairly regular basis.

17         And that's all the proffer that we have, Judge.

18         THE COURT:  All right.  Thank you.

19         Mr. Podolsky?

20         MR. PODOLSKY:  Yes, Your Honor.  And, obviously,

21   Judge, I know you have a Pretrial Services Report for the

22   Court.

23         THE COURT:  Right.

24         MR. PODOLSKY:  Certainly, you'll take judicial

25   notice of.

1          THE COURT:  Yes, the Court takes notice of it.

2          MR. PODOLSKY:  I would like to just point out a

3    few facts regarding that.

4          As it states, my client was working.  He was

5    working loading trucks for -- his father works for Boise

6    Trucking, and he has been working with his father in that

7    capacity, in the trucking business for quite some time.

8    Prior to that, he was employed for three years, you know,

9    operating a forklift.  So, he has been employed.

10          There was a mention of his traveling to Jamaica,

11    and that was confirmed through Pretrials discussions with

12    the father.  First, those are family vacations.

13          He is living -- at the time of his arrest, he was

14    living with his -- with his father and his step -- or excuse

15    me, with his father and stepmother, Curtis Pink and Thea

16    Pink (phonetic).  And he is also the primary caretaker of

17    his son, Denzel Junior.

18          Now, the Court may be thinking, well, you know,

19    I'm not comfortable with him caretaking for a four-year-old

20    under these circumstances and in that -- and we have an

21    alternative for the Court.  Denzel Junior is welcome to live

22    with Tiska Pink (phonetic), who is in court today.

23          Ms. Pink, if you can just stand.  Just there.  And

24    she will take care and custody of Denzel Junior, if that's a

25    concern for the Court, and then Denzel will continue to live

1    at the Sonoma address with Thea Pink and Curtis Pink.

2         All his family in court today is Rashon (phonetic)

3    Pink, his mother in court today.  She just raised her hand,

4    Your Honor.  Thea Pink, step-mom in the back.  His --

5    Belinda, grandmother, excuse me.  Tiska Pink, as we've

6    mentioned, sister, Kendall Richardson, (phonetic).  They're

7    all present in court, all of which have been -- are willing

8    to sign on to any bond to represent to the Court that they

9    can be -- that they would assist in any way in notifying the

10   Court of any issues that come that the Court would  -- they

11   feel the Court would be alarmed about.

12        The Defendant has employment, cares for his four

13   year old, but we also recognize that the Court may be

14   concerned about access or care taking of a child, and we

15   have an alternative, which we just presented to the Court

16   for that.

17        With regard to and I understand that the Defendant

18   has criminal history, and I want to point out to something

19   that is in the report, Judge, with regard to his transport

20   of firearm felony from 2010.  It says, my understanding of

21   that case is that it alleged a new law violation.  I'm not

22   aware of any arrest that was happening during the time that

23   he was on supervised release.  There's none mentioned in

24   here that at least I can see it, unless I'm misreading this.

25   I believe there was -- it was technical violations on that,

1  Judge.  So, I just wanted to point that out.  I don't see

2  any arrest during -- between 2010 and 2012, when he -- it

3  looks like his supervision was revoked, Judge.  At least no

4  arrest for any new law violation.

5         We would ask the Court -- I don't need to belabor.

6  The Court is well aware of what conditions, ankle monitor,

7  house arrest and whatnot, the Court has at its disposal to

8  ensure appearance in Court and/or safety in the community.

9  I know the Court is well aware of all them.

10         I would ask the Court strongly consider a release.

11  It appears to me just based on looking at the Indictment

12  that he is -- in it, it looks like a -- I got this correct,

13  a 14 count Indictment of which my client is only mentioned

14  in one count, which is count 14.  I'm sorry.  It's a 15

15  count Indictment, of which my client is mentioned in only

16  one count.

17         It is a -- it is a 500 grams case with a five-year

18  minimum sentence, Judge.  I would ask the Court to consider

19  release to allow him to defend himself properly, assist his

20  attorney in these -- in these charges.

21         Judge, it is heck of a thing to incarcerate

22  someone, you know, pending the outcome of a case,

23  disposition of a case and (indiscernible) --

24         I understand that this is what these detention

25  hearings are about.  I understand the concept of the

1    presumption in this case.  Given the evidence in this case,

2    I would ask the Court to consider release, consider home

3    confinement, consider an ankle monitor, consider all the

4    weapons the Court has to ensure the safety of the community

5    and his appearance in court, Judge.  Thank you.

6              THE COURT:  Thank you, Mr. Podolsky.

7              All right.  Brief argument from the Government.

8              MR. MEGGALI:  Your Honor, at the end of the day, a

9    search warrant was executed in his home.  He had a felony

10   conviction from as recent as 2016, which is released in

11   2020, and those firearms, Your Honor, they were not there

12   for decoration.  Law enforcement recovered ammunition as

13   well.

14             The Government is learning right now, for the

15   first time, there's a four-year-old child who resided there.

16   That four-year-old child was endangered not only by his drug

17   trafficking activities, not only by the presence of

18   firearms, but by potential fire fights that might proceed

19   from the drug trafficking activities and the possession of

20   those firearms.

21             MR. PODOLSKY:  Judge, I don't believe that --

22   excuse me to interrupt, but I argue that there's any

23   evidence that the child was living at that Sonoma address

24   certainly at the time that any of this happened or any of

25   this occurred.  There's been no evidence of that.

1          In fact, they asked the witness who was residing

2    at the home, and in the house at the time, and all he said

3    was family members.  So, I don't know where that information

4    is coming from.

5          MR. MEGGALI:  If I --

6          THE COURT:  Hold on.  Let him finish.

7          MR. PODOLSKY:  The Pretrial  Services Report

8    indicates that he has a son that he cares for and I'm just

9    noting that.  I just -- if that was a concern for the Court,

10   we can make sure that arrangements are made to make sure

11   that there's some sort of severance between the two upon

12   release.

13         THE COURT:  You may proceed.

14         MR. MEGGALI:  My apologies, Your Honor.  So, the

15   Government is not prepared to prove that the son was

16   residing there at the time.

17         THE COURT:  Correct.

18         MR. MEGGALI:  All we know is that he was residing

19   there, his stepmother was residing there, and his father was

20   residing there.  Who else could have been taking care of the

21   child, we're not prepared to prove that, Your Honor.

22         THE COURT:  That's fine.

23         MR. MEGGALI:  And as far as the weight of the

24   evidence that the Defendant is facing, we have evidence

25   going back to March 2024 of him ordering cocaine on wiretap.

1    We have several encounters that other law enforcement agents

2    have witnessed, that this law enforcement agent has

3    witnessed.  We have an unsolicited pointing at the Defendant

4    from somebody who had just encountered the Defendant after

5    he saw a known drug distributor in the Houston area.

6           And so, in light of that, the Defendant also poses

7    a risk of flight.  We would submit that his April 4th, 2016

8    conviction does qualify as a serious drug felony.  That

9    would lead to an enhancement in his sentence.

10          We would note that the Indictment that the

11   Defendant is facing right now doesn't include some of the

12   firearms and the drugs that law enforcement seized on August

13   28th, and therefore those are ripe for a superseding

14   Indictment that the Defendant might end up facing as well.

15          And so, in light of the volume of evidence that he

16   is facing, in light of the potential for a serious drug

17   felony to aggravate his sentence, and in light of potential

18   superseding Indictments, he does pose a flight risk as well.

19          And so, we would conclude that given that he

20   hasn't not yet provided the potential third party custodians

21   that he's proposing.  And given that a four-year term of

22   incarceration that is pending, neither of those individuals

23   deterred him and the specter of a felony of a federal

24   conviction for drug trafficking or felony possession

25   charges, that specter didn't deter him.  We don't think that

1    there's any combination of conditions that would ensure

2    safety of community or his appearance at trial.

3            THE COURT:  All right.  Thank you.  We'll take

4    this one by one, since you're just discussing Mr. Pink.

5            So, is there anything else you want to add

6    Mr. Podolsky that you already hadn't said?

7            MR. PODOLSKY:  No, Your Honor.  And this goes

8    without saying, but obviously he could surrender his

9    passport --

10            THE COURT:  Sure.  Thank you.

11            All right.  Further closing argument from the

12    Government.

13            MS. SCHWARTZ:  Yes.  I'll turn first to Mr. Green.

14            THE COURT:  Okay.

15            MS. SCHWARTZ:  So, you had not asked at the

16    beginning of the basis for the detention hearing as to

17    Mr. Green.  I believe that Mr. Meggali answered only a

18    little moot now since we got --

19            THE COURT:  I thought he was responding to all

20    defendants, but the presumption does apply to all

21    defendants.

22            MS. SCHWARTZ:  The presumption does -- that's what

23    I was going to say.

24            And their -- I mean, based on the Grand Jury's

25    test -- the Grand Jury's vote alone as to Mr. Green, there

1    is probable cause to show that he has committed a drug

2    offense punishable by 10 years or more, and also the 924(c).

3    So, there's a rebuttable presumption both of flight risk and

4    a danger to the community based on the charges.  And, of

5    course, the Court has also heard evidence to that effect as

6    well.

7            In terms of the nature and circumstances of the

8    charged offense, as to Mr. Green, these are very serious

9    charges.  He is basically wholesaling drugs that he acquires

10   in bulk from Lopez and then routes onward.  It includes

11   interstate transport of drugs dealing over a prolonged

12   period of time. The investigation having lasted, as the one

13   witness said, about a year and a half. The Indictment

14   charges activity from March of 2023 through July of 2024,

15   and he is charged with buying for distribution kilogram

16   weight of cocaine during that time.

17           Looking only to the 22 kilograms of cocaine that

18   he is believed to have purchased from Jose Lopez and --

19   well, I guess, some of this evidence didn't come out, but I

20   would proffer that six of the eight kilograms that were

21   seized on March 29th had a different source.  Based on that,

22   the Government calculated that under sentencing guidelines

23   for those 28 kilograms, that would be a base level of 32.

24   And I'll discuss his criminal history separately, but he's a

25   Category four, and as such, the amount of time he faces for

1    this crime, even without an enhancement for a leadership

2    role, would be 168 to 210 months.  And, of course, that

3    underestimates, in the Government's view, the amount of

4    cocaine that he actually transacted during that period of

5    time.

6              In addition, because of his prior history, he also

7    faces enhanced minimum sentences, a minimum of 25 to life on

8    a (b)(1)(A) crime.

9              So, this is -- this is not just one small

10   incident.  This is a course of conduct involving large,

11   large volumes of cocaine.  There is no question that he is a

12   felon, and he had 11 loaded weapons and half a kilo of

13   cocaine in his home on April 17th, 2024, the same day he was

14   arrested in Cincinnati with 10 kilograms of cocaine.  And on

15   the day of his arrest in August of 2024, when he was told

16   and knew there was an arrest warrant for him, I mean, people

17   throughout the hotel could hear that there was an arrest

18   warrant for him, instead of surrendering right away, the

19   evidence shows he flushed drugs down the tub drain.

20             And the implication, although this officer didn't

21   see it, of the door having been breached, is that he did not

22   voluntarily open the door to law enforcement either.  And on

23   that day, as well, he had a loaded gun in his car.

24             So, these are serious charges, and the charges

25   themselves say something about the history and

1  characteristic of the Defendant, which I'll get to in a

2  moment.

3           But in the meantime, in terms of the weight of the

4  evidence, the next factor to consider, this is not a one-

5  time observation, this is not a single search warrant.  This

6  was a long-term investigation.  The Court has seen -- has in

7  evidence samples of some of the different types of

8  surveillance. You've seen photographs from one date, you've

9  heard about recordings on another.  This was a year and a

10 half FBI invest -- year and a half long FBI investigation.

11 The Defendant was captured on wiretaps, photographs, pole

12 cameras and directly observed by agents over the course of

13 more than the year.  So, I think it's fair to call this a

14 very strong case.

15          In terms of the Defendant's history and

16 characteristics, he does have three prior Texas convictions

17 for possession with intent to distribute controlled

18 substance.  The most recent of which were two in 2016, as

19 well as additional convictions as well.  He has a history of

20 bond forfeiture as found by Pretrial, the 2014 case shows

21 that in the Pretrial report.

22          There is conflicting information about his

23 employment.  He claims to work as a barber, and yet, the

24 Pretrial report indicates that he had not received a

25 barber's license.  The Pretrial report indicates drug and

1   alcohol abuse.

2         In addition, he was arrested staying at a motel,

3   not even in a home, which suggests a measure of transients.

4   The record of the hearing does not show it, but I would

5   proffer to the Court that Counsel did ask on Cross, the

6   motel room was rented in the name of his mother and paid for

7   by, if memory serves, FEMA.  It had something to do with

8   Hurricane Beryl relief that she was being provided with this

9   hotel room, although agents saw that no apparent damage to

10  the house in Rosharon where the Defendant is now suggesting

11  that he would live.

12        So, his being in that hotel room was, in some

13  sense, potentially at that point in time, at least a fraud

14  on the federal government as well.  In addition, and this

15  also is not in the record, but I'll proffer it to the Court.

16  He was not consistently staying in that hotel room.

17        One of the reasons that we did a warrant on that

18  room to execute the arrest warrant -- a search warrant on

19  the room to execute the arrest warrant prior to the actual

20  search warrant to search the room for the drugs and so

21  forth.  Found in plain view was that he had not been staying

22  in that hotel for very long.  He had been at some other

23  motel shortly beforehand.  And again, this is the proffer on

24  behalf of the Government that was -- I'm not claiming that

25  this was in the record of the hearing.  To that extent, he

1   is a transient.

2          Now, the Government is not denying that he has

3   Houston ties, but it would be the Government's position that

4   his mother has not been able to supervise him to date.  That

5   he has had the opportunity, you know, to live with her and

6   so forth until this point, and there's nothing in the

7   current circumstances that suggest that she would be able to

8   control -- be able to control him or prevent him from doing

9   anything further.

10          The Defendant was not on probation or parole at

11   the time of the incident offense, but he does have a history

12   of violating probation in the past, Pretrial, both parole

13   and probation violation, as well as the bond forfeiture I

14   mentioned before.

15          And, finally, as to danger to the community, the

16   cocaine in itself presents a serious danger to the community

17   but given the Defendant's penchant for possessing weapons

18   and the 924(c) charge showing that the possession was in

19   furtherance, that's for the April date, of the drug

20   trafficking.

21          And, presumably, and again, this could be the

22   subject of a superseding Indictment because we have not done

23   anything with the evidence seized on the day of the arrests.

24   His possession of a gun on the day of the arrest, even

25   though he did not bring it into the hotel room, suggests

 1  that when he is out in the world with drugs, he keeps a

 2  firearm for protection of himself, his drugs, the drug

 3  proceeds, which include that sum of money in the -- in the

 4  hotel room.  As such that presents a danger to the

 5  community, both to bystanders and to the other people with

 6  whom he transacts.

 7           It would be the Government's position that no set

 8  of -- no set of conditions would be sufficient to prevent a

 9  danger to the community in this case, or a risk of flight

10  with an emphasis on the danger to the community.

11           THE COURT:  All right.  Thank you.

12           Mr. Salinas, would you like to add anything to

13  your proffer for Mr. Green?

14           MR. SALINAS:  No, Your Honor.

15           THE COURT:  Okay.  And lastly, for Mr. Fizer?

16           MS. SCHWARTZ:  Yes.

17           MR. GAITHER:  Go ahead.  I'm sorry.

18           MS. SCHWARTZ:  As to Mr. Fizer, it is also a

19  presumption case.  In his case, he is also charged both with

20  drug offense having the punishable by more than 10 years,

21  and as well the 924(c).  The 924(c) is based on the gun

22  recovered on March 29th.  The theory being that he could not

23  take it with him to the airport and therefore had to leave

24  it at home for that trip, but nonetheless, that it was there

25  to protect the inventory of drugs when it was at the

1  airport.

2          In terms of the seriousness of the case, the

3  nature and circumstances of the charges, he was in joint

4  possession with the female with him of eight kilograms of

5  cocaine on that date.  The circumstances at the apartment

6  made clear that this was not something -- he wasn't just

7  given a suitcase that he didn't know the contents of.  He

8  brought it with him from that building, and in that

9  apartment that was rented by him in a false name at that

10  building.  There was -- there were items in his name, and

11  there was material there consistent with the packing of

12  suitcases, including luggage tags and so forth, and a

13  sealing machine suitable for packaging narcotics for

14  transport without detection.

15          To that extent, that's a -- that's a serious

16  amount of -- that's a serious charge, and even though it is

17  substantially less than what Mr. Green is charged with, when

18  one looks at the sentencing guidelines for that amount of

19  cocaine, there is, I believe, if memory serves that that is

20  a base level of 30 without any enhancements.  I noted down

21  that the -- his guidelines would be 97 to 121 months based

22  on that amount of cocaine alone.  That's holding him jointly

23  responsible for both suitcases as a joint enterprise on that

24  date.

25          The evidence suggests that on his return from

1   Ohio, he had the proceeds.  He was -- the suitcases were

2   intercepted on one date on the way to Ohio.  He was

3   intercepted with a bag on the way back from Ohio on another

4   date, and the strong inference would be that that is -- had

5   the suitcases not been intercepted, he would have been

6   coming back from Ohio with proceeds shortly after the March

7   date, he did not.

8          The circumstances also suggest that there was some

9   shipment that was not detected that got through and that he

10  was intercepted on the July date coming back with that.

11         In addition, when you look at both dates, he had a

12  gun in the apartment on March 29th, 2024 and two guns loaded

13  in the apartment on when he -- when that was searched after

14  his arrest on August 28th, 2024.  And one can't say that he

15  doesn't know he's a felon and shouldn't possess a firearm

16  because here in the Southern District of Texas in 2015, he

17  was convicted of the offense of being a felon-in-possession

18  of a firearm.

19         So, if there is the clearest indication of his

20  disregard of this court is that having been convicted of

21  this crime in this court in 2015, he went out in 2024, and

22  committed that crime, essentially two, if you count dates,

23  or three, if you count firearms, additional times.

24         In terms of his history and characteristics, I've

25  discussed his prior federal conviction.  He has a multitude

1  of earlier, less serious convictions.  He does have an open

2  case stemming from an arrest on July 13, 2020, the Pretrial

3  report indicates that there is no current court date on

4  that.  The Government had learned that, in fact, he had a

5  court date on Monday of this week on that case, which I

6  alerted Pretrial to, and I was informed in the course of

7  today's proceedings that they looked it up and that that

8  court date has now been adjourned until November.

9          So, that case is an active case for engaging in

10  organized crime, which is a serious charge here in Harris

11  County.  But notably, he was out on bond for that case.

12  Pretrial even thought he was on GPS supervision for that

13  case although I'm thinking there must be an error there

14  because I'm not aware of any GPS tracker on the Defendant.

15  But in any event, he was on bond.  He was out pending that

16  and that did not prevent him from committing both the March

17  crime, and the August crime.

18          In addition, he's got a history of drug and

19  alcohol abuse Pretrial.  He is identified as a member of the

20  Young Scott Block Gang.  His residence has been unstable.

21  He had rented the apartment -- in the evidence showed here

22  he had rented the apartment in March under a false identity,

23  and Pretrial indicated that he could not explain who the

24  female was that the apartment he was arrested in in August

25  was.  So, the strong implication there is that there was

1   likely identity fraud in connection with his rental of the

2   apartment in August.  That's the Post Oak apartment as well.

3   His mother -- his mother's influence did not

4   prevent him from doing any of these things in the past, and

5   whether his niece/sister -- if her relationship with him is

6   of long standing and like that, then his relationship with

7   her also did not prevent him from doing any of these things

8   in the past.  I would also think that a woman with three

9   small children and running her own business would have a

10  limited amount of time to supervise his activities, and as

11  such, the Government believes there is no combination of

12  conditions that would be sufficient to ensure his

13  appearance, even if he doesn't travel internationally.

14  We know he is comfortable with travel, including

15  the multiple trips to Cincinnati, and this is a large

16  country where one can get oneself lost.  But most seriously,

17  the Government does not believe that there is any

18  combination of conditions that could prevent him from being

19  a danger to the community if he were released.

20  Thank you.

21  THE COURT:  Thank you.

22  Mr. Gaither, do you have anything to add in

23  addition to your proffer previously?

24  MR. GAITHER:  Yes, Your Honor.  I would tend to

25  agree with Ms. Schwartz that it is not the mother or the

 1  cousin that would control the behavior of a grown man, but

 2  that's where the conditions come in, GPS monitoring, the

 3  curfew, and again, the plan that we had proposed sort of

 4  includes the provision that Ms. Davis would, in fact, be in

 5  a position to monitor him as a -- just in the day-to-day

 6  course of her regular duties in her business if he were to

 7  go to work there with that.

 8          One of the things about the prior record, in terms

 9  of what's showing on the Pretrial report, and specifically

10  in relation to the bond forfeitures and the revocations, on

11  the ongoing case, which have been going on now for five

12  years and so, you know, one has to question, how serious is

13  it if it's going on for five years and there's no activity

14  over there, and that many activity for a year and a half is

15  according to what I've seen on the schedule.  But in any

16  event, he was on bond, and there had been what two

17  revocations on that, and each one of those revocations was

18  based not on any violation of the bond but being arrested on

19  matters that ultimately were dismissed for lack of evidence.

20          And so, I'm not sure that that doesn't overstate

21  what it -- what appears on the page here, and similarly with

22  -- now, this is talk about your double-edged sword here.  If

23  you go back to the bond forfeitures, if you look at the

24  timing that is just noted on the Pretrial report, those bond

25  forfeitures were all posted at a time when he was in federal

1  custody.  I'm not exactly sure, you know, how that happened

2  -- how that happens because if you are not able to be there

3  because of some valid reason, that's not supposed to result

4  in a bond forfeiture.  But in any event, so you have four

5  things listed there that basically he had no control over.

6         You know, like I said, he has had plenty of

7  problems, but there are a lot of these things that are

8  showing that have been dismissed.  A lot of them were a long

9  time ago, and most of them are nonviolent.  You know, the

10  guns aside, you know, that's not a good situation, but it's

11  one of those things that, you know, we just have to deal

12  with, although the ones that we -- that are involved in this

13  case, no indication that those were ever used and never

14  taken anywhere.  There's no indication that he was in --

15  found in possession of those weapons and the theory that,

16  well, he couldn't take it to the airport didn't mean

17  couldn't take it in the car.

18         So, anyway, there is a line of demarcation there,

19  and probably of most significance is this, we have basically

20  talked about two incidents, or they presented evidence of

21  two incidents, one in March, one in July.  July, admittedly,

22  their agent says we have absolutely no evidence that that

23  involved any kind of drug trafficking whatsoever.  So, you

24  can just set that one aside.

25         In the March one, the question, is there

1  surveillance on Mr. Fizer at some point, but there is no

2  continued surveillance at least based on the knowledge of

3  the person that they brought to testify to the Court.  They

4  don't continue any kind of monitoring.  They don't continue

5  any kind of surveillance either up to the -- up to then or

6  to the July incident, or anywhere up to the August incident.

7  And so, you know, you gauge if he's not significant or in

8  their mind dangerous enough to put on any kind of monitoring

9  of some sort, keep an eye on things like that, then just how

10 dangerous is he, in their minds.

11        And I suggested based on the evidences before the

12 Court, that the best case scenario is for Mr. Fizer be given

13 a bond with the custodian and the plan that we generally

14 describe going in more detail if the Court has inquiries,

15 and we request by Mr. Podolsky, request the opportunity to

16 confront these charges in the most efficient and fullest way

17 possible on behalf Mr. Fizer.

18        Thank you, Judge.

19        THE COURT:  Thank you.  Yes?

20        MS. SCHWARTZ:  Your Honor, I just -- I neglected

21 to mention, and I won't go through all of it, but Government

22 Exhibit F3, the open warrant from Cincinnati, and

23 particularly the nature of the charges in that case, which

24 apparently reading between the lines of the paper or

25 drunkenly or on drugs going through a red light causing an

1  accident, leaving the scene of the accident and then not

2  returning to Court.

3          The Government may not have been aware of the

4  warrant at the time he returned, you know, and was stopped

5  in July, but given the timing of the warrant and the initial

6  case, the Defendant should have known that he had a case in

7  Cincinnati and gone back to court, didn't do it there.

8  That's one of our concern.

9          MR. GAITHER:  Well, Judge, if I can respond to

10  that?

11          THE COURT:  All right.  Look -- all right.  Who

12  knew what about what warrant, the fact is, this is issued,

13  this is in Ohio, and this is the case that's pending.

14  That's what the Court is knowing.  That's what the Court is

15  taking into consideration.

16          Whether he knew he had a warrant, I'm not going to

17  consider whether he knew, or he didn't know.  I'm only

18  considering that there is a warrant.

19          So, do you have anything further to add,

20  Mr. Gaither?

21          MR. GAITHER:  All the more reason to release him

22  and let him go take care of it now that he knows about it.

23          THE COURT:  All right.  Is there anything further

24  from either side?

25          MS. SCHWARTZ:  Not from the Government, Your

1  Honor.

2         THE COURT:  Anything from the defense, either of

3  the defense attorneys or any of the defense attorneys?

4         MR. PODOLSKY:  No, Your Honor.

5         MR. GAITHER:  No, Judge.

6         THE COURT:  All right.  Thank you.

7         So, to the Defendants, you are all -- the

8  Government has moved for detention based on the -- this is a

9  presumption case, and the presumption arises based upon a

10  finding of probable cause that your potential sentence is

11  subject to a maximum of at least 10 years or more, and all

12  of you face a potential serious sentence given this

13  Indictment that involves potentially 10 years or more as a

14  sentence.  So, the presumption does apply in the

15  detention --

16         MR. PODOLSKY:  Your Honor, I think it's five

17  years.

18         THE COURT:  It's five to 40, isn't it?

19         MR. PODOLSKY:  Right.  That's right.

20         THE COURT:  So, it involves potentially 10 years.

21         MR. PODOLSKY:  Oh, I'm sorry.  I thought --

22         THE COURT:  Right.  So, it's subject to a maximum

23  of 10 years or more.  He could possibly get 10 years or

24  more, therefore, the presumption applies.

25         In a presumption case, the presumption is that

1    there are no condition or combination of conditions that

2    will reasonably assure the appearance of the person as

3    required and the safety of the community.

4         In a presumption case, the burden shifts to you,

5    the Defendant, to produce only rebutting evidence.  The

6    burden of persuasion remains with the prosecutor.  If there

7    is some evidence tending to rebut the presumption, the

8    presumption still remains as a factor to be considered,

9    along with the 3142(g) factors.

10        If there is not sufficient evidence to rebut the

11   presumption, the Court still must consider the factors along

12   with the presumption.  If there's no evidence at all to

13   rebut the presumption, then you will be detained.

14        Merely producing some evidence does not completely

15   rebut the presumption, and the Defendant must produce

16   evidence sufficient to rebut the presumption under both --

17   under both flight and danger.  That's the protocol that the

18   Court has considered each of your cases.

19        I will address each of one of you separately.

20   I'll start with Mr. Fizer.  With respect to Deandre Marquel

21   Fizer, Defendant Number 3, and Cause Number 24404.

22        With respect to the presumption based on the

23   evidence and the testimony today, the Court finds that there

24   are no condition or combination of condition to reasonably

25   assure the safety of the community as required.  In other

1    words, the Court finds that the presumption has not been

2    rebutted with regard to safety of the community.

3            Alternatively, if there's -- if there was some

4    evidence to rebut the presumption that the safety of the

5    community, the Court still finds under the 3142(g) factors,

6    by clear and convincing evidence that there are no condition

7    or a combination of conditions to reasonably assure the

8    safety of the community.

9            In addition, the Court also finds that based upon

10   the evidence and testimony as well as the Pretrial Services

11   Report that there is no condition or combination of

12   conditions a court can impose to reasonably assure your

13   appearance as required in court.  And the Court will issue,

14   and for all of you, the Court will issue a written order

15   after today's hearing, outlining the reasons for the Court's

16   order.  But, in summary, the Court bases its decision on the

17   following:

18           For Mr. Fizer the Court notes that the weight of

19   the evidence in this case is strong.  The Court takes into

20   consideration that the search warrant -- the firearms that

21   were found in the residence.  The Court also takes into

22   consideration the numerous arrests and convictions including

23   arrest for resisting arrest, an arrest for evading arrest

24   with a bond forfeiture in 2012 that resulted in a nine month

25   sentence.

1           Again, in 2012, it looks like the same incident.
2   You were arrested for unauthorized use of a motor vehicle
3   with the bond forfeiture.  You were also sentenced to nine
4   months of confinement.  It looks like out of the same
5   instance, but two different cases.  You have an assault on a
6   family member in 2013.  You have multiple bond forfeitures,
7   and the Court does take into consideration that it looks
8   like those bond forfeitures resulted while you were in
9   federal custody, which is a whole another issue.  You were
10  in federal custody and arrested for a felony possession of a
11  firearm in the Southern District of Texas, given a 75 month
12  term of imprisonment, followed by a three-year term of
13  supervised release with numerous petitions for violation of
14  your supervised release alleging new criminal conduct.
15          In 2020 you have a -- you were arrested in Harris
16  County for engaging in organized crime, which is still
17  pending in Harris County.  According to the Pretrial
18  Services Report, you were released on a $20,000 personal
19  bond in 2020, and your bond was revoked for new criminal
20  conduct, which was aggravated assault with a family member
21  or aggravated assault with a deadly weapon and felony
22  possession of a firearm.
23          The Court notes you were released on September
24  30th, 2020, on a new bond, and in 2021, there was a motion
25  to revoke that bond filed for new criminal conduct, and you

 1    were continued on bond with GPS monitoring.

 2            The Court also notes that you do have pending

 3    warrants out of Ohio for driving while under the influence

 4    of alcohol, drugs, failure to stop after the accident.

 5            The Court does note that you are affiliated with a

 6    gang.  The Court also notes that you were certified as an

 7    adult even though the case was dismissed, you were charged

 8    with murder.

 9            You have a history of bond forfeitures and

10    committing new criminal offenses while under supervision.

11    You have a history of including evading and resisting arrest

12    of law enforcement.  You have numerous arrests, convictions

13    for drug-related and firearms offenses.

14            This case does involve a large-scale drug

15    conspiracy and the Court notes that the risk of continued

16    drug trafficking, which the Court finds in this case, is a

17    risk to the community, and finds that, according to case

18    law, the drug offenders pose a special risk of flight and

19    dangerousness to the society.

20            Sir, you reflect a pattern of violent offenses,

21    which include assaults, aggravated assaults, aggravated

22    robberies, firearms.  Based on all these reasons then the

23    Court finds that there are no condition or combination of

24    conditions to reasonably assure your appearance as required

25    and the safety of the community and orders you detained

1   pending trial in this case.

2           Anything further for Mr. Fizer?

3           MS. SCHWARTZ:  Not from the Government.

4           MR. GAITHER:  No, Your Honor.

5           THE COURT:  All right.  Thank you.

6           Sir, you're remanded into custody pending trial in

7   this case.  And I'll ask the Marshals, as we resolve these

8   cases, to remove the Defendants from the courtroom because I

9   do have to get into a Grand Jury after this.

10          MR. GAITHER:  Your Honor, may I be excused?

11          THE COURT:  Yes, sir.  Thank you.

12          MR. GAITHER:  Thank you.

13          THE COURT:  The Court next turns to Defendant

14  Number 1, Alfred Jacoby Green.  Cause Number 4:24-cr-00404,

15  Defendant Number 1.

16          Again, the Court finds that the presumption has

17  not been rebutted that will ensure the safety of the

18  community.  The Court finds there are no combination -- no

19  condition or combination of conditions that will reasonably

20  assure the safety of the community, and to the extent

21  there's been some evidence to rebut the risk of flight, the

22  Court finds, still considering the 3142(g) factors, that

23  there are no condition or combination of conditions that

24  will reasonably ensure the appearance of the person as

25  required.

1          The Court, again, will issue a written order after

2   this, but issues this finding for the following reasons:

3          One, given the nature and circumstances of this

4   offense and the potential lengthy sentence that you're going

5   to be facing.  You also have a history of using illicit

6   drugs.  You also have 1, 2, 3, 4, 5, 6, 7 -- six convictions

7   for drug-related offenses, and now, you're here on another

8   drug related offense.  You also have numerous other arrests

9   for drug-related offenses.

10          In 2007, you were convicted for a drug-related

11   offense, given probation that was revoked because of new

12   criminal conduct.  2007, you were convicted for a drug

13   offense.  Received four years confinement.  You were paroled

14   to Harris County.  In 2011, new criminal conduct involving

15   drugs which you were convicted in 2011 for drugs, for

16   cocaine.  2013, again, convicted for cocaine.  2014,

17   convicted for manufacturing and delivering cocaine with a

18   bond forfeiture.  2014, received time for possession and

19   intent to distribute or deliver cocaine.  2017, felon-in-

20   possession of a firearm.  Ten years deferred adjudication.

21   And there's a 2024, looks like, pending felonies out of

22   Hamilton County, Ohio.

23          MS. SCHWARTZ:  The April 2024 is this incident in

24   Ohio, and they will be dismissing those charges.

25          THE COURT:  Okay.  The Court takes note of that.

1          Regardless, you have a history of failing to abide

2    by court orders as evidenced by bond forfeiture and history

3    committing new criminal offenses while on probation.  You

4    have numerous, again, convictions for drug-related and

5    firearms offenses.  You're involved in a large-scale drug

6    conspiracy now and potentially facing a lengthy sentence.

7    You have a history for violating probation and parole.

8    You're a documented gang member, and your pattern of

9    continuing to engage in drug trafficking is evident.

10          The Court notes, again, continued drug trafficking

11   is a risk to the community and poses a special risk of

12   flight and dangerousness to society.  The Court will issue a

13   written order, but the Court finds that there no condition

14   or combination of conditions to reasonably assure your

15   appearance as required and the safety of the community,

16   therefore, orders you detained pending trial in this case.

17          Anything further with respect to Mr. Green?

18          MS. SCHWARTZ:  Not from the Government, Your

19   Honor.

20          THE COURT:  Mr. Salinas?

21          MR. SALINAS:  No, Your Honor.

22          THE COURT:  Thank you.  You're remanded, and

23   you're excused, Mr. Salinas.

24          Now, the Court turns to Defendant Number -- on

25   Defendant Number -- Denzel Dwayne Pink.  And again, the

1    Court finds that the presumption of danger to the community

2    has not been rebutted and, therefore, order you detained

3    based on that.

4          In addition, to the extent that there's some

5    evidence rebutting the presumption that you will assure your

6    appearance in court as required, the Court considers the

7    presumption along the 3142(g) factors, and still finds, by

8    preponderance of evidence, that you -- that there are no

9    condition or combination of conditions to reasonably assure

10   your appearance as required.

11         The Court bases its findings on the following:

12         One, the nature and circumstances of the pending

13   criminal case, your potential for a lengthy sentence.  The

14   fact that you have 1, 2, 3, 4, 5, 6 convictions for drugs,

15   and that continued drug trafficking again poses risk to the

16   community and poses special risk of flight and dangerousness

17   to society.

18         In addition, your probation was adjudicated in

19   2008 on a drug offense, and you were sentenced to seven

20   months confinement.  In 2010, you were convicted in federal

21   court for unlawfully transporting of firearms.  Received

22   supervised release after your term of imprisonment, and that

23   was revoked.  It says based on new law violations; I do note

24   that your attorney said that there are technical violations

25   regardless your supervised release was revoked.

1            Even after that, you have continued drug

2    convictions and arrests, and convictions for unlawful

3    possession of a firearm by a felon, which you received four

4    years in 2015.  And a conviction for evading arrest,

5    detention with a motor vehicle.  You have a 2021 conviction

6    for assault of a family member.

7            You have a history of serious felony convictions,

8    including evading arrest, detention and drugs.  Based on

9    this pattern of continued drug activity, the Court, again,

10   finds that there are no condition or combination of

11   conditions to reasonably assure your appearance as required,

12   or the safety of the community, and orders you detained

13   pending trial in this case.

14           Anything further on Mr. Pink?

15           MR. PODOLSKY:  No, Your Honor.

16           MR. MEGGALI:  And nothing further from the

17   Government.

18           THE COURT:  All right.  Thank you.  You-all are

19   excused.

20            And I would ask the courtroom to be cleared for

21   the Court to take in the Grand Jury.

22       (Proceeding adjourned at 1:12 p.m.)

23

24

25                         *  *  *  *  *

1          *I certify that the foregoing is a correct*

2     *transcript to the best of my ability produced from the*

3     *electronic sound recording of the proceedings in the above-*

4     *entitled matter.*

5     */S/ MARY D. HENRY*

6     *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

7     *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

8     *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

9     *JTT TRANSCRIPT #69520*

10    *DATE FILED:  JANUARY 27, 2025*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25